## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUANA DOE I individually and as representative of her deceased husband, JUAN DOE I; JUANA DOE II individually and as representative of her deceased husband, JUAN DOE II; JUANA DOE III individually and as representative of her deceased husband, JUAN DOE III; JUANA DOE IV individually and as representative of her deceased husband, JUAN DOE IV; JUANA DOE V individually and as representative of her deceased husband, JUAN DOE V; JUAN DOE VI in his individual capacity; JUANA DOE VI in her individual capacity; JUAN DOE VII in his individual capacity and as representative of his deceased father, JUAN DOE XVIII; JUAN DOE VIII in his individual capacity; JUAN DOE IX in his individual capacity and on behalf of all others similarly situated, and on behalf of his minor daughter, JUANA DOE VII; JUAN DOE X; JUAN DOE XI; JUAN DOE XII; JUAN DOE XIII individually and on behalf of all others similarly situated; JUAN DOE XIV; JUAN DOE XVI individually and as representative of his deceased father, JUAN DOE XV; JUAN DOE XVII in his individual capacity and on behalf of all others similarly situated, <br> *Plaintiffs* <br> v. <br> INTERNATIONAL FINANCE CORPORATION, <br> 2121 Pennsylvania Avenue, NW <br> Washington, D.C., 20433 <br><br> IFC ASSET MANAGEMENT COMPANY, LLC <br> 2121 Pennsylvania Avenue, NW <br> Washington, D.C., 20433 <br> *Defendants* | Civil Action No. _____. <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**ADDRESSES:** All Plaintiffs can be contacted through their counsel, EarthRights International,

1612 K Street NW, #401, Washington, D.C. 20006. The street and postal addresses of the individual

Plaintiffs cannot be made public due to the substantial risk of violent reprisals against them.

# TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ........................................................................................1

II.   THIS COURT HAS JURISDICTION AND IS THE PROPER VENUE. ...............................8

III.  PLAINTIFFS AND DEFENDANTS ................................................................................9

   A.   The Plaintiffs...................................................................................................9

   B.   The Defendants ..............................................................................................12

IV.   STATEMENT OF FACTS ...........................................................................................12

   A.   The Players .....................................................................................................12

   B.   The Defendants' support for Facussé and his palm companies. ..................17

   C.   The Bajo Aguán has long been the subject of violent land conflicts between Dinant's owner, and farmer and indigenous communities.................................................................18

   D.   Amidst escalating land-related violence in the Aguán and a coup d'état, IFC investment staff push through a second investment with Facussé, and the IFC begins lending to Ficohsa..............24

   E.   Despite escalating land conflicts and violence on Dinant's properties in the Aguán and a coup d'état, the IFC transfers $15 million to Dinant in November 2009 and considers a new investment in Banco Ficohsa.....................................................................................................33

   F.   Dinant uses the Defendants' critical funding and support to carry out a campaign of violence, aggression, and murder against farmers – including the Plaintiffs – whom it views as adverse to its interests in the Bajo Aguán.......................................................................38

   G.   2010: The IFC does nothing as Dinant murders the Plaintiffs and other farmers in the Aguán; the IFC then seeks a new way to fund Dinant via Banco Ficohsa.......................................40

   H.   2011: As Dinant's campaign of violence against the farmers continues, the IFC gives Dinant another pass even as other funders cut the company off; the IFC and the IFC-AMC approve a new investment in Ficohsa.................................................................................................46

   I.   2012: Dinant's attacks on cooperative farming leaders continue; the IFC acknowledges "little progress" on social and environmental obligations. .................................................................51

   J.   As the violence mounts, the Vice President of the CAO calls for an audit of the IFC's investment in Dinant. ........................................................................................................56

   K.   2013: World attention turns to the Aguán as Dinant's violence continues; IFC guarantees more Banco Ficohsa loans to Dinant.......................................................................................58

   L.   The CAO releases a scathing audit of the IFC's investment in Dinant. ....................................59

   M.   2014: As the violence continues, the IFC responds to the CAO, and increases its investment in Ficohsa even as the existing investments come under CAO scrutiny. ...........................................62

   N.   The IFC turns to problem-solving even as the CAO finds that IFC has violated its own policies, again. ....................................................................................................................65

   O.   Dinant guards and security agents working for Dinant continue to intimidate and kill

community members and farmers' leaders across the Aguán to this day. ..........................................69

V.    DEFENDANTS IFC AND IFC-AMC ARE LIABLE FOR DINANT'S CAMPAIGN OF

TERROR AGAINST THE PLAINTIFFS .................................................................................71

    A.    The Defendants assume legal obligations to the communities affected by their projects,
including to consult with them, protect them, and ensure their access to an adequate remedy for
injuries connected to the project. ..............................................................................................72

    B.    The CAO found that the Defendants breached their obligations to the Plaintiffs. ................78

    C.    Dinant is responsible for the foreseeable tortious conduct of its security personnel alleged
herein. ......................................................................................................................................84

    D.    The IFC and the IFC-AMC aided and abetted Dinant's tortious conduct alleged herein. ......86

    E.    The IFC and the IFC-AMC knowingly participated in Dinant's criminal joint venture that
led to the tortious acts alleged herein. .......................................................................................89

    F.    The IFC and the IFC-AMC acted with reckless disregard of the obvious and highly probable
risk that their actions would result in serious harm to the Plaintiffs, and such harm to the
Plaintiffs did result. ..................................................................................................................90

VI.   THE PLAINTIFFS WERE HARMED BY DINANT'S IFC-BACKED CAMPAIGN OF

VIOLENCE AND TERROR .................................................................................................91

VII.  CLASS ACTION ALLEGATIONS .............................................................................95

    A.    The Panamá Class ...........................................................................................................95

    B.    Unjust Enrichment Class .................................................................................................101

VIII. THE DEFENDANTS ARE NOT IMMUNE FROM SUIT. .............................................105

IX.   CAUSES OF ACTION .............................................................................................109

X.    TIMELINESS AND TOLLING .................................................................................124

XI.   DEMAND FOR JURY TRIAL ..................................................................................127

XII.  PRAYER FOR RELIEF .............................................................................................127

## Glossary

| | |
|---|---|
| AML | Agricultural Modernization Law |
| BCS | Broad Community Support |
| CAO | Compliance Advisor Ombudsman |
| Cressida | Corporación Cressida |
| Commission | Technical Judicial Commission |
| DEG | Deutsche Investitions- und Entwicklungsgesellschaft (German Investment and Development Corporation) |
| Dinant | Corporación Dinant S.A. de C.V. |
| E&S | Environmental & Social |
| ESAP | Environmental and Social Action Plan |
| ESRD | Environmental and Social Review Document |
| ESRS | Environmental and Social Review Summary |
| Facussé | Miguel Facussé Barjum (Dinant's longtime owner) |
| Ficohsa | Banco Financiera Comercial Hondureña (Banco Ficohsa) |
| FPIC | Free, Prior and Informed Consent |
| GTFP | Global Trade Finance Program |
| IACHR | Inter-American Commission on Human Rights |
| IDD | Integrity Due Diligence |
| IFC | International Finance Corporation |
| IFC-AMC | IFC Asset Management Company, LLC |
| INA | National Agrarian Institute (Instituto Nacional Agrario) |
| MCA | Campesino Movement of the Aguán (Movimiento Campesino del Aguán) |
| MCRGC | Campesino Movement for Refoundation – Gregorio Chavez (Movimiento Campesino Refundación Gregorio Chávez) |
| MOCRA | Campesino Movement for the Recovery of the Aguán (Movimiento Campesino Recuperación del Aguán) |
| MUCA | Unified Campesino Movement of the Aguán (Movimiento Unificado Campesino del Aguán) |
| NGO | Non-Governmental Organization |
| OAS | Organization of American States |
| Performance Standards | IFC Performance Standards on Environmental and Social Sustainability |
| SEMS | Social & Environmental Management System |
| SPA | Security Program Assessment |
| Sustainability Policy | IFC Policy on Environmental and Social Sustainability |

## COMPLAINT

1.      Plaintiffs, by their attorneys, bring this action against Defendants International Finance Corporation (IFC) and IFC Asset Management Company, LLC (IFC-AMC) (collectively, "Defendants"), on behalf of themselves and their deceased family members. They are seeking compensatory damages, punitive damages, and injunctive relief to remedy murders, torture, assault, battery, trespass, unjust enrichment, and other acts of aggression committed, sponsored, and abetted by the Honduran company, Corporación Dinant S.A. de C.V. ("Dinant"), which was – and continues to be – funded and supported by the IFC and the IFC-AMC.

## I.      SUMMARY OF THE ACTION

2.      This case is about the International Finance Corporation and its captive investment company, the IFC-AMC, knowingly profiting from the financing of murder.

3.      Since the mid-1990s, the International Finance Corporation has invested millions of dollars in Honduran palm-oil companies owned by the late Miguel Facussé. Those companies – which exist today as Dinant – have been at the center of a decades-long and bloody land-grabbing campaign in the Bajo Aguán region of Honduras.

4.      For nearly two decades, farmer cooperatives have challenged Dinant's claims to sixteen palm-oil plantations (of the African oil palm tree species) that it has held in the Bajo Aguán region. On information and belief, Dinant's former owner, Miguel Facussé, took that land from the farmer cooperatives through fraud, coercion, and actual or threatened violence. The farmer cooperatives have engaged in lawsuits, political advocacy, and peaceful protests to challenge Dinant's control and use of the land. And Dinant has responded to such efforts with violence and aggression.

5.      The Plaintiffs and their decedents are among the scores of farmers in the Bajo Aguán that have been shot, killed, and terrorized by Dinant and those working on its behalf. Most, if not

all, of these deaths have gone uninvestigated by Honduran authorities.

6.      Seven of the Plaintiffs are surviving family members of men killed by Dinant; three Plaintiffs were shot but fortunately survived; three more had their homes invaded by security forces acting on behalf of Dinant and were beaten or had family members threatened at gunpoint; two were kidnapped, bound, and threatened by Dinant's security forces. The Plaintiffs have chosen to remain anonymous because Dinant's violence and retaliation against its opponents continues to this day.

7.      All of the attacks against the Plaintiffs took place while the Plaintiffs were in their own homes or communities, or on their way to or from work. None of the attacks took place within the limits of property claimed by Dinant. But the purpose of these attacks was clear: Dinant wanted to threaten and intimidate the Plaintiffs and other farmers into accepting Dinant's control over land that Dinant had taken from them.

8.      Defendants IFC and IFC-AMC have repeatedly and consistently provided critical funding to Dinant, knowing that Dinant was waging a campaign of violence, terror, and dispossession against farmers, and that their money would be used to aid the commission of gross human rights abuses.

9.      The IFC's support has come in many forms and continued for many years. In 1997, the IFC made a $55 million loan to Facussé's Corporación Cressida (the "Cressida Loan"). Thereafter, Facussé bought and consolidated his land holdings in the Bajo Aguán, a process marred by violence, fraud, and murder. In the early 2000s, Cressida was broken up, and Facussé's Honduran palm plantation holdings became part of his Dinant group companies.

10.      In April 2009, the IFC made a second investment with Facussé – this time in the form of a $30 million loan to Dinant (the "2009 Dinant Loan"). The loan was not disbursed until after a June 2009 military coup d'état in Honduras. Despite the fact that Honduras erupted into

violence following the coup, the IFC went on to disburse the first $15 million of the loan in November 2009. While the IFC has delayed the second $15 million disbursement, it has not cancelled or recalled its loan.

11.     At the time of the IFC's initial investment and disbursement of funds to Dinant in 2009, Defendants not only were required by their own policies to investigate, but also actually knew that Dinant's land ownership was highly contested in the Bajo Aguán, and that Dinant and its owner were connected to killings of the leaders and members of rural farmer cooperatives that challenged Dinant's ownership of the land.

12.     In the months and years following the 2009 Dinant Loan, scores of farmers and families, including the Plaintiffs, were killed, shot, and terrorized by and for the benefit of Dinant. These killings resulted in public outcry by international human rights organizations as early as November 2010, when an advocate for the farmers wrote to the President of the IFC about the deaths of farmers at the hands of Dinant guards.

13.     Despite being alerted to the violence directly connected to Dinant, the Defendants found new ways of supporting the company. In 2011, at the height of violence in the Aguán, the IFC and the IFC-AMC made a $70 million investment in a Honduran Bank, Banco Ficohsa (the "2011 Ficohsa Investment"). As part of this investment, the IFC-AMC took a 10 percent ownership stake in Banco Ficohsa ("Ficohsa"). In 2014, it purchased an additional $5.5 million in Ficohsa equity.

14.     Ficohsa was one of Dinant's largest creditors, if not its largest. And the Defendants made the 2011 Ficohsa Investment with full knowledge that Ficohsa was a critical source of capital for Dinant. Moreover, the Defendants specifically waived the IFC's policies that would have required Ficohsa to reduce their lending to Dinant. As IFC's Compliance Advisor Ombudsman (CAO) found, the Defendants' waiver and subsequent Ficohsa investments "facilitated a significant

ongoing flow of capital to Dinant . . . at a time when IFC management was aware of serious

unmitigated environmental and social risks regarding [Dinant]."

15.    Going even further, in November 2013, the IFC guaranteed at least $5.3 million in

loans that Ficohsa made specifically to Dinant through its Global Trade Finance Program (the

"GTFP Guarantees").

16.    Bolstered by the Defendants' critical funding, Dinant exerted violent control over

contested farms. To defend its gains, Dinant has radically expanded its security forces, and, on the

IFC's advice, entered into contracts with military forces that use lethal and extreme force. On

information and belief, Dinant also hired (and continues to hire) paramilitary death squads and

private assassins. Together, these forces comprise Dinant's "security personnel" as referred to in this

Complaint.

17.    With the Defendants' financial backing, Dinant's heavily armed and notoriously

brutal security personnel have committed widespread abuses and murder in an attempt to intimidate

small-scale farmers in the Bajo Aguán from asserting their competing claims to the land coveted or

claimed by Dinant.

18.    And their strategy has worked. Numerous farmer cooperative leaders, including

several of the Plaintiffs and their decedents, have been forced to flee their homes and their land due

to threats of violence against them and their loved ones. In the face of the violence and intimidation,

the attempts of farmer cooperatives to recover or maintain control of their land have collapsed again

and again.

19.    U.S. government sources place the number of farmers killed in the Bajo Aguán at

well over 100 people since 2009. What evidence has been uncovered and made public links Dinant

to at least forty of the killings that took place between 2009 and early 2013. And the number of

killings has continued to grow.

20.    To this day, the Honduran military and paramilitary forces – including the Xatruch Task Force, which operates under an agreement with Dinant – continue to murder, assault, batter, and intimidate farmers, including the Plaintiffs.

21.    And for the past seven years, the Defendants have allowed and continue to allow Dinant to breach the IFC's own policies on social responsibility – enabling and authorizing Dinant's campaign of violence, terror, and eviction against the Plaintiffs and their families.

22.    The Defendants continue to support Dinant both directly and indirectly through Ficohsa. The Defendants' substantial equity stake provides it with the ability to influence Ficohsa's investments, as do the conditions of their loans to Ficohsa. The Defendants refuse to exercise this authority and continue to finance Dinant, even while other major financial institutions have withdrawn or suspended their support to Dinant.

23.    The Defendants' support for Dinant not only violates the laws of Honduras and the United States; it also violates the Defendants' own policies and the standard of care in international finance.

24.    In April 2012, the internal IFC office responsible for auditing the IFC's compliance with its environmental and social safeguards, the CAO, opened a compliance process (audit) into the IFC's funding of Dinant.

25.    The CAO investigated the IFC because, in its own words, the "violence against farmers on and around Dinant plantations on Honduras' north coast (including multiple deaths) was occurring because of inappropriate use of security forces under Dinant's control or influence."

26.    On December 20, 2013, the CAO produced a scathing report which found, among other things, that:

IFC failed to spot or deliberately ignored the serious social, political and human rights context in which Dinant was operating; that IFC failed to adhere to its own

policies to protect local communities, and continued to allow Dinant to breach those safeguards over the past five years to the present; IFC failed to disclose vital project information, consult with local communities, or to identify the project as a high-risk investment, despite public information that was widely available at the time the investment was made.

27.     The CAO found that these failures arose, in part, from staff incentives "to overlook, fail to articulate, or even conceal potential environmental, social and conflict risk," and to "get money out the door." The CAO also found "contemporaneous reports of violence and conflict, as well as allegations relating to illegal activities on and/or around properties belonging to Dinant and its owner, in the public domain before IFC committed to the Project" and that the IFC's staff, including social specialists, were discouraged from "making waves."

28.     After the audit, the IFC took what it described as corrective measures to control and supervise Dinant's use of security forces, but it also purchased more than $5 million in additional Ficohsa equity, knowing that Ficohsa was *continuing* to finance Dinant. It should be no surprise, then, that the IFC's purportedly corrective measures were inadequate to control and supervise Dinant, and failed to provide an adequate remedy to the Honduran farmers – including the Plaintiffs – that have been harmed by the IFC and Dinant.

29.     In response to the CAO's audit of the Dinant Loan, the IFC facilitated a grossly inadequate consensus-building process, as well as an "Action Plan" and an "Enhanced Action Plan."

30.     The IFC's Action Plans failed to address root causes, and exacerbated aspects of the conflict. For example, the IFC directed Dinant to disarm its own guards and rely on the Honduran military – a violent and unaccountable security force under investigation by international human rights bodies for its own human rights abuses – for its security functions. By 2014, Dinant had even constructed an army barrack on one of its plantations to house Honduran soldiers.

31.     The IFC-sponsored consensus-building initiative, which was set up to respond to the violence, has also been futile. The IFC and Dinant have refused to have a direct, meaningful dialogue with the farmers about redress for harms, and have refused to provide them with a meaningful remedy despite repeated requests from the affected farmers.

32.     Although it found multiple violations of the IFC's policies, the CAO has no authority to remedy these abuses. It cannot enter a judgment on the merits of a complaint, provide a remedy, or hold the IFC accountable for aiding and abetting the torture, abduction, and murder described herein.

33.     Only months before the filing of this Complaint, in October 2016, two leaders of farmers' movements in the Bajo Aguán were murdered by a paramilitary death squad as they exited a movement meeting.

34.     Because the IFC's response has been inadequate at best and harmful at worst, and due to the lack of other options for the affected farmers to achieve a legal remedy for their suffering, the Plaintiffs now turn to this Court in search of justice. They have exhausted every mechanism available to them within the IFC or the CAO.

35.     While the IFC boasts of its mission to "end extreme poverty by 2030 and boost prosperity in every developing country," the IFC has knowingly entered one of the world's most persistent and abusive land conflicts, and taken the side of Dinant – a primary author of that violence. In the words of one farmer in the Bajo Aguán, the IFC is not "ending poverty"; it is "ending the lives of the poor."

36.     This case is not simply about whether the IFC made a reasonable investment in order to meet its poverty alleviation goals. This case is about the IFC knowingly backing a Honduran businessman and company that have repeatedly engaged in serious, well-documented human rights abuses against smallholder farmers, and then continuing its substantial financial

support even as the abuses continued.

## II.    THIS COURT HAS JURISDICTION AND IS THE PROPER VENUE.

37.    This Court has jurisdiction over all claims by virtue of 22 U.S.C. § 282f, which

provides that any action brought against the IFC "shall be deemed to arise under the laws of the

United States, and the district courts of the United States shall have original jurisdiction of any such

action."

38.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because complete

diversity exists between the Plaintiffs and the Defendants, and because the amount in controversy

exceeds $75,000.

39.    The IFC is not immune from suit as this suit arises out of its commercial activity (the

critical support provided to Dinant). The IFC has also waived immunity over these claims.

40.    The IFC-AMC does not have any immunities under the International Organizations

Immunities Act (22 U.S.C § 288 *et seq.*).

41.    Personal jurisdiction over the Defendants is proper under D.C. Code § 13-423

(2001).

42.    This Court has personal jurisdiction over Defendant International Finance

Corporation (IFC) because the Defendant has its headquarters and principal place of business in the

District of Columbia, conducts substantial business within the District of Columbia, and has such

continuous and systematic contacts with the District of Columbia as to render it essentially at home

here.

43.    This Court also has personal jurisdiction over the Defendant IFC because, on

information and belief, the IFC made key decisions in Washington, D.C. about whether and under

what conditions to finance Dinant.

44.    This Court has personal jurisdiction over Defendant IFC Corporation Asset

Management Company, LLC ("IFC-AMC") because it has its headquarters and principal place of business in the District of Columbia, conducts substantial business within the District of Columbia, and has such continuous and systematic contacts with the District of Columbia as to render it essentially at home here.

45.    This Court also has personal jurisdiction over the Defendant IFC-AMC because, on information and belief, the IFC-AMC made key decisions in Washington, D.C. about whether to finance Dinant and under what conditions.

46.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the Defendants reside in this District, do business in this District, and/or own property within this District.

47.    The Plaintiffs do not have access to an independent or functioning legal system within Honduras to raise their complaints. Further, if the Plaintiffs were to complain to governmental authorities or initiate civil litigation, they would face near-certain retribution, retaliation and attack. Several Plaintiffs have already been subject to death threats for their efforts in speaking out against Dinant.

### III.    PLAINTIFFS AND DEFENDANTS

**A.    The Plaintiffs**

48.    The term "Plaintiffs" herein includes the named plaintiffs and the decedents on behalf of whom they bring this action.

49.    Plaintiff Juana Doe I is a resident and citizen of Honduras. She brings this action individually and as representative of her deceased husband, Juan Doe I. She fears for her life if she were to disclose her or her husband's identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

50.    Plaintiff Juana Doe II is a resident and citizen of Honduras. She brings this action

individually and as representative of her deceased husband, Juan Doe II. She fears for her life if she were to disclose her or her husband's identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

51.     Plaintiff Juana Doe III is a resident and citizen of Honduras. She brings this action individually and as representative of her deceased husband, Juan Doe III. She fears for her life if she were to disclose her or her husband's identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

52.     Plaintiff Juana Doe IV is a resident and citizen of Honduras. She brings this action individually and as representative of her deceased husband, Juan Doe IV. She fears for her life if she were to disclose her or her husband's identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

53.     Plaintiff Juana Doe V is a resident and citizen of Honduras. She brings this action individually and as representative of her deceased husband, Juan Doe V. She fears for her life if she were to disclose her or her husband's identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

54.     Plaintiff Juan Doe VI is a resident and citizen of Honduras. He brings this action in his individual capacity. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

55.     Plaintiff Juana Doe VI is a resident and citizen of Honduras. She brings this action in her individual capacity. She fears for her life if she were to disclose her identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

56.     Plaintiff Juan Doe VII is a resident and citizen of Honduras. He brings this action individually and as representative of his deceased father, Juan Doe XVIII. He fears for his life if he were to disclose his or his father's identity, but will nevertheless provide such disclosures in

accordance with the terms of an appropriate confidentiality order.

57.    Plaintiff Juan Doe VIII is a resident and citizen of Honduras. He brings this action in his individual capacity. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

58.    Plaintiff Juan Doe IX is a resident and citizen of Honduras. He brings this action in his individual capacity and on behalf of his minor daughter, Juana Doe VII, and as a representative of all other persons similarly situated. Both he and his daughter fear for their lives if they were to disclose their identities, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

59.    Plaintiff Juan Doe X is a resident and citizen of Honduras. He brings this action in his individual capacity. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

60.    Plaintiff Juan Doe XI is a resident and citizen of Honduras. He brings this action in his individual capacity. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

61.    Plaintiff Juan Doe XII is a resident and citizen of Honduras. He brings this action in his individual capacity. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

62.    Plaintiff Juan Doe XIII is a resident and citizen of Honduras. He brings this action in his individual capacity and as a representative of all other persons similarly situated. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

63.    Plaintiff Juan Doe XIV is a resident and citizen of Honduras. He brings this action in his individual capacity. He fears for his life if he were to disclose his identity, but will nevertheless

provide such disclosures in accordance with the terms of an appropriate confidentiality order.

64.    Plaintiff Juan Doe XVI is a resident and citizen of Honduras. He brings this action individually and as representative of his deceased father, Juan Doe XV. He fears for his life if he were to disclose his or his father's identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

65.    Plaintiff Juan Doe XVII is a resident and citizen of Honduras. He brings this action individually and as representative of all other persons similarly situated. He fears for his life if he were to disclose his identity, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

## B.    The Defendants

66.    Defendant IFC is an international organization established by Articles of Agreement among its members, which includes the United States. It is a member of the World Bank Group. The IFC's principal place of business and international headquarters are, and at all relevant times were, located at 2121 Pennsylvania Avenue, NW, Washington, D.C., 20433.

67.    Defendant IFC-AMC is a wholly-owned subsidiary of the IFC that manages funds from the IFC and other institutional co-investors. The IFC-AMC only considers projects that have been approved by the IFC's Board of Directors; IFC-AMC projects must also comply with the IFC's requirements, including those related to environmental and social issues. The IFC-AMC is incorporated in Delaware and headquartered in Washington, D.C. It shares offices with the IFC, and its principal place of business and headquarters are, and at all times relevant were, located at 2121 Pennsylvania Avenue, NW, Washington, D.C., 20433.

## IV.    STATEMENT OF FACTS

## A.    The Players

68.    **IFC:** Defendant IFC was founded in 1956 and is currently owned by 184 member

12

countries. The head of the IFC is the President of the World Bank Group, though the IFC's day-to-day operations are run by its Executive Vice President. The IFC is overseen by its own Board of Directors.

69.     Unlike the other World Bank lending institutions, which loan to governments, the IFC generally finances private corporations. While the IFC's lending portfolio is purely commercial, the self-professed "overarching goals" of its lending are to "[e]nd extreme poverty by 2030" and "[b]oost shared prosperity – in every developing country." The IFC's own Articles of Agreement – the treaty that brought it into being – provide that the purpose of the IFC "is to further economic development by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas[.]"

70.     According to the IFC, "Central to IFC's development mission are its efforts to carry out investment and advisory activities with the intent to 'do no harm' to people and the environment[.]" In order to meet that commitment, the IFC has stringent social and environmental "Performance Standards" – conditions that its borrowers must comply with before any loan is disbursed (and with which borrowers must comply throughout the life of that loan). These conditions are enforceable by the IFC as part of its loan agreement, and are for the benefit of the people living in the communities in which the IFC invests.

71.     By the terms of its loans, the IFC can take a number of steps when its Performance Standards are violated, including cancellation of the loan and active management of the borrower to bring it into compliance. Put another way, the IFC is not a "hands off" lender.

72.     **IFC-AMC:** Defendant IFC-AMC was formed in 2009, and it manages "third-party capital across thirteen funds that invest in IFC transactions in developing countries." According to the IFC-AMC's website, "AMC is a new model of development, using a strong governance structure and innovative business model to marry commercial capital with development finance." It invests

alongside the IFC and manages money for a variety of institutional investors, including sovereign wealth and pension funds. The IFC-AMC sub-contracts the origination, due diligence, and supervision of projects to the IFC. IFC-AMC only considers projects that have already been approved by the IFC Board of Directors. In the case of the Banco Ficohsa investments that are at issue in this Complaint, the IFC-AMC provided the financing for the investment and subcontracted the IFC to appraise and supervise it. All investments proposed to the IFC-AMC were required to meet the IFC's Performance Standards.

73.    Through the $70 million 2011 Ficohsa Investment, the IFC-AMC became a 10 percent equity owner of Ficohsa in 2011– a stake that was enlarged in 2014 by around $5.5 million.

74.    **CAO:** Defendant IFC's independent internal auditor, the Compliance Advisor Ombudsman (CAO), reviews the IFC's and its borrowers' compliance with the Performance Standards. While the CAO can make recommendations to the IFC, the IFC is at liberty to ignore those recommendations. The CAO cannot provide – or order the IFC to provide – remedies to communities affected by IFC-funded projects. As the CAO admitted in its 2013 Audit Report on IFC's Dinant investment: "The CAO has no authority with respect to judicial processes. CAO is neither a court of appeal nor a legal enforcement mechanism, nor is CAO a substitute for international court systems or court systems in host countries."

75.    **Cressida:** Corporación Cressida ("Cressida") was a Honduran laundry, soaps, foods, and beverages company belonging to Miguel Facussé. Like Dinant, it processed palm oil and owned palm plantations in the Bajo Aguán. In 2000, Cressida was acquired by Unilever, but Facussé retained Cressida's palm plantation interests. Those palm interests are now owned and managed by Dinant.

76.    **Dinant:** Dinant is a privately-owned integrated palm oil and food company in Honduras, founded by late Honduran magnate, Miguel Facussé Barjum ("Miguel Facussé" or

"Facussé"). On information and belief, it is a member of a larger group of corporate affiliates that were all once owned by Miguel Facussé under the name Grupo Dinant. For the purpose of this complaint, "Dinant" also includes other corporate subsidiaries and affiliates within the Dinant corporate family such as Exportadora del Atlántico and Químicas Dinant de Centroamérica SA. Dinant is headquartered in Tegucigalpa, Honduras, and is one of the principal palm oil companies in that country. It has palm plantations totaling over 20,000 hectares in the north of Honduras, many of which are in the Bajo Aguán region, where the Plaintiffs reside. Facussé was the sole owner of Dinant, until his death in 2015, when his family took over the business.

77.    **Miguel Facussé Barjum:** Facussé was Dinant's longtime owner, who procured the IFC's support to expand his palm empire at the expense of the Plaintiffs' lives. Facussé was also the project sponsor for the IFC's 1997 loan to Cressida, and for its later 2009 loan to Dinant. In the words of the U.S. Embassy in Honduras, Facussé was "the wealthiest, most powerful businessman in the country," one of the country's "political heavyweights." In its audit of IFC's investment into Dinant, the CAO found public allegations that linked Facussé to (a) misuse of political influence; (b) involvement in the murder of an environmental activist; (c) environmental crimes; (d) involvement in multiple land disputes; and (e) the use of his properties as a staging post for drug trafficking.

78.    Before his death in 2015, Facussé had sweeping political influence. He was one of the key supporters of the June 28, 2009 military coup that deposed democratically-elected President Manuel Zelaya. Miguel Facussé's nephew, Carlos Flores Facussé, served as President of Honduras from 1998 to 2002. Reporters Without Borders named Facussé as the biggest threat to press freedom in the country, claiming that he oversees his own private militia which "can count on support from the police and army to impose his will." His reputation for violence against those who oppose him and his interests has inspired boycotts and even songs that narrate his alleged criminal acts. He has admitted that he kept files of photos of the various Honduran activists who speak out

15

against him in his office.

79.    **Dinant security personnel**: Dinant manages and maintains a vast array of security personnel to act on its behalf and in its interest, referred to collectively as "security personnel" in this Complaint. This includes but is not limited to: several hundred security guards employed by Dinant, including those provided by the Orion Corporation or other third-party contractors; Honduran military and police forces acting under a memorandum of understanding or other agreement or arrangement with Dinant – whether formally written or otherwise – specifically including the Xatruch Task Force, which signed a Memorandum of Understanding with Dinant in November 2013; and paramilitary death squads composed of former and active military.

80.    **Banco Ficohsa**: Banco Financiera Comercial Hondureña ("Ficohsa"), is the largest bank in Honduras. Throughout the 2000s, Ficohsa made a substantial number of loans to Dinant, including a $16.6 million loan in 2008, and nearly $40 million in loans between November 2011 and March 2014. The Defendants acquired a substantial ownership interest in Ficohsa in 2011 and 2014.

81.    **Cooperative farmer groups**: Since the 1970s, Honduran farmers in the Bajo Aguán ("Aguán") – including the Plaintiffs and their families – have farmed small parcels of land in the Aguán Valley of Honduras. In recent years, they have organized themselves into various farmer cooperative federations in order to assert collective rights against large landholders – including Dinant – that have intimidated or coerced them into selling their land against their will or fleeing it under threat of violence. Most of the cooperative federations are organized around a particular community, farm, or group of farms. Under the Agrarian Reform Laws of Honduras, the cooperative federations are referred to as movements. Some of the key federations mentioned in this complaint are:

- MCA (Movimiento Campesino del Aguán) – Campesino Movement of the Aguán;

- MCRGC (Movimiento Campesino Refundación Gregorio Chávez)– Campesino

Movement for Refoundation – Gregorio Chavez;

- MUCA (Movimiento Unificado Campesino del Aguán) – Unified Campesino Movement of the Aguán;

- MOCRA (Movimiento Campesino Recuperación del Aguán) – Campesino Movement for the Recovery of the Aguán; and

- MARCA (Movimiento Autentico Reivindicador Cempesino del Aguán) – Authentic Revindicative Campesino Movement of the Aguán.

**B.    The Defendants' support for Facussé and his palm companies.**

82.    As detailed further below, the Defendants provided support for Facussé, Cressida, and Dinant, directly and indirectly, on at least five occasions from 1997 through 2014.

83.    **The Cressida Investment:** In 1997, the IFC made its $55 million Cressida Investment. The investment included a $45 million loan and a $10 million equity stake. The IFC's loan was repaid in 2001, when Facussé sold Cressida to Unilever. The IFC also made a substantial profit from their equity position upon sale to Unilever. During the period of the loan, Cressida and Facussé acquired palm holdings in the Aguán, which ultimately became part of Dinant.

84.    **The Dinant Loan:** In 2009, the IFC made its $30 million Dinant Loan to facilitate Dinant's young palm production. The loan included two $15 million installments, the first of which the IFC paid out in November 2009. The second $15 million payment has been delayed, but not cancelled.

85.    **The Ficohsa Investments**: The IFC and the IFC-AMC have also supported Dinant through Banco Ficohsa. For years, Ficohsa has been one of Dinant's largest creditors, if not its largest, providing tens, if not hundreds, of millions of dollars to Dinant.

86.    In 2008, the IFC made a $20 million loan to Ficohsa (the "2008 Ficohsa Loan").

87.    In 2011 (the "2011 Ficohsa Investment"), the Defendants made a massive $70

million investment in the Honduran bank, including a $32.1 million equity investment (amounting to a 10 percent ownership stake in Ficohsa) and a $38 million loan.

88.    In 2014, this ownership stake was increased by $5.5 million.

89.    Between 2011 and 2014, Ficohsa lent around $40 million to Dinant.

90.    **The GTFP Guarantees**: The IFC also enabled Ficohsa's lending to Dinant through loan guarantees. In 2013, and possibly at other times as well, the IFC guaranteed short-term loans of $5.3 million from Ficohsa to Dinant through its Global Trade Finance Program (GTFP).

91.    Because African oil palm cultivation is a capital-intensive venture, the capital that Dinant obtained through Defendants' direct investments, investments in Ficohsa, and the GTFP Guarantees, had a substantial effect on Dinant's operations, and enabled it to consolidate control over and expand its palm plantations.

## C.    The Bajo Aguán has long been the subject of violent land conflicts between Dinant's owner, and farmer and indigenous communities.

### *The 1970s to the 1990s: Farmers' cooperatives obtain land in the Bajo Aguán.*

92.    The lower reaches of the Aguán River Valley, located along the Caribbean coast in northeastern Honduras, are known as the Bajo Aguán (or "the Aguán"). The Bajo Aguán is one of the most fertile regions of Honduras and provides an ideal environment for African oil palm plantations. Located in the Department of Colón, the Aguán comprises five municipalities – Tocoa, Saba, Trujillo, Sonaguera, and Bonito Oriental – and has a combined population of approximately 150,000 people.

93.    Honduran farmers – including the Plaintiffs and their families – have farmed in the Bajo Aguán since at least the 1970s, when the Honduran government instituted land reforms that encouraged people to move to the area to clear the jungle and cultivate the land. Waves of poor migrants were drawn to the Aguán from other regions of the country. They built infrastructure, cleared the forest, and prepared the land for cultivation – including labor-intensive palm cultivation.

94.     To support their smallholdings, the farmers organized themselves into rural cooperatives. The Honduran government, through its National Agrarian Institute (INA), actively promoted the creation of communally-run, rural cooperatives and provided the farmers with incentives – including inputs and credit – in exchange for their investment in the land.

95.     Under the reform laws, collective titles could be awarded to these rural cooperatives if they worked the land cooperatively for a certain number of years. Elected leadership governed the cooperatives. Members of each cooperative held shares in its collective profit.

96.     Under this "land-to-tiller" paradigm, the Honduran government also prohibited the sale or lease of lands acquired through the agrarian reform program in the Aguán Valley.

97.     Indeed, the Honduran government took steps to ensure that the land investment would reward the poor farmers themselves, and not the rich. A 1974 law (Decree law 1970) thus limited the number of hectares a single person or collective could own, in order to prevent the concentration of land ownership.

***The 1990s: Land "modernization" laws and questionable land "transfers."***

98.     In the early 1990s, Honduras changed its approach to land reform. As a part of a package of counter-reforms promoted by the World Bank, Honduras passed a series of "Land Modernization" laws to be carried out in conjunction with structural adjustment policies.

99.     The Agricultural Modernization Law (AML), promoted by the World Bank and enacted in 1992, reversed the prohibition against the sale or lease of lands acquired through the Agrarian Reform and resulted in the alienation and transfer of the collectively owned land held in the Aguán.

100.     The AML reversed the "land-to-tiller" paradigm under which the farmers had labored and replaced it with a so-called "willing buyer – willing seller" paradigm. Although any land sales were supposed to be voluntary – and still required the consent of all the cooperative members

19

– the sales to Facussé were anything but voluntary. In practice, many farmers and collectives lost their land through violence, threats, and fraud.

101.     Dinant's late owner, Miguel Facussé, was one of the principal perpetrators and beneficiaries of these coercive and aggressive practices against the farmers. Facussé and his agents used coercion and intimidation – including threatened and actual violence – to force cooperative leaders to sign land sale deals. What Facussé could not obtain by force, he obtained by trickery. He deceived cooperatives into selling their land through misrepresentations and false pretenses, and forced farmers to "sell" without complying with laws or procedures for the proper sale of cooperative land.

102.     Miguel Facussé and his agents used unjust, illegal, and tortious means to acquire dozens of farms owned by farmer cooperatives in the Aguán, which he consolidated into large palm plantations for his palm businesses. Through these questionable transfers, Facussé came to control and profit from at least sixteen palm plantations in the Bajo Aguán – all of which used to be held and worked by farmer cooperatives.

103.     With 22,000 acres of palm plantations, Facussé became the largest landowner in the Aguán Valley.

104.     His land acquisitions violated (and continue to violate) Honduran law, which limits the amount of land any one person can own. Facussé has tried to circumvent this rule through "prestanombres" or "testaferos" – individuals whose names are used for titling purposes, with the understanding that the real owner is a third person.

105.     The Plaintiffs and their families belong to farmer cooperatives that lost their land to Facussé through the tactics described above.

**Facussé and other land tycoons wage a campaign of violence against the Garífuna people on Honduras' northern coast.**

106.     The farmers of the Aguán were not the only target of Facussé's aggressive, coercive,

20

and violent tactics for acquiring and securing land. Beginning in the mid- to late-1990s, nearby Garifuna communities living in the upper reaches of the Aguán Valley were also affected.

107.    The Garifuna people are descendants of African slaves and two Caribbean indigenous groups – the Arawaks and the Caribs. The Garifuna communities that span Honduras' Caribbean coast – which partially overlaps with the Aguán – hold land title dating back over a century.

108.    As one Garifuna representative explained in recent testimony before the Tom Lantos Human Rights Commission of the U.S. Congress, the Land Modernization Laws unleashed a wave of "large scale illegal land grabbing of Garifuna ancestral territory often through violence and the threat of violence."

109.    This included violence and land-grabbing by Facussé, who was "the biggest beneficiary of the ransacking of Garifuna territory through the Land Modernization Law." In some instances, Facussé stole Garifuna ancestral territory by "sending gunmen acting as *campesino* farmers into Garifuna land."

### 1997: The IFC funds Facussé's Corporación Cressida, and Facussé is charged with abetting an activist's murder.

110.    It was in this context – while Miguel Facussé was using terror and violence to force farmers and the Garifuna to give up their lands – that Defendant IFC first decided to invest in Facussé and his palm empire.

111.    Facussé had originally founded what was called Dinant Chemicals in 1960. Dinant Chemicals eventually became part of Cressida, also owned by Facussé.

112.    In 1997, the IFC proposed and approved Project No. 7114 – a $55 million USD investment in Cressida. At the time, Cressida owned significant parts of what are now Dinant's agricultural holdings in the Bajo Aguán. Miguel Facussé was the project sponsor for the IFC loan.

113.    According to the loan documents, the IFC's 1997 Cressida Loan was intended to

21

assist Facussé and Cressida in upgrading and constructing processing plants.

114.    The IFC provided this assistance even as Facussé was using unlawful and coercive means to "buy up" farmer cooperative land in the Bajo Aguán in the manner described above.

115.    Prior to investing in Cressida in 1997, the IFC apparently undertook an "Environmental and Social Review" of Cressida's operations. Any such review should have identified the unlawful and coercive means employed by Facussé to acquire land for his palm companies, including Cressida. But a later search revealed no environmental and social reporting materials from Cressida on file with the IFC. However, IFC files do contain a copy of a 1998 report commissioned by the IFC entitled, "An Environmental Review of Lands and Facilities belonging to Corporación Cressida of Honduras." That report was prepared in response to a complaint from an environmental non-governmental organization (NGO).

116.    Around the same time that IFC invested in Facussé's company, an activist that openly challenged the construction of one of Facussé's processing plants was murdered. On October 18, 1997, Carlos Escaleras Mejía was slain by assassins after publicly opposing Facussé's proposal to construct a palm oil processing plant in the Aguán. As a result of his opposition to the plant, Escaleras was subject to multiple threats that finally culminated in his assassination.

117.    Shortly before the killing, Facussé had warned Escaleras's brother to "advise his brother to stop being an obstacle to his business." Facussé was initially charged by prosecutors with abetting the murder, but the court dismissed the charges without hearing any evidence.

118.    The Honduran government's inability to effectively investigate the killing and hold Facussé accountable became the subject of a high profile case before the Inter-American Commission on Human Rights (IACHR), which allowed Escaleras's family to proceed with a complaint against Honduras. The IACHR's 2005 opinion was widely and publicly available. It mentions Facussé's name as an alleged, and initially charged, abettor of the murder, and concludes

that the dismissal of charges against Facussé is evidence of the ineffectiveness of the Honduran government's administration of justice.

> **Late 1990s to mid-2000s: Farmers in the Aguán organize and challenge land grabbing; Facussé re-brands Cressida as Dinant.**

119. During the late 1990s, the farmer cooperatives began to appeal to the courts and the Honduran government to decry Facussé's land acquisition tactics and try to recover their lands.

120. Around 1998, the farmer cooperatives formed federations to challenge the land transfers in the courts and before the government. They called for investigation of the land "sales" and demanded that the government return the lands once held by the collectives to the farmers. Dozens of cooperatives presented lawsuits to annul the title transfers – claiming fraud and coercion.

121. Cooperatives claiming that Facussé had wrongfully taken their lands formed the Unified Campesino Movement of the Aguán (Movimiento Unificado Campesino del Aguán, or "MUCA") to support the lawsuits seeking to invalidate Miguel Facussé's claims to the land; at least eight such lawsuits were filed against Facussé. In addition to legal action, MUCA also emphasized organization and peaceful social protest.

122. In the ensuing years, cooperative leaders challenging land transfers to Facussé reported that their lawyers were threatened and bribed, and that as a result, they were often unable to maintain legal representation. Ultimately, all but a handful of the dozens of cooperatives that tried to challenge the land transfers were forced to abandon their lawsuits under threats of violence or other harassment.

123. In 2000, Facussé sold most of Cressida's assets and product lines to the Anglo-Dutch conglomerate, Unilever. As Unilever's press release at the time noted, however, Facussé retained Cressida's "palm plantation interests." In 2005, Facussé re-launched the company as Corporación Dinant, including the former Cressida's palm plantation holdings in the Aguán.

**D.    Amidst escalating land-related violence in the Aguán and a coup d'état, IFC investment staff push through a second investment with Facussé, and the IFC begins lending to Ficohsa.**

124.    Throughout the mid-2000s, the farmer cooperatives continued to seek return of their lands. The difficulties in sustaining civil suits led the cooperatives to appeal to the Honduran government to resolve the conflict. They found support in President Manuel Zelaya, who was elected in 2006, and was viewed as a supporter of the farmers.

125.    In February 2006, seven thousand farmers peacefully occupied the road near Tocoa, the principal town in the Bajo Aguán. They requested that both government authorities located in Tocoa, and the central Honduran government, investigate the lawfulness of the land transfers.

126.    On January 3, 2006, the Garifuna presented a formal complaint to the World Bank Inspection Panel, claiming that the Land Modernization Law, which the World Bank had promoted, had resulted in the demise of collective property held by Garifuna communities, in favor of individual property. In June 2007, the Inspection Panel published a report applying the World Bank Operational Directive on Indigenous Peoples, in which it identified agribusiness (including oil palm) as a cause of conflict in the area. In its response to the Inspection Panel report, the World Bank included a map locating Garífuna communities in the Bajo Aguán near Dinant properties.

127.    In 2007, despite these ongoing land disputes, the IFC began to explore a second investment to support Miguel Facussé, this time a $30 million loan to Corporación Dinant. From the earliest stages of its consideration of the loan, the IFC was presented with obvious red flags and was on notice that Facussé and Dinant were responsible for, and capable of, more violence in the Aguán.

128.    According to the IFC Summary of Proposed Investment, the stated purpose of IFC's investment in Dinant included, among other things, "developing young palm oil plantations." As IFC staff later admitted to the CAO, anyone involved in palm oil in Honduras at the time knew

that there were serious land disputes – often accompanied by violence. Indeed, at this very same time, the IFC suspended all its other investments in palm oil companies, including another Honduran company.

129.    The IFC's social and environmental review for the Dinant investment was manifestly inadequate. On information and belief, investment staff interested in pushing forward the investment convinced social specialists – charged with ensuring that the IFC's Performance Standards were met – into watering down their recommendations. IFC staff ignored current and well-reported incidents of violence and land conflicts associated with Dinant. And IFC staff ignored obvious indications that Dinant was neither interested in, nor capable of, implementing the IFC's Performance Standards.

***May 2007 to February 2008: A consultant "assesses" the Dinant investment, ignoring serious and ongoing land disputes on, or connected to, Dinant properties.***

130.    The initial plan for the IFC investment in Dinant included funding from other national and multilateral development banks, each of which ultimately pulled out of the investment.

131.    In May 2007, one of the IFC's prospective partners – the German Investment Corporation (DEG) – commissioned a Guatemalan environmental consultant to conduct a social and environmental assessment of the potential Dinant investment. While DEG seems to have requested the study, the consultant was, in fact, contracted by Dinant.

132.    The consultant prepared an Environmental and Social Assessment throughout 2007 and 2008, culminating in a "final report" in February 2008 (the "February 2008 Assessment"), which was never made public.

133.    The review and the resulting Assessment were deeply flawed (and fell well short of the procedures for conducting environmental and social assessments, according to IFC's internal guidelines). The consultant never met with community members, nor performed an analysis of the obvious and ongoing land conflicts in the Aguán. Instead, the consultant assessed the social impacts

of the potential investment exclusively by interviewing Dinant staff and suppliers.

134.    Still, the February 2008 Assessment put the IFC on notice of serious red flags, including that, (a) Dinant paid 300 security personnel, most of whom were armed and many of whom were ex-military, to guard its operations; (b) Dinant employed a security consultant who was active-duty military; and (c) Dinant had no records of security incidents and claimed that there had been none, despite acknowledging a ten-day occupation of one of Dinant's properties – Finca San Isidro – in early 2007 that required "the intervention of local authorities."

135.    During the same period that the February 2008 Assessment was being drafted, there were numerous and public examples and flare-ups of the land conflicts in the Aguán. In early 2007, Dinant's San Isidro plantation was the site of a land protest. In August 2007, protests and road blocks continued and expanded into the vicinity of other Dinant properties.

### March 2008 to July 2008: The IFC invests in Ficohsa, which in turn invests heavily in Dinant.

136.    In March 2008, while the IFC was moving its Dinant investment forward, Banco Ficohsa organized a $77 million multi-bank loan to Dinant. Banco Ficohsa's contribution was $17 million.

137.    Shortly thereafter, in May 2008, the IFC made a $20 million loan to Banco Ficohsa. As a condition of that loan, Ficohsa was required to put together a Social and Environmental Management System (SEMS) and was supposed to adhere to the IFC's "Exclusion List" – a set of companies to whom, on information and belief, Ficohsa was not permitted to lend. While making the loan, IFC staff remarked that Banco Ficohsa had a substantial percentage of high-risk loans in agribusiness, among other sectors. Nonetheless, IFC decided not to classify its own Dinant investment as high-risk.

138.    In December 2008, Banco Ficohsa's board voted to adopt the required SEMS, but it did not employ a full-time employee to oversee it until 2013.

139.    In addition to the $20 million 2008 Ficohsa Loan, the IFC also gave Banco Ficohsa access to its Global Trade Finance Program (GTFP) and a $15 million credit line. The GTFP is a loan guarantee program that enabled Ficohsa to provide short-term loans to companies, like Dinant, with expected payments on the recipients' exports as collateral, with the IFC as guarantor.

### *July 2008 to October 2008: The IFC conducts its own "appraisal" of its Dinant Loan.*

140.    While the unreleased February 2008 Assessment remained the IFC's foundational due diligence document for the Dinant Loan, the IFC's staff conducted their own "appraisal" during the summer of 2008. In spite of the obviously fraught context in Honduras, on information and belief, the IFC's appraisal was led by a "social specialist" who did not speak Spanish and who had never previously led or conducted a social assessment.

141.    In late July 2008, the IFC conducted a pre-appraisal review, setting the stage for its site visits. During the course of that review, the IFC identified several obvious, but important, risks to be reviewed during appraisal that were later unexplored in its site visits and unaddressed during its decision to approve the loan. IFC staff identified both the existence of actual land disputes (that "would need to be reviewed during appraisal") and concerns for what might happen if Dinant did not have access "to adequate unencumbered land free from conflicts and disputes."

142.    One week before IFC staff conducted their site visit, twelve people were killed in a land dispute over disputed property bordering Dinant's El Tumbador farm in the Bajo Aguán. This incident was reported in the Honduran news along with the assessment that "if the problem of land tenure in Honduras is not resolved, blood will flow, especially in the departments of Colon [Bajo Aguán] . . . where political interests and organized crime syndicates add fuel to the fire." In June 2008, Irene Ramirez Trochez, a member of the MCA, was killed for her work on collective land rights in the Aguán.

143.    IFC staff conducted a visit to Dinant sites in Honduras from August 12-16, 2008.

Like the consultant who prepared the February 2008 Assessment, IFC staff met extensively with Dinant staff and security, but, on information and belief, the IFC did not meet with farmer representatives, civic leaders, or civil society organizations in the areas most proximate to Dinant's facilities or plantations. Its failure to meet with potentially affected groups is notable, because the World Bank had recently launched an investigation into land disputes involving the Garifuna and property overlapping and/or directly neighboring Dinant's plantations.

144.     After the appraisal, IFC staff set to work on the Environmental and Social Review Document (ESRD), a document prepared for each IFC project that summarizes the environmental and social risks. The ESRD's conclusions would be incorporated into investment review documents that would then be presented to the IFC's Board of Directors. IFC staffers later reported to the CAO that IFC investment staff tried to "influence the context of the E&S [Environmental and Social] review" and that pressure to grow the agribusiness portfolio meant that the same investment staff were "highly motivated" to "get money out the door."

145.     The most critical conclusions that were reached in the February 2008 Assessment either never made their way into the ESRD, or were watered down. Thus, while the earlier document observed that Dinant's "lack of an effective system to manage environmental and social impacts" had led to "repeated and continuous compliance problems related to both environmental and social issues," the ESRD noted only that Dinant's social management was "decentralized" and that its "policies" had "miss[ed] concrete implementation steps." Ultimately, the environmental and social (E&S) team concluded that no additional assessment was needed.

146.     IFC policies mandated another form of diligence, in addition to the site visit and production of the ESRD, known as Integrity Due Diligence (IDD). The IFC was expected to analyze, report on, and file incidents "which may indicate current or previous allegations or negative perceptions about Partners or Contacts." At the time the Dinant Loan was approved, this process

required the IFC to conduct news searches through a service known as Factiva – a search tool that aggregates content from both licensed and free sources. Senior IFC managers at the country, regional, and transactional level are required to sign off on IDD before a project can be approved.

147.    The CAO subsequently re-created the news searches that the IFC would have been required to perform pursuant to IDD. It found fifteen links indicating that Dinant and Facussé were involved in land grabbing and the murder of activist Carlos Escaleras, and that a criminal warrant had been issued against Facussé for environmental crimes. Nonetheless, at the time, IFC staff reported finding only one issue involving Dinant and Facussé, concerning a land dispute unrelated to the Aguán.

148.    In October 2008, IFC staff signed off on the inadequate IDD report, paving the way for the Dinant investment to go forward. The report was put together by the transaction leader, and approved by the IFC's country manager and regional industry director. During the CAO's subsequent audit process, the IFC asked the CAO not to include reference to the IDD process.

**_The IFC's review ignores Facussé's well-known, aggressive, and violent campaign for land on the northern Honduran coast._**

149.    By 2008, it was widely known – at least throughout Honduras and by newspapers covering the region – that Dinant's owner was accused of using violence against farmers and the Garifuna as a result of their competing claims to land held by Dinant. It was also widely reported that farmers in the Bajo Aguán were using peaceful social protest and calling for political action on the part of the Honduran government to help them reclaim their land.

150.    Indeed, Facussé's aggressive, coercive, and violent tactics for acquiring and securing land in the region received significant public attention during the late 1990s and early 2000s. In fact, there were entire books written about it.

151.    One book detailing the Garifuna land conflict – and Facussé's role in it – was published in both English and Spanish in 2008 – before the IFC made the Dinant Loan. The book

dedicated two chapters to the Garifuna communities' conflicts with Facussé – including claims that Facussé had illegally taken Garifuna land and that people were selling to him "because they are afraid that he will take it over by other means if they do not sell to him."

152.    The book also told the story of how Facussé took "most of the territory of Limon [ ] from the Garifuna people, with violence and threats, including Punto Farallones and Vallecito" during the late 1990s; this was also the subject of various legal proceedings in national and international courts. In 2004, the Honduran Supreme Court ruled in favor of the Garifuna in a case challenging Facussé's incursion onto Garifuna lands. Around the same time, a Garifuna community leader, Santos Euquerio Bernardez Bonilla, was tortured and killed. Many blamed the Garifuna dispute with Facussé as the motive for the killing. These facts were the subject of multiple articles, news stories, and legal proceedings.

153.    A simple replicated Google news search for "Miguel Facussé" and "Cressida loan" between 1997 and June 2009 returns sources identifying the land conflict and Miguel Facussé's role in it. Several sources point to Miguel Facussé as the intellectual author of targeted murders of those who opposed the expansion of his plantations, including Carlos Escaleras.

154.    One 2004 article reported that cooperatives "have been subject to many harassments" since winning a judicial case regarding land issues against Facussé.

155.    Another article, entitled "Who is Miguel Facussé? Profile of a businessman" stated that "Miguel Facussé's thirst for land knows no obstacles: in September of 1998, he invaded, with a bulldozer and armed men approximately 100 hectares of land belonging to Garifuna communities with the objective of cultivating African Palm." This article was available in English before 2009.

156.    World Bank and IFC staff and consultants were actually aware of this context and these facts. One journalist based in Honduras, Wendy Griffin, publicly reported that World Bank consultants told her they had read her work and were aware of the land conflicts in the Bajo Aguán.

30

In her words:

> The land struggles in the Bajo Aguán, including in Silin and Guadelupe
> Carney outside of Trujillo, and Limón, are not struggles that have gone
> unnoticed in books, newspaper articles in Spanish and English newspapers in
> Honduras. And they were known to the consultants who were being paid by
> the World Bank, because some of these consultants in their expensive cars
> with tinted windows came to my house and said to me, "Oh, I read your
> article in in the paper about the land problems in Silin." I responded by
> saying, "People are dying here over land, as if we were at war." These World
> Bank and SNV consultants took copies of my books like Los Garifunas de
> Honduras (The Garifunas of Honduras), published in 2005, and Los Pech de
> Honduras (The Pech of Honduras), published in 2009.

**October 2008 to April 2009: The IFC reviews, considers, and approves the investment in Dinant.**

157.    On October 16, 2008, the IFC held its "Investment Review Meeting" – a review
conducted by senior managers before an investment proposal is submitted to the IFC's Board of
Directors. In preparation for this meeting, the ESRD, which had already been watered down from
the inadequate February 2008 Assessment, was converted into an even more watered-down
Environmental and Social Review Summary (ESRS) and Environmental and Social Action Plan
(ESAP), where "references to weaknesses in [Dinant's] E&S management and reporting systems
[were] absent." An ESAP is required by the IFC's policies and must "identif[y] specific mitigation
measures and actions necessary for the project to comply with applicable laws and regulations and to
meet the requirements of the Performance Standards." It must also be made available to the
communities that will be affected by a project or investment.

158.    After obtaining approval from IFC management, the proposed investment was

publicly disclosed on November 18, 2008. Although under its own policies, the IFC was supposed

to make the more critical 2008 February Assessment public, the IFC's E&S staff, fearing "'push

back' from the client" – i.e., Dinant – "and the IFC transaction leader," decided to withhold that

document.

159.    In December 2008, IFC management completed the "Environmental and Social

Clearance Memorandum" for the Dinant investment and forwarded the investment for

consideration by the IFC's Board. IFC staff presented the Board with the same ESRS and ESAP

that IFC management had considered in October 2008. Notably, even the much-reduced ESAP that

the Board considered included, suggested, as a condition of disbursement, that Dinant "assign

experienced, corporate-level staff to lead [Environmental and Social Management System]

development and implementation . . . ." On December 17, 2008, with the ESAP suggestion before

it, the Board approved the $30 million loan to Dinant.

160.    The IFC and Dinant signed the loan agreement in April 2009. In the loan agreement

itself, the condition recommended by the ESAP – the assignment of experienced high-level staff to

lead the Environmental and Social Management System – was conspicuously omitted.

161.    But the loan agreement did include several important contractual obligations and

representations. These included, (a) representation that Dinant possessed "good and marketable title

to all of the assets purported to be owned by it ( . . . ) in all cases free and clear of all Liens" and that

it was not "engaged in nor, to the best of its knowledge, after due inquiry, threatened by, any

litigation, arbitration or administrative proceedings, the outcome of which could reasonably be

expected to have a Material Adverse Effect"; (b) covenants that Dinant would abide by the

Environmental and Social Action Plan and the IFC's Performance Standards; and (c) mandatory

reporting on an annual basis certifying compliance with the "Action Plan, the social and

environmental covenants [of the loan agreement] and Applicable [social and environmental] Law . . .

."

162.     Additionally, Dinant was obliged to report any "social, labor, health and safety, security or environmental incident" within three days of its occurrence, including remedial steps and plans.

163.     As detailed below, Dinant failed to comply with each of these conditions, but the IFC never attempted to enforce its contract. Under the loan agreement, Dinant would have been in default for failing to comply with these obligations for a "period of thirty (30) days after the date on which IFC notifie[d]" Dinant of its non-compliance. In spite of this authority and leverage, the IFC ignored Dinant's persistent non-compliance, which went unpunished. Indeed, the IFC knew about Dinant's non-compliance even before any money was disbursed.

**E.     Despite escalating land conflicts and violence on Dinant's properties in the Aguán and a coup d'état, the IFC transfers $15 million to Dinant in November 2009 and considers a new investment in Banco Ficohsa.**

164.     Between April 2009 – when the IFC signed the loan agreement – and November 2009 – when it disbursed the first $15 million of the $30 million loan – the IFC watched as the political situation in Honduras unraveled. Before disbursement, the IFC knew that the agrarian land conflict, which had been violent for years, was about to erupt. The IFC went ahead with the Dinant investment even though it had clear and specific notice that Dinant's properties were part of a conflict that was only escalating. The IFC's 2009 disbursement was also in breach of the requirement in the loan agreement that the IFC must ensure that any change in circumstances would not create a material adverse effect on the ability of the client to comply with the obligations under the agreement, and to ensure that the conditions of disbursement were still met.

*The IFC holds course as tensions mount in the first of half of 2009.*

165.     Throughout the first half of 2009, farmer cooperatives, still finding some support from the Zelaya government, continued their peaceful efforts to recover their lands, including land

33

held by Dinant.

166.     On May 28, 2009, farmers from the MUCA federation peacefully occupied Dinant's El Chile property to challenge Facussé's disputed claims to the land.

167.     On June 9, 2009 the San Isidro Cooperative occupied a palm oil processing plant and a machine house in the town of Tocoa to which the cooperative held title, but over which Dinant had simply taken possession.

168.     MUCA's protest action led to negotiations with the government. The government agreed to form a commission to review the legality of the land transfers, including those claimed by Dinant. President Zelaya and the Supreme Court agreed to oversee the process. This was widely reported on public news sources.

169.     On June 19, 2009, the National Agrarian Institute ("INA") – an agency of the Honduran government – seized sixty-six hectares of Dinant's Paso Aguán property. The INA determined that Dinant had illegally claimed ownership of this land, and had no right to do so. On information and belief, those sixty-six hectares included farmers' homes in the town of Panamá, which later became the site of some of Dinant's worst atrocities.

170.     The IFC knew about these events, because Dinant itself notified the IFC. Following the INA's reprimand in June 2009, Dinant notified its lenders – including the IFC – of the INA's seizure. Dinant's letter to the IFC recounted the history of legal disputes around the entire Paso Aguán property dating back to 2002, as well as attempts by farmer cooperative groups to reclaim their land. The letter also referred to the earlier occupation of Dinant's El Chile property by members of the farmer cooperatives.

171.     During the summer of 2009, the legality of Dinant's claimed land holdings was an issue of such national importance that on June 19, 2009, President Zelaya visited Tocoa – the principal town in the center of the Bajo Aguán – to formalize the creation of a Technical Judicial

Commission ("Commission") to review the land claims of the farmer cooperatives.

172.    One of this Commission's first acts was to meet with Fabio Ochoa, an important member of the MUCA negotiating team. The meeting took place on June 23, 2009. Later that day, Ochoa was shot four times by assassins in Tocoa. The shooting was widely reported in the press, including in several articles that expressly linked the shooting to Miguel Facussé. Ochoa miraculously survived, but the injuries left him permanently disabled.

### Honduras experiences a coup d'état, unleashing atrocities on land rights activists and aligning businessmen like Facussé with non-accountable armed forces.

173.    On June 28, 2009, five days after the attempted assassination of Fabio Ochoa, Honduras suffered the first military coup d'état in Central America since the Cold War. Honduran soldiers raided President Zelaya's house in the middle of the night, and a military airplane flew him to Costa Rica. This action was condemned as an illegal coup by the United Nations, the Organization of American States (OAS), and the European Union, and led to Honduras' almost immediate suspension from the OAS.

174.    Large landowners and business owners, including Facussé and the head of Banco Ficohsa, supported the coup and backed the interim regime that replaced him. Facussé's support went beyond intellectual backing for the coup; he admitted that his personal airplane was used to illegally carry the foreign minister, Patricia Rodas, out of the country against her will.

175.    Popular protest against the coup was significant and was immediately met with violent crackdowns and repression by Honduran military and police forces. International media and NGOs documented the popular unrest and the widespread and systematic human rights violations committed by the Honduran military against activists, journalists, lawyers, farmers, and others who opposed President Zelaya's ouster. These abuses were widely documented by the Honduran Truth and Reconciliation Commission, and are the subject of a submission to the Office of the Prosecutor of the International Criminal Court. These documents provide evidence of over 100 killings, tens of

thousands of illegal detentions, and a plethora of other serious abuses.

176.    Farmers and land rights advocates were prime targets of the political persecution by the interim regime. The interim government's attacks against farmer groups and activists and journalists who supported them, as well as Facussé's association with the coup, were widely reported in national and international media in both Spanish and English.

**In the wake of the coup, the IFC disburses $15 million, ignoring the impact of the coup on likely violence and ongoing disputes on Dinant's properties.**

177.    In July 2009, the IFC analyzed whether the coup could be considered to have a "material adverse effect" that would bar disbursement of the loan. The IFC's loan agreement included, as a condition of disbursement, that "nothing has occurred which has or can reasonably be expected to have a Material Adverse Effect" – specifically,

> a material adverse effect on: (i) any of the Guarantors, any of the Borrowers' or any of its respective Subsidiaries' business, Operations, property, liabilities, conditions (financial or otherwise), prospects or the carrying on of any of the Guarantors, or the Borrowers' or its Subsidiaries' business or Operations; (ii) the implementation of the Transaction; or (iii) the ability a material adverse effect on: (i) any of the Guarantors, any of the Borrowers' or any of its respective Subsidiaries' business, Operations, property, liabilities, conditions (financial or otherwise), prospects or the carrying on of any of the Guarantors, or the Borrowers' or its Subsidiaries' business or Operations; (ii) the implementation of the Transaction; or (iii) the ability of any of the Guarantors, any of the Borrowers or any of its respective Subsidiaries to comply with its obligations under this Agreement, or under any other Transaction Document to which it is a Party.

178.    Although this definition expressly includes adverse effects on Dinant's ability to comply with its obligations under the loan agreement – including its environmental and social

obligations – the IFC's analysis was concerned solely with Dinant's ability to repay the loan. As the CAO later found, the analysis of political developments contained in the disbursement documentation focused only on financial risk, and omitted "any analysis of how recent national level events or the escalation of the conflict over land in the Aguán . . . might affect E&S risk surrounding the investment or Dinant's ability to deliver on its E&S commitments."

179.    Incredibly, despite the coup and the violence that followed, Dinant certified to the IFC that there were no material social or environmental risks or issues relating to its operations and that it had not received nor was aware of either (a) any existing or threatened complaint, order, directive, claim, citation, or notice from any Authority, or (b) any material written communication from any person concerning its failure to comply with any matter covered by the Performance Standards.

180.    It is an IFC condition of disbursement that the borrower's representations and warranties as to environmental and social issues must be true and correct in all material respects as of the date of that disbursement. Nonetheless, the CAO found no indication that the continued validity of Dinant's representations regarding environmental and social risks and issues were subject to scrutiny by the IFC, despite the deterioration of the political situation in Honduras following the removal of President Zelaya, and the known existence of land claims affecting Dinant's holdings in the Aguán Valley.

181.    Again, the IFC knew about these risks, in part because Dinant itself notified the IFC. In August 2009, Dinant notified the IFC about additional Dinant properties that were implicated in land disputes with farmers. Dinant notified the IFC that several of the properties that it had put up as collateral for the $30 million loan had been frozen by judicial order, triggered by claims that Dinant had unlawfully acquired them. In response, the IFC agreed to accept Dinant's El Chile and La Isla properties as substitute collateral – the very properties that Dinant had identified as being

subject to land disputes in its June 2009 letter to the IFC.

182.     On September 9, 2009 the IFC announced that it had "suspended all investments in palm oil businesses until after a review of its practices in the sector." The announcement came in response to social and environmental complaints filed in 2007 by smallholder and indigenous groups in Indonesia related to the IFC's investments in two subsidiaries of a major palm oil producer there, and the CAO's audit of those projects. In an August 28, 2009 letter to civil society groups, the World Bank President at the time, Robert Zoellick, said the audit highlighted important deficiencies in the IFC's practices: "Therefore, I have directed IFC management to take all necessary steps to ensure that the problems identified in the CAO audit are not repeated."

183.     Despite this, and despite its awareness of the coup, the continued deterioration of the political and social situation in Honduras, the widely documented repression and killing of political dissidents and land rights activists, and the specific land conflicts involving Dinant properties in the Bajo Aguán, the IFC proceeded with disbursement of its loan. In November 2009, the IFC disbursed $15 million to Dinant.

184.     At or around this time, the IFC also put together a concept note for an additional investment in Ficohsa, including a potential equity – i.e., ownership – stake in the bank.

**F.     Dinant uses the Defendants' critical funding and support to carry out a campaign of violence, aggression, and murder against farmers – including the Plaintiffs – whom it views as adverse to its interests in the Bajo Aguán.**

185.     In the wake of the coup, the work of President Zelaya's Technical Judicial Commission to review the land "transfers" ground to a halt. The new post-coup government ended all negotiations with the farmer movements. This loss of government support and cover set the stage for an explosion of violence that claimed over 100 lives in the Bajo Aguán, and caused the injuries suffered by most of the Plaintiffs.

186.     After the coup, the farmers continued to challenge the illegal "transfers" through

legal complaints and peaceful occupations and began a period of "negotiation" with large landholders, including Dinant, to re-purchase the farms. Throughout these negotiations, public and private security forces working on behalf of Dinant committed extreme violence against the farmers and their leaders in order to intimidate the farmer groups into accepting disadvantageous terms for the purchase of the land.

187.    After the IFC's first disbursement of funding in November 2009, Dinant immediately enlarged its security forces and supplied them with high-powered weapons, which were then used against farmers who challenged Dinant's ownership of disputed land. On information and belief, Dinant also utilized these funds to pay *sicarios* – assassins – to execute cooperative leaders that Dinant viewed as a threat to its interests. And, on information and belief, Dinant provided financing and support to the Honduran military and paramilitary death squads in exchange for harassing and even executing farmers who challenged Dinant's interests.

188.    The Plaintiffs estimate that Dinant's security forces quadrupled in size in the six months following the November 2009 IFC disbursement. And in the wake of the disbursement, Dinant's guards began to carry illegal and military-grade weapons. Dinant also hired private security outfits, such as the Orion Corporation, to provide armed private security in addition to its own guards.

189.    While Dinant had long been engaged in violence against farmers in the Aguán, in the wake of the IFC disbursement, the violence intensified. Since 2009, more than 100 farmers have been killed in the context of the land conflict in the Aguán. That number continues to climb today. The vast majority of these murders have not taken place during land "occupations," nor during any sort of confrontation between security guards and farmers on disputed land, but rather have been targeted killings.

190.    Dinant's aggression against the farmers – including the Plaintiffs – is part of a larger

39

pattern of sustained violence by Dinant to crush the agrarian reform movement and to intimidate farmers into giving up their challenges to Dinant's occupation of contested land.

191.    Farmers – and in particular those who have challenged Dinant's land holdings, including the Plaintiffs – have been attacked while at home, while working in their fields or gardens, or while traveling to or from work. Some have been abducted and later found dead, often with signs of torture on their bodies.

192.    Many of the victims have been leaders or active members of farmer federations such as MUCA, Movimiento Campesino Recuperación Aguán (MOCRA), Movimiento Campesino Refundación Gregorio Chávez (MCRGC), and Movimiento Campesino del Aguán (MCA). Many of the victims, including the Plaintiffs, were members of stable communities that have been in place for decades, whose residents believed that they had secure title to their current holdings, but whose farms were coveted or claimed by Dinant.

193.    Many of these killings and related attacks were carried out by Dinant's security personnel: guards, hired assassins wearing either plainclothes or Dinant uniforms, or military and paramilitary units working on Dinant's behalf. And the motive of the killings was clear; Dinant's aim was to silence, intimidate, and deter the farmers' federations from challenging Dinant's control over the land that they claimed had been taken from them improperly.

**G.    2010: The IFC does nothing as Dinant murders the Plaintiffs and other farmers in the Aguán; the IFC then seeks a new way to fund Dinant via Banco Ficohsa.**

> ***The IFC fails in its supervision of Dinant and moves forward, along with the IFC-AMC, with a new Ficohsa investment.***

194.    In December 2009 or early January 2010, Dinant informed IFC senior management that farmers had taken back three of its properties – San Isidro, La Confianza, and La Aurora. The IFC had been aware since at least August 2009 that there was a dispute over San Isidro because Dinant had tried to use the farm as collateral for the IFC's loan, but was initially frustrated because it

was subject to an asset freeze order in light of farmers' legitimate claims to it.

195.    On January 8, 2010, an English-language article written by Honduras's most prominent human rights group reported attacks and repression against farmer federation groups, including the abduction of two members of MUCA. The article noted that "[t]he pressure on these communities is directly related to the power of large landowners in the zone such as Miguel Facussé, a powerful businessman with landholdings throughout Honduras but is unsatiated in his desire to accumulate more territory."

196.    Throughout 2010, Dinant's security forces, with the aid of the Honduran military and police, forcibly and violently tried to evict the farmers who had taken back land from Dinant, and targeted members of the cooperative farming movement.

197.    On February 16, 2010, Dinant wrote a letter to the IFC alerting them of "eviction orders" for San Isidro, La Confianza, and La Aurora, and of additional land disputes that had emerged on "other farms."

198.    On March 12, 2010, the IFC put Dinant on its "Corporate Watch List," "a list of high risk investments which is prepared by IFC's External Relations department and circulated to senior management on a weekly basis." Nonetheless, the IFC took no substantive action to rectify Dinant's non-compliance with its loan obligations.

199.    Dinant's first Annual Monitoring Report (required under the loan agreement) was also due in March 2010. Dinant never submitted the report – and would not submit one in 2011 or 2012, either.

200.    On March 17, 2010, an internal IFC discussion began about land disputes involving Dinant. For the first time – at least since the loan was disbursed – IFC environmental and social staff were included in this discussion. But the IFC decided to take no action.

201.    On March 23, 2010, IFC staff met with Miguel Facussé in Washington, D.C. There is

no record of what was discussed at this meeting, but no environmental and social staff were present.

202.    Between March and August 2010, the IFC appears to have had no environmental and social staff specifically assigned to the Dinant loan at all. This was so even as murders of farmers in the Aguán were taking place amidst rampant allegations that they were connected to Dinant.

203.    On April 13, 2010, the Government of Honduras and MUCA agreed on a memorandum of understanding, which included establishing a new Judicial Commission to analyze whether land in the Aguán could be returned to the farming cooperatives. The land covered by this Commission would include up to 3,000 hectares of land occupied by Dinant.

204.    In May 2010, the IFC made two visits to Banco Ficohsa. The first visit was supervisory, and connected with the 2008 Ficohsa Loan. The purpose of the visit was to assess Ficohsa's performance in social and environmental compliance. IFC staff mysteriously gave Banco Ficohsa a satisfactory rating even though Ficohsa had not provided the necessary documentation and IFC staff in Honduras knew "of both the serious nature of the conflict involving Dinant and Ficohsa's status as a major lender to Dinant at this time."

205.    The IFC's second May 2010 visit was part of an appraisal review for a new investment. As part of this review – which included a follow-up the very next month – IFC staff reviewed every loan that Banco Ficohsa had made. IFC staff discovered that Ficohsa's lending to Dinant violated one of the covenants in the 2008 Ficohsa Loan, which required Ficohsa to diversify and limit its overall exposure to any single borrower. Ficohsa's lending to Dinant greatly exceeded that limit.

206.    In July 2010, investment staff responsible for the IFC's 2008 Ficohsa Loan requested a waiver from IFC management for Ficohsa's excessive loans to Dinant. As part of their waiver request, IFC investment staff sent a memorandum to the management of the IFC's Financial Institutions department. That memo did not include any reference to the land conflict that IFC

investment staff knew about or that IFC had delayed their own second disbursement to Dinant. Instead it described Facussé as a "very respected businessman," and described "Dinant as among the 'top players' in a strategic sector for the IFC "with a high developmental impact" in one of the least developed countries in Latin America." Ultimately, the Financial Institutions department granted the waiver even though Dinant was on the IFC's Corporate Watch List and the IFC was clearly aware of serious violence and land conflicts connected with Dinant.

207.    In August 2010, IFC staff responsible for the Dinant investment requested that the IFC release the second $15 million of the $30 million loan.

208.    At the same time, IFC staff responsible for investment in Ficohsa made their intent to pursue a new equity investment in Ficohsa public. In its public disclosure of the project, and in violation of its disclosure policy, the IFC omitted the necessary requirement that Ficohsa upgrade its Social and Environmental Management System (SEMS) to screen high-risk investments against the Performance Standards. The disclosure also incorrectly stated that Ficohsa had implemented the SEMS and submitted its required E&S report, when in fact the SEMS was not yet fully implemented and the report was overdue.

### November 15, 2010: Dinant murders five farmers and wounds four others outside El Tumbador farm.

209.    On November 15, 2010, a group of farmers from the village of Guadalupe Carney set out on bicycles, on foot, and in cars to farm a small parcel of land to which they held undisputed title. The land was located near Dinant's El Tumbador plantation and adjacent to another small piece of land over which they and Dinant had disputing claims.

210.    The farmers were unarmed and carried only their traditional farm tools. Before the group reached the gate that demarcated their land from Dinant's El Tumbador plantation, Dinant's security guards opened fire on them from within El Tumbador.

211.    At the time of the attack, the farmers had not entered onto any land that was claimed

by Dinant. Instead, they were on land belonging to their cooperative – fifty meters from the entrance to El Tumbador – when Dinant's guards opened fire on them without any provocation. El Tumbador plantation was entirely under the control of Dinant and its personnel at the time.

212.     Several farmers were shot and wounded during the first round of gunfire by Dinant's guards.

213.     After Dinant's guards opened fire, the farmers withdrew to evacuate the wounded. The Dinant guards continued firing on the farmers as they ran. A crowd of about eighty farmers reached a shelter on a nearby farm owned by a farmer cooperative and huddled for safety.

214.     At some point, a local military unit arrived. On information and belief, Dinant called in the military to assist in its attack against the farmers.

215.     The military parked their vehicles some distance from where the farmers were sheltering and – together with Dinant's guards – walked down the road and then through the bush to carry out a surprise attack on the farmers gathered in the shelter.

216.     Moments later, the Dinant guards and the military, without warning, fired upon the group in the shelter from two sides. The Dinant guards and/or military initiated the attack with a machine gun mounted on a tripod. Thereafter, the Dinant guards continued to fire upon the farmers with high-powered assault weapons.

217.     The farmers threw themselves into the brush for cover, hiding in the uneven terrain and brush along a ravine. At least five farmers were killed over the course of the attack that morning.

218.     For four hours Dinant and military security forces searched the brush for farmers. Some survivors were found by security forces, who pointed guns at them and told them to run. On information and belief, individuals working on behalf of Dinant placed weapons near the bodies of the murdered farmers to make it appear that they had been armed at the time of the attack and that

44

the attack was an armed confrontation. On information and belief, Dinant also directed one of its guards to fire shots at the entrance to Dinant's gate to make it look as though the farmers were armed when they approached. However, none of the farmers were armed, and no Dinant guards or military registered any injuries that day.

219.    On information and belief, the purpose of the attack was to intimidate the farmers of the nearby Guadalupe Carney community and the MCA farmer collective from asserting their rights to a nearby tract of land, which overlapped with part of the El Tumbador plantation claimed by Dinant. The National Agrarian Institute ("INA") had been supporting and assisting the farmers with the process to recover that tract of land.

220.    On November 17, 2010, Dinant's owner, Miguel Facussé, prepared a written statement regarding the attack, which he read out loud on the television show, "Frente a Frente," and published in the newspaper, La Tribuna. In the statement, Dinant's owner berated the Secretary of the INA and blamed it for "sending" the farmers "to their death" by telling them that the land was theirs. Facussé continued, "[Y]ou sent them, knowing that we have security guards in place . . . . You knew that we were armed and ready to defend our lands." However, the farmers were not on any of Dinant's properties either before, or at the time of, Dinant's attack.

221.    Following the massacre, Rights Action, an international human rights organization with a presence in the Aguán, wrote a scathing letter to the President of the World Bank. The letter informed the World Bank that several farmers had been killed by guards employed by Dinant, concluding that "The World Bank [Group] shares responsibility in the November 15, 2010 massacre in El Tumbador, Honduras." The letter continued: "The [IFC] decision to release funds to Dinant sent a clear message to Dinant: that the company and its owners enjoy impunity for their actions, and the [World Bank] will tolerate violence, illegal land grabbing, and even participation in military coups by corporations and their owners."

45

222.    In response to the letter, the IFC "ask[ed] for restraint" and suggested hiring an "international security consultant." The IFC thus introduced Dinant to McFetridge Consulting, Inc. – a private security consulting company – for the job.

223.    McFetridge Consulting was not an obvious choice for protecting human rights. Don McFetridge, the company's head, was a former U.S. Army colonel and Department of Defense attaché in Indonesia in the mid- to late-1990s, shortly before the U.S. government cut off military cooperation with Indonesia in 1999 due to its gross human rights abuses. According to a Foreign Service Officer who worked with McFetridge, the colonel "was a staunch defender of the Indonesian military, consistently denying allegations in the mid- and late-1990s that it was guilty of human rights crimes," and "was a lead defender of General (ret.) Prabowo, son-in-law of dictator Soeharto," who "stands out as among the worst human rights violators in a regime known for its brutality."

224.    By the end of 2010, twenty-four farmers in the Bajo Aguán had been killed. Although many of these murders have not been officially investigated by the Honduran authorities, witness testimony and other evidence directly links at least eleven of these killings to Dinant's properties or security guards.

**H.    2011: As Dinant's campaign of violence against the farmers continues, the IFC gives Dinant another pass even as other funders cut the company off; the IFC and the IFC-AMC approve a new investment in Ficohsa.**

225.    Dinant's violence against the farmers escalated in 2011, and the IFC continued to receive indications that it was funding that violence.

226.    In February 2011, at the request of the IFC, a Dinant consultant conducted a Security Program Assessment (SPA), to analyze its approach to human rights and compliance with the IFC's Performance Standards, relevant laws, and commitments. The SPA did not involve interviews with affected farmers in the Aguán or investigate any of the recent violence perpetrated

46

by Dinant's guards. Rather, the consultant interviewed Dinant's managers, security guards, and third-party security providers. Even so, the consultant noted obvious flaws, including that "Dinant ha[d] significantly increased its security capacity," "third party security guards were poorly trained," and "Dinant was not able to produce a security risk assessment for review."

227.    Building on that assessment, in March, the IFC's environmental and social staff made their first site supervision visit, which was delayed because of "security risks." The result of the visit was a finding that the company's environmental and social management structures were "poorly developed," and a subsequent update to Dinant's ESAP or Action Plan.

228.    Following the visit, Dinant was given an "Unsatisfactory" environmental and social risk rating. Instead of demanding compliance, the IFC "request[ed] a Corrective Action Plan (CAP), but "extend[ed] deadlines" for Dinant to implement any recommended environmental and social measures. As it had in 2010, Dinant also failed to produce an Annual Monitoring Report for 2011.

229.    Meanwhile, other financial backers of Dinant were pulling their funding. In April 2011, the German Investment Corporation, DEG, declared that it would not pay out an already-approved loan to Dinant, the value of which Miguel Facussé reportedly put at $20 million. Following suit, EDF Trading, a wholly-owned subsidiary of Electricité de France SA, pulled out from a contract to buy carbon credits from the project.

230.    In March 2011, as a follow-up to the September 2009 decision to suspend palm oil investments, the World Bank Group and the IFC published a ninety-one page "World Bank Group Framework and IFC Strategy for Engagement in the Palm Oil Sector." The report dedicates an entire section to social concerns and land rights, and notes that,

    "[t]ensions can arise in connection with land acquisition, and the recognition of local

    people's rights to land during the establishment of industrial estates. When oil palm estates

    are established, compensation for lost land access can improve the distribution of benefits,

but unclear land rights and lack of transparency can lead to inequitable outcomes."

The report then counsels that "[e]ffective broad based community participation in land use planning is needed to address the wide range of issues presented when any large scale plantations interact with local communities." The adoption of this strategy marked the IFC's resumption of palm oil financing.

231.    Ignoring the advice of its own strategy, and while other investors were abandoning Dinant, in May 2011, the IFC's Board approved the 2011 Ficohsa Investment. As noted above, this required waiving objections to Ficohsa's support of Dinant, including Ficohsa's violation of the terms of its existing loan agreement by having too much exposure to Dinant. The new IFC deal involved a $32.1 million equity investment (amounting to a 10 percent ownership stake in Ficohsa) and a $38 million loan. After the investment was approved by the IFC Board, the financing was arranged through Defendant IFC-AMC, which considered and approved the investment in June 2011. Though the IFC-AMC sub-contracts the origination, due diligence, and supervision of projects to the IFC, IFC-AMC staff were present at key decisions points in the IFC's approval.

232.    As later reported by Rights Action, that same month, on May 15, 2011, a farmer belonging to one of the collectives challenging Dinant was tending cattle on his lands near the border of Dinant's Paso Aguán farm, which was controlled by Dinant security. As witnessed by a young boy who was accompanying him, Dinant guards shot out of the farm and wounded the farmer. The boy ran to get help from other members of the community. When he returned with others, they saw a trail of blood that led into the Panamá farm, but police refused to search the farm.

### June 2011: Dinant guards open fire on unarmed women and children affiliated with MUCA who were sheltering from floods.

233.    In early June 2011, about fifty farmer families from the community of La Confianza were sheltering in a training center in Sinaloa, owned and run by the Honduran National Agrarian

Institute ("INA"), after they had been displaced from their community due to severe flooding months earlier. All of the families were members of, or affiliated with, the farmer federation MUCA, which had been a vocal critic of Dinant's claims to land in the Aguán.

234.    Early in the morning of June 5, 2011, the men – all farmers – left to work in their fields, leaving the women and children at the INA compound.

235.    At around 5:00 a.m., dozens of Dinant guards gathered along the road near the compound. Without any provocation, they entered the INA training center, which was full of unarmed women and children belonging to the farmer cooperatives, and began shooting live ammunition. The guards were wearing balaclavas, body armor, and blue uniforms with black pants – the typical uniform worn by Dinant's guards. At one point, the guards assembled themselves in a ditch and fired on the women and children as they fled the shelter.

236.    Women and children – about fifty in total and all unarmed – began running out of the shelter. The Dinant guards fired at them from behind as they ran. At least one woman was shot as she fled, but survived after hiding herself in a ditch.

237.    On June 9, 2011, the Executive Director of the INA posted a public announcement on its official website in which it "condemned the presence of armed men that unlawfully entered the territory of the State of Honduras and carried out acts of violence against defenseless people and the facilities of the INA." A partial translation of the statement, which was issued in Spanish, reads:

> On June 5 a group of security guards belonging to the landholder Miguel Facussé entered onto the state lands of the INA . . . . the security guards of Mr. Miguel Facussé that attacked a group of farmers located in the INA facilities left two people injured . . . . These individuals are part of a group of 100 farmers, members of MUCA, who have been victims since the previous year when they were displaced because their farms were flooded and two people were injured.

238.     The statement called for an investigation and for the masterminds to be brought to justice. No investigation ever took place.

***After the June 2011 violence, the IFC-AMC takes a large ownership interest in Banco Ficohsa and makes another substantial loan.***

239.     On September 23, 2011, Banco Ficohsa submitted its Annual Environmental Performance Report, which, again, put the IFC on notice of the bank's exposure to Dinant. Despite the fact that the IFC had delayed the disbursement of the second $15 million due under its Dinant Loan, Defendants IFC and IFC-AMC continued to support Dinant through Ficohsa.

240.     Less than a week later, on September 28, Defendants IFC and IFC-AMC signed the shareholder and loan agreements for the 2011 Ficohsa Investment – a $32.1 million equity investment and a $38 million loan. Defendant IFC-AMC acquired its equity stake in October, and issued the debt instrument in November.

241.     On information and belief, under the terms of the equity and loan agreements with Banco Ficohsa, Defendants IFC and IFC-AMC were given substantial control and oversight over Ficohsa, particularly in the commencement, management, and continuation of high-risk investments, such as Dinant. Indeed, Ficohsa was obliged to:

- Comply with the IFC's Performance Standards and assess "all existing and future financing operations in accordance with the E & S requirements (which include the Performance Standards)";

- Ensure that its clients "agree on corrective measures to remedy [a] breach [of environmental and social requirements] and if such action is not possible, use reasonable efforts to dispose of the investment[ ]";

- Provide the IFC and the IFC-AMC with annual reports certifying compliance with

environmental and social requirements;

- Inform the IFC and the IFC-AMC of any incidents "related to a client that would have a material impact on a client's ability to operate in accordance with the Performance Standards";

- Guarantee that "there are no material social or environmental risks or issues in respect of the Company Operations [which include all existing and future lending]"; and

- Notify the IFC and the IFC-AMC when it considers any new high-risk (Category A) loans.

242.    Despite the IFC's and the IFC-AMC's extensive contractual remedies, they neglected to stop Ficohsa from funneling their financial support to Dinant. To the contrary, the investments in Ficohsa enabled substantial additional lending to Dinant. Between November 2011 and March 2014, Banco Ficohsa approved approximately $40 million in new loans to Dinant.

243.    As later reported by Rights Action, on or around both October 2 and 11, 2011, two more farmers belonging to farmer collectives were killed by Dinant's guards, from shots originating from within Dinant's San Isidro farm, while they undertook agricultural labor near the property line. As mentioned above, the San Isidro farm was one of the farms Dinant had proposed as collateral for the IFC loan.

244.    By the end of 2011, at least thirty-five farmers in the Bajo Aguán had been killed. Although many of these murders have not been officially investigated by the Honduran authorities, witness testimony and other evidence directly links at least fifteen of these killings to Dinant's properties or security guards.

**I.    2012: Dinant's attacks on cooperative farming leaders continue; the IFC acknowledges "little progress" on social and environmental obligations.**

245.    In April 2012, on a supervisory visit to Honduras, IFC staff reported "little progress" on social, security, and land issues. The report noted that Dinant "ha[d] significant gaps with

51

Honduran [environmental and social] legal requirements and little progress has been made on the social aspects including stakeholder engagement and security forces practices." Once again, Dinant was given an "Unsatisfactory" environmental and social risk rating.

246.    As later reported by Rights Action, around the time of the IFC staff's visit to Honduras, on April 11, 2012, Dinant guards killed another farmer cooperative member as he drove his pickup truck past a section of Dinant's San Isidro farm, which is controlled by Dinant security personnel.

247.    Throughout 2012, Dinant and its guards carried out a series of targeted killings and other acts of aggression against members of the village of Panamá in order to intimidate them from contesting Dinant's claims to the adjacent Paso Aguán farm. These aggressions included assaults, battery, kidnapping, burning of homes and motorcycles, death threats, and targeted killings of farmers.

248.    Since at least 2009, when the IFC began funding Dinant, Dinant has maintained a large security force on the Paso Aguán farm surrounding the Panamá community, and even uses a former farmer cooperative building in Panama as a security office.

249.    As later reported by forensic anthropologists of the Guatemalan Forensic Anthropology Foundation, on or around May 5, 2012, a cooperative farmer from the community of Panamá disappeared after he went fishing near Dinant's Paso Aguán farm. A few days before his disappearance, he had received death threats from Dinant's guards. The forensic anthropologists reported that his body was found one year later in a shallow grave on Dinant's Paso Aguán farm. The exhumation report showed that he had been tortured and murdered.

250.    In June 2012, IFC investment staff requested temporary waivers of Dinant's loan requirements, including non-compliance with the ESAP. While the waivers were initially withheld, all that it took to satisfy the IFC team and ultimately grant the waivers was the "personal

commitment made by Dinant's CEO," Miguel Facussé, to meet environmental and social
obligations.

251.    Just two months after Facussé promised to meet Dinant's obligations, the IFC
investment staff sought to revise Dinant's deadlines to meet those very same environmental and
social obligations. The IFC investment team was internally in conflict over the approach to Dinant
and the decision to extend these deadlines. Rather than hold Dinant to its commitments, however,
the team simply replaced the specialist on the Dinant project that had vocally criticized Dinant's
performance.

252.    On July 2, 2012, Dinant's security personnel abducted Gregorio Chavez, a Panamá
farmer and community leader, while he was tending his garden adjacent to Dinant's Paso Aguán
Farm. As later reported by Rights Action, Chavez "disappeared while tending his garden . . . . When
he did not return for supper, his family searched the garden and found blood, rope and a trail of
flattened plants leading into the farm, indicating he had been shot or otherwise injured, bound and
dragged."

253.    Gregorio Chavez was one of the most vocal supporters of farmers' rights in the
Panamá community. He often spoke out in front of church congregations and community meetings
against the unlawful acquisition of community land by Dinant. On various occasions he had heated
verbal exchanges with Dinant's guards about respecting the rights of the people of the community
of Panamá. On several occasions Dinant guards threatened Chavez directly.

254.    When Chavez disappeared, the community of Panamá immediately requested police
assistance to gain entry into the farm to search for Chavez. They also asked the guards for access to
the farm, but the guards would not let them enter a place known as "Lot 8" within the farm. In the
following days the family and other members of the community were permitted into the farm to
search for Chavez, but the guards continued to refuse them access to Lot 8.

255.     On July 6, after four days of intense searching, the community was finally permitted to enter Lot 8 with the support of other observers. There, the group discovered Chavez's body buried in a shallow grave. The body had a bag over its head, indicating that Chavez had been executed by asphyxiation. On information and belief, this abuse was carried out by Dinant's security personnel.

256.     On information and belief, Dinant's security personnel tortured and murdered Chavez to intimidate him and other farmers from challenging Dinant's claimed ownership of palm oil properties over which the farmers assert competing claims to ownership.

257.     In the wake of Chavez's death, and in response to the pattern of violence and aggression by Dinant's guards, farmers in the community of Panamá formed the Campesino Movement for Refoundation – Gregorio Chavez (MCRGC). MCRGC's purpose is to end the presence of armed security in their village and support the villagers' claims to land held by Dinant and other large landholders. Many, if not all, of the members of MCRGC reside in the village of Panamá.

258.     In response to their advocacy activities in pursuit of justice for Chavez's murder and their efforts to challenge Dinant's claimed ownership of land, the members of MCRGC – and the community of Panamá more broadly – have been harassed, intimidated, kidnapped, and tortured by Dinant guards or military working on behalf of Dinant.

259.     On multiple occasions, Dinant's security personnel have opened fire from their posts within the Paso Aguán plantation in an attempt to intimidate and scare the villagers. Dinant's security personnel also patrol the access road to the community and regularly enter the community of Panamá, where they target farmers affiliated with either MCRGC or MUCA for intimidation purposes. Agents working on behalf of Dinant have infiltrated and secured leadership positions in the community, and regularly make verbal threats against farmers active in collective farming

movements.

260.    The people of Panamá have lived for years with the constant presence of Dinant's security personnel, who threaten and carry out acts of aggression against community members affiliated with collective farming movements. They have suffered repeated invasions, murders, and intimidations, and they live in a state of near-siege.

261.    Between September and October 2012, Dinant agreed to resell some of its illegally acquired lands to farmers who were occupying those lands, but as the IFC noted in a 2013 Credit Risk Review, "settlement invasions" by Dinant's security forces continue.

262.    On September 24, 2012, Antonio Trejo, a prominent lawyer who represented MUCA and other farmers' cooperatives, was assassinated near Tegucigalpa, where Dinant is headquartered.

263.    Trejo's murder – which was openly celebrated by Dinant's security guards, and widely believed to be carried out on Miguel Facussé's orders – came in the wake of a June 2012 legal victory that Trejo secured on behalf of several farmer cooperatives, against Dinant and Facussé. After eighteen years of litigation, Trejo had obtained a ruling from a district court that held that Dinant's acquisition of the San Isidro farm was illegal. Three months later, he was shot and killed by an assassin while he stood in a parking lot outside of a church where he had been conducting a marriage ceremony. According to a news article, when asked about Trejo's murder, Miguel Facussé admitted that he had reason to kill Trejo.

264.    Shortly after Trejo's death, the legal victory he had won unraveled because the community could not find a reliable and faithful lawyer to contest Dinant's appeal of the judgment.

265.    Trejo's killer has never been brought to justice.

266.    In November 2012, NGOs made a submission to the International Criminal Court, identifying Facussé and Dinant as responsible for several high-profile assassinations.

267.     The murders of leaders such as Chavez and Trejo were only the most high-profile of killings of 2012.

268.     That year, at least twenty-nine people affiliated with the farmer movement in the Aguán were assassinated. At least twelve of the killings were publicly linked to Dinant.

269.     Dinant again failed to submit its required Annual Monitoring Report to the IFC in 2012. And once again, the IFC did not take any action against Dinant for this breach.

**J.     As the violence mounts, the Vice President of the CAO calls for an audit of the IFC's investment in Dinant.**

270.     As the IFC continued to fail to hold Dinant to its commitments, the IFC's Compliance Advisor Ombudsman (CAO) – an "independent recourse mechanism" for projects supported by the private sector lending arms of the World Bank Group – began to notice.

271.     In response to allegations of ongoing violence on and around Dinant's plantations in the Bajo Aguán, the CAO Vice President triggered a compliance process in April 2012. Unusually, this review was initiated by the CAO itself, not in response to a specific complaint.

272.     The CAO opened the compliance process to investigate allegations that:

- Dinant conducted, facilitated, or supported forced evictions of farmers in the Aguán;

- Violence against farmers on and around Dinant plantations in the Bajo Aguán (including multiple deaths) occurred because of inappropriate use of private and public security forces under Dinant's control or influence; and

- The IFC failed to identify early enough and/or respond appropriately to the situation of Dinant in the context of the declining political and security situation in Honduras, and specifically in the Bajo Aguán, following the ouster of President Zelaya in June 2009.

273.     Following an appraisal of the IFC's performance in relation to the investment, in August 2012, the CAO issued terms of reference for a compliance audit focusing on whether the IFC:

- Exercised due diligence in its review of the social risks attached to its Dinant loan;

- Responded adequately to the context of intensifying social and political conflict surrounding the project post-commitment; and

- Had policies and procedures that provided adequate guidance to staff on how to assess and manage social risks associated with projects in areas that are subject to conflict or conflict prone.

274.     Because the CAO audit was triggered internally, the affected farmers in the Aguán did not have standing to participate formally in the compliance process. In July 2014, the affected farmers filed two complaints with the CAO for the purpose of gaining standing to formally participate in the CAO's review and participate in any IFC actions flowing from that review.

275.     As the CAO began to investigate the IFC's investment in Dinant, the IFC finally began to acknowledge Dinant's misdeeds – at least, internally. By the end of the year, the IFC had updated its due diligence files to reflect that Miguel Facussé was alleged to be "the intellectual perpetrator of the September 2012 murder of MUCA's lawyer" – i.e., Antonio Trejo – and was linked to the murder of environmental activist Carlos Escaleras in 1997. The file also mentioned that Dinant's guards were connected to the murder of three people near Dinant's Farallones property – when, according to the CAO, "three intruders were killed and their bodies burned following an altercation with security guards on Dinant's owner's Farallones property near Limon."

**K.      2013: World attention turns to the Aguán as Dinant's violence continues; IFC guarantees more Banco Ficohsa loans to Dinant.**

276.     On February 13, 2013, the IFC, on behalf of the IFC-AMC, completed a Site Supervision Report for the 2011 Ficohsa Investment. The report found that Banco Ficohsa was not taking the IFC's Performance Standards seriously, and noted Ficohsa's ongoing exposure to Dinant.

277.     On February 18, 2013, Banco Ficohsa informed the IFC (consistent with its shareholder agreement obligations) that it had made an *additional* $5 million loan to Dinant. Despite the IFC's acknowledgement only days before that Ficohsa was not following the Performance Standards and was already overexposed to Dinant, and the fact that it now owned 10 percent of Ficohsa, neither the IFC nor the IFC-AMC did anything to hold Ficohsa accountable or curtail lending to Dinant.

278.     On February 20, 2013, Rights Action, published a shocking report detailing more than eighty-eight violent killings of farmers in the Bajo Aguán. The report repeatedly attributed many of the killings to Dinant's security guards and Honduran military units working in concert with them. The report drew special attention to the involvement of two Honduran military units – the Xatruch Task Force and the 15th Battalion – in carrying out killings.

279.     Also in February 2013, the United Nations Working Group on the Use of Mercenaries condemned human rights abuses by Dinant's private security forces in the Aguán.

280.     On February 16, 2013, José Trejo, the brother of murdered MUCA attorney Antonio Trejo, was shot dead in Tocoa. José had been raising questions about the 2012 death of his brother and calling for a full criminal investigation in the weeks before he was assassinated.

281.     In August 2013, during the CAO's investigation of the IFC's loan to Dinant, the CAO "became aware that Dinant is one of Ficohsa's largest borrowers and as a result that IFC had a significant exposure to Dinant through its equity stake in Ficohsa." As a result, the CAO Vice President initiated a separate investigation into the IFC's investment in Ficohsa.

282.     In October 2013, farmer groups in the Bajo Aguán were so besieged with violence that they brought a complaint against the state of Honduras at the Inter-American Commission on Human Rights. They alleged that Honduran military units in the Bajo Aguán – and in particular the 15th Batallion and the Xatruch Task Force – had carried out extrajudicial killings and other acts of aggression against the farmers in an effort to support large landholders, including Dinant specifically. Their complaint described the violent deaths of more than 100 farmers, and explained how these military units and/or the security personnel of large landowners like Dinant were to blame.

283.     Nevertheless, in November 2013, the IFC provided the GTFP Guarantees for two of Ficohsa's loans to Dinant, totaling $5.3 million. The guarantees enabled Ficohsa to provide pre-export funding for intra-firm trades between Dinant's corporate entities in Honduras and Guatemala.

284.     On information and belief, the only reason for the trades that were funded by the IFC-guaranteed loans was to increase the amount of short-term financing that Dinant could obtain from Ficohsa. The IFC provided a line of credit to Dinant (Guatemala) to guarantee its payments to Dinant (Honduras), enabling Dinant (Honduras) to collateralize those expected payments and obtain additional short-term financing from Ficohsa. The amount of funding thus available was greater than if Dinant (Honduras) had sought to raise the money through a direct loan from Ficohsa because trade financing is cheaper than unsecured short-term debt.

**L.     The CAO releases a scathing audit of the IFC's investment in Dinant.**

285.     A month later, in December 2013, the CAO released its audit of the IFC's loan to Dinant. The audit – in which the CAO noted that it had been presented with specific allegations linking Dinant to the deaths of forty people affiliated with the farmer cooperative movement in the Aguán between January 2010 and May 2013 – was scathing.

59

286. The CAO concluded that IFC staff had repeatedly underestimated the social and security risks of the loan, failed to assure themselves that Dinant would and could comply with the Performance Standards, ignored publicly available evidence of serious abuses by Dinant's security personnel, neglected to adapt to changing circumstances (such as the political environment of Honduras after the coup), and failed to supervise the implementation of the loan.

287. The CAO found that these failures arose, in part, from staff incentives "to overlook, fail to articulate, or even conceal potential environmental, social and conflict risk," and that staff felt pressured to "get money out the door" and discouraged from "making waves."

288. The CAO also found that when "some members of the E&S raised concerns" about the IFC's approach to Dinant's compliance, this caused "tensions" that led E&S management to "decide to replace the lead E&S specialist working on the project . . . [,]" who had been critical of the loan to Dinant.

289. The CAO also found that both before, during, and after the commitment and disbursement of the first tranche of the loan, the IFC was not in compliance with a number of IFC policies. Beyond that, the IFC did know, or should have known, of the allegations of violence related to the company and project in which the IFC was investing.

290. The CAO also replicated the "Factiva" news search that would have been required of the IFC in 2008 under its own Integrity Due Diligence procedure and found the IFC's process to be "insufficient." The results of the CAO's replicated Factiva search for Miguel Facussé revealed fifteen links that the CAO believed "could indicate current or previous allegations or negative perceptions about Dinant's owner."

291. Relevant links include descriptions of Facussé's political influence, allegations of his involvement in the murder of environmental activist Carlos Escaleras, reports of a warrant having been issued for his arrest in relation to environmental crimes, and allegations of his involvement in

land disputes with Garifuna communities.

292.    Despite the availability of these links and sources through the Factiva search, the CAO found "no indication that the issues raised in these links were considered or their contents were filed as required by the IFC's Due Diligence procedure."

293.    Similarly worrisome was that the IFC assigned the Dinant investment an environmental and social risk category of B, which indicates potential, but limited, adverse E&S impact. In explaining the categorization decision, the IFC noted "that there would be no involuntary displacement of people; and that there are no indigenous peoples' ancestral lands in the area."

294.    According to the CAO, the IFC used its categorization of the project as one that did not pose any adverse social and environmental risks or impacts to local communities, to conclude that consultation was optional. The CAO disagreed with that conclusion, finding that consultation was required as part of the E&S assessment. This is because the E&S assessment identified environmental impacts relating to Dinant's air emissions and wastewater discharge, and the publicly disclosed ESRS reports showed agricultural communities surrounding the majority of Dinant's facilities, and that the project could impact community health or safety. As a result, the CAO found that the IFC violated the Sustainability Policy "which requires IFC to ensure that its client's E&S Assessment meets the requirements of PS1 [Performance Standard 1]."

295.    The CAO found that the IFC's categorization was in error: "Had the IFC team subjected the proposed investment to the required level of review, CAO finds that the project would properly have been classified category A (potential significant adverse E&S impact)."

296.    The CAO also found that the IFC could have exercised "remedies" under the loan agreement when it became clear that Dinant had not and would not bring the project into compliance with the Performance Standards.

**M.    2014: As the violence continues, the IFC responds to the CAO, and increases its investment in Ficohsa even as the existing investments come under CAO scrutiny.**

*Dinant's campaign of violence and terror against farmers in the Aguán continues even as the IFC rolls out its "Enhanced Action Plan"*

297.    On January 3, 2014, the IFC responded to the CAO's audit with a response letter, in which the IFC continued to defend its decision to invest in Dinant. The letter sidestepped the allegations that Dinant was closely tied to the violence and instead asserted that the coup in June 2009 "ignited social unrest across the country and reawakened a push for land redistribution in the Aguán Valley. The resulting political turmoil undermined law and order, exacerbating the trafficking of drugs and arms in the area." The IFC indicated that they "chose to remain engaged and work with Dinant to . . . improve its policies and practices, particularly in security and community engagement." The IFC also announced that it had developed an "Action Plan" in which one of the action items would require Dinant to investigate any credible allegations of human rights.

298.    Both the IFC's response and the Action Plan were swiftly and widely criticized by civil society and experts in human rights and Latin America. These critics concluded that the response failed to address the systemic issues at play: that human rights abuses in the Aguán had been committed by its client, and the root cause of the abuses was a longstanding conflict over land. They criticized the Action Plan for being contingent upon Dinant's agreement. The groups called for a consultation mechanism that would involve the farmers' movements in the development and implementation of an action plan.

299.    In April 2014, the IFC made a second effort to respond to the issues raised in the CAO's audit, this time in an "Enhanced Action Plan." The IFC stated that the plan was intended to improve environmental and social performance and address the root causes of conflict in the Aguán. Despite the fact that the Honduran military was under investigation for crimes against humanity, a clause in the Enhanced Action Plan requires Dinant to "enter into any Memorandums of

Understanding (MoUs) with military and police regarding any support to Dinant, outlining the roles and responsibilities of each party." The Enhanced Action Plan stipulates that "should Dinant fail to meet these commitments, IFC stands prepared to exercise all remedies available, including cancelling the loan."

300.    That same month, Banco Ficohsa submitted a report to the IFC, acknowledging that it was still not fully incorporating the Performance Standards into a Social and Environmental Management System. The IFC received this report pursuant its role as supervisor of environmental and social performance for projects funded by the IFC-AMC, which it performed on behalf of and at the behest of the IFC-AMC.

301.    Given the severity of the violence against the farmers, on May 8, 2014, the Inter-American Commission on Human Rights granted "precautionary measures" to protect 123 leaders of several farmers' movements in the Bajo Aguán. According to Article 25 of the IACHR's regulations, precautionary measures are granted only in "serious and urgent situations presenting a risk of irreparable harm." The IACHR granted the request based on evidence that "since 2010 *campesino* farmers who belong to these organizations have been subject to killings, disappearances, kidnappings, torture, threats, violent evictions, persecution, and accusations, for the alleged purpose of forcing them to sell their lands."

302.    Each year, the IACHR receives hundreds of requests for precautionary measures, but grants only a few dozen. In 2014, the IACHR received 504 requests, but granted only thirty-three.

303.    In December 2016, in light of ongoing violence and threats against farmers in the Aguán, the IACHR granted precautionary measures to an additional thirty-one leaders. To this day, the IACHR closely monitors the land conflicts in the Aguán, as does the newly-created office of United Nations High Commission for Human Rights in Honduras.

***The IFC-AMC increases its equity position in Banco Ficohsa even as its own
relationship to Dinant comes under investigation.***

304.    In April 2014, despite knowing about Banco Ficohsa's exposure to Dinant and

Dinant's history of abuse, IFC management approved the IFC-AMC's acquisition of an additional

$5.5 million equity stake in Ficohsa. The IFC-AMC approved this investment in May 2014, and

completed the equity purchase in June, making yet more funds available to Ficohsa and, in turn,

Dinant.

***Even in the wake of the audits, Dinant and its security forces continue to commit
violence and intimidate farmers, especially in Panamá.***

305.    Although there was a momentary decline in the near-weekly killings of farmers in the

Aguán in the wake of the CAO's scathing audit and the IACHR's grant of precautionary measures,

Dinant's intimidation, harassment, and aggression against farmers who opposed Dinant's occupation

of land in the Bajo Aguán largely continued. This aggression was particularly acute in the village of

Panamá.

306.    The village of Panama is surrounded on three sides by Dinant's Paso Aguán Farm,

making it particularly vulnerable to violence and aggression by Dinant's security personnel. Guards,

soldiers, and police working for Dinant have on multiple occasions entered unlawfully into the

homes of villagers, beating them and firing live ammunition at them.

307.    On the evening of July 2, 2014 – the second anniversary of the murder of Gregorio

Chavez – members of Panamá, fed up with the persistent intimidation by Dinant's security

personnel, peacefully approached the Paso Aguán Farm. They told Dinant's guards that they were

no longer welcome because of their history of entering the community and harassing the residents.

The guards left, and a crowd of villagers posted representatives at the entrance to the road that gives

access to the village and the farm and proceeded to hold a Mass in Chavez's memory.

308.    The following morning, on July 3, community members continued to congregate

peacefully in the road in front of the main entrance to the village and the farm. The community members were not armed. As they stood there, dozens of vehicles – including tanks – arrived, filled with soldiers, police, and Dinant security guards – all acting at Dinant's request and direction. The forces included members of the National Preventative Police, the Xatruch Task Force, and the 15th Battalion of the Honduran Special Forces.

309.    With little or no warning, the combined armed forces attacked the villagers with live ammunition and teargas. The villagers fled, and most returned to Panamá village. Soldiers and Dinant guards followed them and surrounded the village, where they proceeded to invade homes and attack community members regardless of their participation in the action on the road.

310.    Police, soldiers, and Dinant guards all took part in the attack. Some Dinant guards were dressed in military uniform, but witnesses recognized them as guards. They entered people's homes, beat a number of villagers, and threatened them with guns. They also opened fire, shooting from close range at the fleeing villagers, and wounding at least one man.

## N.    The IFC turns to problem-solving even as the CAO finds that IFC has violated its own policies, again.

311.    In July 2014, the IFC approached the Consensus Building Institute (CBI), which the IFC described as a "dispute resolution and facilitation organization," to meet with multiple stakeholders and assess the possibility of facilitating a joint vision for progress on the human rights, land access, and development concerns in the Bajo Aguán. The IFC also hired Foley Hoag LLP, a U.S.-based law firm, to assist with the review of Dinant's security protocols.

312.    The principal result of this collaboration was a "roadmap" for "all involved parties" to improve security, address land tenure disputes, and contribute to inclusive economic development. At the IFC's behest, Dinant also committed to adopting the Voluntary Principles on Security and Human Rights – an international set of principles that are meant to reduce human rights violations in the operations of security personnel working for corporations. As part of its

commitment, Dinant promised to disarm all its security guards and rely on the Honduran state security forces for all armed operations forces.

313.     Farmers' groups have heavily criticized the IFC's Enhanced Action Plan and the CBI roadmap process. They claim that the process is unrepresentative of their views and overly accommodating of the interests of the Honduran government and Dinant, whose agents have committed so much violence in the Aguán.

314.     Farmers also charge that CBI – while initially engaging with them in good faith – has generally excluded them from the process of formulating the roadmap. They believe that the roadmap does not adequately provide for accountability for the land grabs, physical attacks, and pretextual criminalization that they have faced.

315.     The CAO shares some of the concerns regarding the IFC's Enhanced Action Plan. In its July 6, 2016 monitoring report, the CAO notes the criticism by some of the farmers' groups that they have been excluded from the process. The farmers also continue to allege harassment by military and paramilitary groups, whom they see as linked to the conflict between their communities and Dinant.

316.     The July 2016 report also shows that commitments from the Enhanced Action Plan have not been met. For example, between September 2014 and March 2016, Dinant should have engaged a reputable third party to investigate the past security incidents and disclosed a summary of the process and findings, identifying corrective action, including possible compensation. As of July 2016, these commitments were still a "work in progress."

317.     The CAO also noted that the IFC's response failed to remedy findings from the audit. For example, while the IFC states that Dinant's risk assessments have not identified any impacts on Garifuna communities, the CAO notes that to date no risk assessment or consultation with representatives of those communities has been disclosed. The IFC refuses to disclose its 2008

environmental and social assessment for Dinant.

318.    While acknowledging the steps taken by the IFC, the CAO found that if affected communities do not support the Enhanced Action Plan, Performance Standard 4 requires Dinant to conduct an objective investigation of credible allegations of abusive acts of security personnel. If the allegations are confirmed, remedies including compensation are required. The IFC acknowledges this expectation and included it in an October 2015 update of the Enhanced Action Plan.

319.    While the CAO continues to monitor the IFC response, the farmers' lack of inclusion in the Enhanced Action Plan and CBI roadmap process has forced them to file two new complaints relating to the IFC's loan to Dinant. The farmers' groups lodged these complaints in July 2014 with the hope that doing so would permit them to be meaningfully included in the IFC's remedial efforts in the Aguán. The complaints raised issues relating to the land dispute, displacement of communities, violence, use of security forces, and environmental impacts linked to Dinant's palm oil operations.

### *The CAO releases a scathing audit into the Defendants' support to Banco Ficohsa.*

320.    In August 2014, the CAO released another damning report, this time about the IFC's arrangements with Banco Ficohsa. The CAO initiated this audit when it became aware, during its audit of the IFC's loan to Dinant, that Dinant was one of Ficohsa's largest borrowers, and, through its equity stake in Fichosa, the IFC had significant exposure to Dinant. The CAO's investigation considered whether:

- The IFC's E&S review was sufficient to identify activities where the financial intermediary could be exposed to environmental and social risk or determine whether Ficohsa was engaged in projects with potentially significant E&S risks;

- The IFC established an environmental and social management plan that was commensurate to the level of E&S risk that was present in Ficohsa's portfolio;

- The IFC obtained adequate evidence of compliance with the agreed conditions of disbursement; and

- The IFC adequately assured itself that its client E&S obligations, including reporting obligations, were being fulfilled.

321.    The CAO observed that IFC staff had once again consistently looked the other way and excused Ficohsa's lack of systems to manage social and environmental risks. By waiving its policy limiting Ficohsa's exposure to any one company in favor of Dinant and then investing directly in Ficohsa, the IFC "facilitated a significant ongoing flow of capital to Dinant, outside the framework of its environmental and social standards; and this at a time when IFC management was aware of serious unmitigated environmental and social risks regarding its agribusiness client."

322.    The CAO report shows that the IFC bent the rules for Fichosa. For example, instead of requiring that gaps in Ficohsa's SEMS be closed prior to commitment or as a condition of disbursement, the IFC only required an upgraded SEMS three months after disbursement. According to the IFC's Environmental and Social Review Procedures, this is only acceptable for financial institutions with either relatively low E&S risks or no immediate financing activities in such risky areas, which was clearly not the case for Ficohsa. And Ficohsa still lacked the capacity to implement the IFC's E&S requirements within this timeframe. Senior IFC staff with knowledge of the project told the CAO that developing the appropriate SEMS within three months was impossible, and, given the situation in Honduras, it would have taken no less than five years. Financial institutions with significant exposure to E&S risk must take steps to develop and effectively introduce procedures and processes to manage E&S risk prior to, not concurrent with, an equity investment.

323.    In the IFC's response, it acknowledged that the "report correctly identifies shortcomings in previous practice, particularly as regards gaps in the IFC's appraisal, prior to the

IFC Capitalization Fund equity investment in Ficohsa in 2011 and a lack of due consideration of the

potential environmental and social (E&S) risks in the bank's portfolio." As a response, the IFC

indicated it was working with Ficohsa to strengthen its E&S risk management systems and practice.

324.    In January 2016, the CAO released a monitoring report to track the IFC's response

to its audit of the Ficohsa Loan.  This report shows that Ficohsa still has not reformed its ways, nor

has the IFC made efforts to comply with the Performance Standards. For example, according to the

report, the IFC advised the CAO that Ficohsa does not apply the Performance Standards in the

same manner as the IFC and that the "IFC notes that the client faces major challenges in ESMS

implementation, some of which are outside its control. These include challenges related to . . .

reluctance of clients to accept E&S requirements in a market where these are not the norm."

Moreover, Ficohsa continued to provide additional financing to Dinant during the monitoring

period.

325.    The CAO concludes that the measures taken by the IFC only partly address its non-

compliance findings and that, despite the actions taken, "the IFC has not assured itself that

Ficohsa's ongoing financing for Dinant is contingent on binding commitments to implement the

Performance Standards, either through its loan agreements or the ESAP."

**O.    Dinant guards and security agents working for Dinant continue to intimidate and kill community members and farmers' leaders across the Aguán to this day.**

326.    Dinant's measures to disarm its security guards and formalize its relationship with

the Honduran military have not resulted in improved citizen security in the Aguán. Dinant now

regularly relies on the Honduran military, including the National Police, the members of the Xatruch

Task Force, and the 15th Battalion, to provide security on its farms. These are the same military

units that the farmers and international NGOs have complained are working on behalf of Dinant to

attack and kill them for at least the past four years.

327.    On information and belief, Dinant also deploys informal security forces, including

paramilitary units, to terrorize farmers' movement members.

328.    On information and belief, Dinant guards actively participate with Honduran military units in joint operations to attack farmers. To disguise their participation and use of arms, the Dinant guards adopt military dress. Eyewitnesses have recognized Dinant guards participating in violent military operations against them.

329.    To this day, the farmer cooperatives and their families in the Bajo Aguán – including Plaintiffs – live with the threat of being killed, kidnapped, and beaten. Farmer cooperatives and anyone who supports them remain highly vulnerable to repeated attack by security guards, police, military, and death squads of assassins who, on information and belief, are acting on behalf of Dinant.

330.    Dinant's intimidation and harassment of people affiliated with the farmers' movement has been so sustained and severe that leaders of MUCA and other farmer cooperatives have been forced to flee their homes and land after receiving death threats from Dinant's guards or paramilitary agents believed to be working on its behalf.

331.    Dinant's intimidation and violence against farmers affiliated with farmers' movements continued unabated through 2016 and up to the present.

332.    This violence and intimidation has especially affected the community of Panamá. Dinant guards continue to circulate in Panamá while carrying arms, intimidating villagers, and communicating the message that resistance to Dinant's occupation of village land would be met with force. On information and belief, Dinant's agents spy on and collect information on MCRGC. With little land to support themselves and little hope of recovering their lands, Panamá residents are under a tremendous amount of psychological and emotional stress and continue to face violence.

333.    Through 2015 and 2016, individuals from Panamá have been abducted and attacked by Dinant's security personnel. Dinant guards abducted one youth member of MCRGC near

70

Dinant's Paso Aguán farm in 2015. Other farmer federation leaders in Panamá have been threatened that they will be killed.

334.     Elsewhere in the Aguán, the killings have also continued. On October 18, 2016, the president of MUCA, José Ángel Flores, and other MUCA leader Silmer Dionisio George were shot and killed by a paramilitary death squad in front of the MUCA office in La Confianza as they left a MUCA meeting. Four members of a paramilitary group first shot George – who died a few hours later in the hospital – and then opened fire on Flores and pursued him on foot while he tried to escape. He was fatally shot while climbing over a wire fence.

335.     On information and belief, this paramilitary death squad is led by Coronel Germán Alfaro, who signed a MoU with Dinant for provision of security in November 2013 and was working on behalf of Dinant when it carried out these killings.

336.     Both Flores and George were known for their opposition to Dinant's claims over disputed land and were subject to precautionary measures granted by the IACHR in May of 2014. Flores had already been subject to one attempt against his life on April 30, 2015, when a member of the same paramilitary death squad held a gun to him and pulled the trigger but it misfired.

337.     In the immediate aftermath of his killing, and until today, this paramilitary group has carried out acts of extreme violence and terror against MUCA leaders, causing them to flee their homes and communities for fear of their lives.

V.     **DEFENDANTS IFC AND IFC-AMC ARE LIABLE FOR DINANT'S CAMPAIGN OF TERROR AGAINST THE PLAINTIFFS**

338.     The Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

339.     The Defendants are not ordinary or hands-off lenders. By virtue of their own policies, the IFC's Articles of Agreement, and the investment agreements that they sign with their clients, the Defendants have both undertaken obligations to the communities that may be affected

by its projects and acquired the ability to control the companies whom they finance.

340.    As the CAO found with respect to both the Dinant Loan and the Ficohsa Investments, the Defendants have repeatedly violated their internal policies (which reflect the standard of care for international project finance), allowed their borrowers to flagrantly violate the conditions of the loan agreements, and failed to protect the communities who they are mission-bound to help.

341.    And, as shown above, the Defendants did not make a single mistake. Time and time again, they allowed their monies to support Dinant and its campaign of violence.

**A.    The Defendants assume legal obligations to the communities affected by their projects, including to consult with them, protect them, and ensure their access to an adequate remedy for injuries connected to the project.**

342.    The IFC's own policies reflect the standard of care for international project finance and give the Defendants the authority to enforce those policies against its borrowers. These include the IFC's Policy on Social and Environmental Sustainability (the "Sustainability Policy"), which "[d]efines IFC's responsibility in supporting project performance in partnership with clients," and the Performance Standards on Social & Environmental Sustainability (the "Performance Standards"), which the Defendants' borrowers must satisfy as a condition of investment.

### *The Sustainability Policy*

343.    The Sustainability Policy affirms that the Defendants owe a duty to the Plaintiffs. In that policy, the Defendants recognize that "[c]entral to [their] development mission are its efforts to carry out its investment operations and advisory services in a manner that 'do no harm' to people or the environment." And, if negative impacts do flow from their investments, then the Defendants (through and with their borrowers) have an obligation to "reduce[ ], mitigat[e] or compensate[ ]" for the unavoidable negative impacts on communities.

344.    While the Defendants' first role is to review the client's ability to comply with the

IFC's environmental and social requirements and "to assist the client in developing measures to avoid, minimize, mitigate or compensate for social and environmental impacts," the policy also creates a continuing and direct obligation on the part of the Defendants to ensure that negative impacts are minimized, reduced, or compensated. "[I]f the client fails to comply with its social and environmental commitments, as expressed in the Action Plan or legal agreement with IFC" then the IFC must "work with the client to bring it back into compliance to the extent feasible, and if the client fails to reestablish compliance, exercise remedies when appropriate."

345.     In cases such as this, where the project will have significant adverse impacts on affected communities, the Defendants' have a duty to obtain "broad community support" prior to undertaking any investment. The Sustainability Policy demands that "through its own investigation, IFC [must] assure[ ] itself that the client's community engagement is one that involves free, prior, and informed consultation and enables the informed participation of the affected communities, leading to broad community support for the project within the affected communities." A finding of "broad community support" must be made "before presenting the project for approval by IFC's Board of Directors."

### The Performance Standards

346.     The Performance Standards on Environmental and Social Sustainability define "clients' roles and responsibilities for managing their projects and the requirements for receiving and retaining IFC support." The IFC has an affirmative obligation to ensure the projects it funds are capable of complying with the Performance Standards, ensure the project is in compliance before disbursement, monitor the project throughout the duration of the loan to ensure the client complies with the standards, and take remedial action where necessary. The obligations for clients to comply with the Performance Standards means that the "IFC's social and environmental review of a proposed project is an important factor in its decision to finance the project or not."

73

347.     The Performance Standards are, in part, how the Defendants implement their duties to the communities they intend to benefit. They also reinforce the duties that the Defendants owe and the special responsibilities they undertake to protect affected populations.

348.     These standards are made legally binding on the Defendants' borrowers (through the investment (including loan) agreements) and give the Defendants authority to exercise remedies and authority over their borrowers if they are not followed. There are eight Performance Standards.

349.     The IFC-AMC also requires that the projects it finances comply with all of the IFC's operational policies and standards, including the Sustainability Policy, the Performance Standards, and other social and environmental covenants.  It outsources much of the environmental and social due diligence and oversight to the IFC, which acts as its agent for these purposes.

350.     The Performance Standards were adopted by the IFC in 2006 to better protect local communities and the environment than the IFC's previous framework and ensure positive development outcomes consistent with the IFC's mission and purpose. They were updated in 2012. Compliance with the Performance Standards and relevant provisions of national law is expressly made "the conditions for IFC's involvement" in the projects it finances. This condition is incorporated into the IFC's investment and loan agreements.

351.     Under Performance Standard 1, the Defendants' clients must have an SEMS, which exists throughout the life of an investment or project. This is required to protect communities that may be impacted and includes, among other things:

- A *Social and Environmental Assessment*, which identifies the risks and potential impacts of the project. "As part of the Assessment, the client will identify individuals and groups that may be differentially or disproportionately affected by the project because of their disadvantaged or vulnerable status."

- An *Action Plan* and *Management System*, which identify steps and measures to

74

address any risks and impacts identified in the Assessment. The Action Plan will

be provided to potentially affected communities.

- *Community Engagement* on an ongoing basis throughout the life of the project or

  investment. As part of this requirement, the Defendants' clients and borrowers

  *must* disclose project risks to the affected communities, consult with communities

  about mitigation measures, and "respond to communities' concerns related to

  the project." And "[i]f the client anticipates ongoing risks or adverse impacts on

  affected communities, the client will establish a grievance mechanism to receive

  and facilitate resolution of the affected communities' concerns and grievances."

352.    Under Performance Standard 4, the Defendants demand that their borrowers "avoid

or minimize the risks and impacts to community health, safety and security that may arise from

project activities." This includes specific requirements about the use of "security personnel."

353.    The Defendants' "client[s] will not sanction any use of force except when used for

preventive and defensive purposes in proportion to the nature and extent of the threat."

354.    "When the client directly retains employees or contractors to provide security to

safeguard its personnel and property," it "will make reasonable inquiries to satisfy itself that those

providing security abuses are not implicated in past abuses," and it must "train them adequately in

the use of force (and where applicable, firearms) and appropriate conduct toward workers and the

local community."

355.    "If government security personnel are deployed to provide security services for the

client, the client will assess risks arising from such use" and ensure that those governmental forces

act with the same proportionality that private security forces must.

356.    The IFC's environmental and social standards, policies, and guidelines – including,

but not limited to, the Performance Standards and Sustainability Policy – reflect the industry

standard in international project finance in developing countries. Even if the IFC were to abolish these policies, it would still be bound by the same standards, because they are the industry standard for project finance and, thus, define the IFC's legal obligations.

357.    The Performance Standards in particular are regularly referred to as the "global benchmark" for environmental and social risk management. Most other major international financial institutions, including development banks, commercial banks, and public lenders, as well as many investors, have either expressly adopted the IFC's relevant policies and standards or adopted their own that substantively mirror the IFC's. The IFC's Sustainability Framework has been largely adopted and incorporated into the Equator Principles, "a risk management framework, adopted by financial institutions, for determining, assessing and managing environmental and social risk in projects . . . [that] is primarily intended to provide a minimum standard for due diligence to support responsible risk decision-making." At least eighty international financial institutions have adopted the Equator Principles, covering "over 70 percent of international Project Finance debt in emerging markets."

358.    The IFC identifies one of its roles as "[s]etting standards and supporting sector-wide standard setting initiatives focused on management of environmental and social risks and impacts by private sector companies and financial institutions." The IFC also recognizes its role in "identifying and disseminating private sector GIIP [Good International Industry Practice] in the area of financial, environmental and social sustainability."

359.    Following project approval, the IFC has a duty to monitor and supervise the loan and to ensure the client's compliance with environmental and social obligations and conditions. This duty continues throughout the life of the loan.

360.    The IFC's monitoring and supervision obligations are implemented in part by conducting supervisory site visits, establishing the client's degree of compliance with all conditions

and covenants prior to all disbursements, implementing the ESAP, identifying poorly-performing projects, and, where the client fails to comply with its environmental and social commitments, clearly communicating risks and probable consequences if the client fails to comply with environmental and social requirements. Where a client still fails to comply with these commitments, the IFC is responsible for "initiat[ing] remedies."

361.    Where the client fails to meet its commitments, the IFC has substantial authority and leverage that can be used to enforce the conditions of the loan or investment. For example, under their investment or loan agreements, an IFC client defaults when it seriously and consistently violates the environmental and social requirements and warranties it makes in the those agreements. Such a default gives the IFC the power to terminate its obligations to make disbursements and/or declare the loan to be due and payable, and/or gives the IFC power to cancel the loan. After the release of the CAO's audit on Dinant, the IFC publicly announced the Enhanced Action Plan and declared, "Should Dinant fail to meet these commitments, IFC stands prepared to exercise all remedies available, including canceling the loan." IFC policy makes clear that the IFC is responsible for initiating all remedies necessary to ensure compliance.

362.    Together, the IFC's commitment to conduct robust due diligence and monitor, supervise, and exercise remedies for the benefit and protection of local communities and the environment reflects an affirmative duty to adequately assess, monitor, and supervise the project's compliance; intervene when necessary to prevent and/or mitigate damage arising from noncompliance; and ensure those injured have access to an appropriate remedy, including compensation.

363.    The IFC takes on a unique relationship with the companies and projects it finances and maintains a higher degree of involvement in, responsibility for, and control over the projects it finances than an ordinary lender. It does so to ensure compliance with its Performance Standards

and other environmental and social commitments and obligations incorporated into the loan agreement throughout the duration of the loan. In so doing, the IFC also takes on duties and responsibilities toward certain third parties affected, or potentially affected, by the projects it finances.

364.    The CAO can review whether the IFC is complying with its obligations with respect to a particular project. The CAO's "mandate is to assist" the IFC "in addressing complaints from people affected" by IFC projects "in a manner that is fair, objective, and constructive and to enhance the environmental and social outcomes of those projects." The CAO can also initiate its own review, as it did for the Defendants' loans to Dinant and Ficohsa.

365.    A CAO compliance audit considers whether "the actual social or environmental outcomes of a project are consistent with or contrary to the desired effect" of the IFC "social and environmental policy provisions" or whether a failure by the IFC to address social or environmental issues "resulted in outcomes that are contrary to the desired effect of the policy provisions." It assesses "the application of relevant policy provisions and related guidelines and procedures to determine whether IFC [is] in compliance."

366.    The findings are ultimately published, and the CAO can decide to leave the case open to monitor the IFC's response to the findings. However, the CAO does not have any enforcement power. Its "powers" are limited to issuing recommendations and findings.

**B.    The CAO found that the Defendants breached their obligations to the Plaintiffs.**

367.    When it conducts a compliance audit, the CAO reviews whether the IFC is complying with its obligations with respect to a particular project. In its 2013 Audit Report for the Dinant Investment, the CAO explained that its audit function considers both whether "the actual social or environmental outcomes of a project are consistent with or contrary to the desired effect" of the IFC "social and environmental policy provisions" and whether a failure by the IFC to address

social or environmental issues "resulted in outcomes that are contrary to the desired effect of the policy provisions." It assesses "the application of relevant policy provisions and related guidelines and procedures to determine whether IFC [is] in compliance."

368.    The "audit criteria are the conditions for IFC's involvement," including the IFC's Sustainability Policy, the Performance Standards, and relevant provisions of national law.

369.    CAO investigations question "whether IFC staff exercised reasonable professional judgment and care in the application of relevant policies and procedures based on contemporaneously available sources of information" and do not expect "performance at a level that requires the benefit of hindsight."

370.    As the CAO found, the Defendants' lending to both Dinant and Ficohsa violated the applicable IFC obligations detailed above.

371.    In relation to Defendant IFC's Dinant Loan, the CAO found numerous and repeated violations. The CAO found that the IFC's "decision to invest was [ ] not in compliance with the Sustainability Policy" because:

- The "IFC did not have a reasonable basis on which to conclude that the project could be expected to meet the Performance Standards over a reasonable period of time."

- Though the "IFC was aware of the importance of access to land free from conflicts and disputes . . . its staff underestimated risks related to security and land conflict associated with the Dinant investment" and ignored "numerous sources dating back to the year 2000 describing ongoing land conflict in the immediate vicinity of Dinant's plantations in the Bajo Aguán."

- The "IFC's E&S review was not 'commensurate to risk' . . . In particular the IFC accepted an overly narrow definition of project E&S risk, without adequate consideration of project context or contemporaneously available source of information regarding land conflict and

insecurity in the Bajo Aguán."

- The "IFC was or should have been aware of a series of public allegations and negative perceptions in relation to its client that went significantly beyond those what were considered . . . ."

- The "IFC failed to ensure that the Dinant E&S Assessment met the consultation requirements set out in PS1." This was, in part, because of "'push back' from the client and the IFC transaction leader to the disclosure of the E&S Assessment."

- IFC staff ignored the risks associated with the hundreds of armed security guards Dinant employed and the close relationships with active Honduran military and did "not seek to triangulate the information received from Dinant management against other sources, nor does it place Dinant's approach to security in the context of violence, political tumult and criminality which characterized Honduras at the time." That context, which was succinctly captured in a 2008 State Department report, includes the use of lethal force "by private security companies with ties to former and current military or police officials."

- "ESAP items agreed with E&S staff in October 2008 were dropped from the ESAP as included in the loan agreement between IFC and Dinant."

372.    The CAO also found that the IFC violated its policies when it disbursed the loan in November 2009 – something it deemed "a significant failure of supervision" – because:

- "IFC E&S staff failed to adequately assess its client's performance against the full range of ESAP conditions that had fallen due prior to the date of disbursement."

- "IFC staff did not keep E&S staff appraised of relevant developments in relation to land disputes, occupations and negotiations around the client's plantations in the Aguan Valley of which they were aware."

- "[I]nvestment staff did not include E&S staff in an assessment of local and national

developments that could have constituted a Material Adverse Effect on the project,"
including the coup.

- "[I]nvestment staff processed the disbursement in November 2009 on the basis of representations made by the client five months earlier, without evidence of analysis on the impact of intervening events on the validity of those representations."

373.    Finally, the CAO found that the IFC's post-disbursement supervision of Dinant violated IFC policies because, among other things:

- The "IFC failed to 'develop and retain information needed to assess the status of its client's compliance with the Performance Standards (PSs)' during supervision as required by the ESRP . . . ."

- The "IFC did not adequately supervise its client's PS4 obligations: (a) to investigate credible allegations of abusive acts of security personnel [ ]; and (b) not to sanction the use of force by security [personnel] other than for 'preventative and defensive purposes in proportion to the nature and extent of the threat' [ ]."

- The "IFC failed to require an adequate root cause analysis in relation to the serious incidents of land-related violence that were occurring around the project."

- The "IFC did not give due consideration to the requirement that IFC 'exercise remedies where appropriate' in a situation where a client does not or is not able to re-establish E&S compliance . . . ."

374.    And in relation to the Defendants' investments with Ficohsa, the CAO also found violations of IFC policies in the approval and appraisal of the 2011 investments, including that:

- The "IFC took insufficient measures to identify activities where Ficohsa was exposed to environmental and social risk through its existing portfolio, a particular concern given background E&S risk that emerges from the regulatory and governance context in which

Ficohsa was operating."

- The "IFC did not conduct an adequate review of Ficohsa's social and environmental management system (SEMS) or its capacity to implement IFC's environmental and social requirement" and structured the investment "in a way which allowed disbursement to Ficohsa in advance of actions to close gaps in the SEMS."

- "[H]ighly relevant information on the conflict and related E&S risks surrounding Dinant, that was held by member of IFC's Dinant investment team, was not shared with key members of its Ficohsa team, even though there were staff working across both teams."

- IFC investment staff working in the Honduras office were aware of both the serious nature of the conflict involving Dinant and Ficohsa's status as a major lender to Dinant in 2010 while the IFC was conducting its appraisal of the equity investment.

375.   The CAO found, too, that "[b]y waiving a key financial covenant and then taking an equity position in Ficohsa," IFC: "(a) increased its exposure, and (b) facilitated a significant ongoing flow of capital to Dinant, outside the framework of its environmental and social standards; and this at a time when IFC management was aware of serious unmitigated environmental and social risks regarding [Dinant]."

376.   The CAO also found that the Defendants disbursed on the 2011 Ficohsa investment in violation of IFC policies because they:

- Did not "assur[e] [themselves] that Ficohsa had submitted the [required] E&S information."

- "[D]id not review the ongoing validity of Ficohsa's E&S representations and warranties prior to disbursement." Of critical importance was Ficohsa's representation that "there are no material social or environmental risk or issues in respect of the Company Operations . . . at a time when Dinant (a major client of Ficohsa) was listed on IFC's

Corporate Watch List, and in the context of a worsening security environment in the Aguan Valley, where Ficohsa had more than one major agricultural client."

377.    Finally, the CAO has found that the Defendants have failed to adequately supervise Ficohsa as required by IFC policies – a fact that is supported by Ficohsa's continued financing of Dinant – because:

- The "IFC did not assure itself that in an adequate or timely manner that Ficohsa was 'operating the SEMS as envisaged at the time of appraisal' or that Ficohsa had 'applied the Applicable Performance Requirements to its sub-projects.'"

- The "IFC's June 2012 supervision documentation was deficient in that it did not address the E&S requirements of the 2011 equity investment . . . ."

- The "IFC did not meet the requirement to review initial financing activities in relation to [a Financial Intermediary] client with potential significant E&S risks associated with its financing activities."

- The "IFC did not adequately supervise the requirement of Performance Standard 1 vis-à-vis Ficohsa itself, in particular the requirement to establish a grievance mechanism which is 'readily accessible . . . to affected communities' and about which affected communities are informed."

378.    The Defendants intentionally, recklessly, willfully, grossly, and negligently provided critical capital funding and moral cover to Dinant when they knew, or had reason to know, that the harms alleged would occur; failed to properly classify the foreseeable risk that funding to Dinant and Banco Ficohsa would harm the Plaintiffs; failed to mitigate those foreseeable harms, which, in fact, did occur at the Plaintiffs' expense; and ultimately exacerbated the harms suffered by the Plaintiffs by failing to exercise appropriate remedies against Dinant and Ficohsa that could have brought Dinant and Ficohsa into compliance.

379.    These actions breached the Defendants' duties to the Plaintiffs to prevent, minimize, and compensate injuries resulting from their investments. As Dinant's security personnel openly unleashed a campaign of terror, murder, and dispossession – harming the Plaintiffs – the Defendants failed to supervise and restrain Dinant (though it had the ability to do so). Instead of terminating the loan or otherwise forcing compliance, the Defendants enabled the continued violations by continuing to directly and indirectly fund Dinant through Ficohsa.

380.    As a direct and proximate result of the IFC and the IFC-AMC's unlawful and tortious conduct as alleged herein, the Plaintiffs, as well as members of the proposed Panamá Class, have suffered and will continue to suffer harm, including loss of life, injury to their persons, psychological trauma, property damage, harm to their livelihoods, and harm to their health.

381.    The conditions endured by the Plaintiffs in violation of the law, the policies of the IFC, and the contracts between the IFC, the IFC-AMC, Dinant, and Banco Ficohsa are the result of the Defendants' failure to follow their policies and enforce the conditions of the loan agreements and/or the result of the Defendants ignoring the requirements of their own policies and the conditions of the loan agreement.

382.    The Defendants' conduct as alleged herein violates the laws of the District of Columbia, United States federal common law, Honduran law, and the laws of any other jurisdiction that might apply.

## C.    Dinant is responsible for the foreseeable tortious conduct of its security personnel alleged herein.

383.    Dinant retains an array of security personnel in the Bajo Aguán and uses these security personnel to act on its behalf to secure its interests. Dinant specifically directs or authorizes these security personnel to carry out acts of aggression and violence against farmers – including the Plaintiffs – for the benefit of Dinant and its business interests.

384.    For the purpose of this Complaint, "Dinant's security personnel" include, but are not limited to:

- Security guards employed by Dinant, including those provided by the Orion Corporation or other third party contractors;

- Honduran military and police forces acting under an MoU or other agreement or arrangement with Dinant, whether formally written or otherwise, specifically including the Xatruch Task Force, which signed an MoU with Dinant in November 2013, and the 15th Batallion, which, on information and belief, acted at Dinant's request and under Dinant's direction at all relevant times in this Complaint;

- Paramilitary death squads composed of former and active military, which, on information and belief, operate in the region in close coordination with military intelligence officials in the Xatruch Task Force at the 15th Battalion base in Río Claro and have been used by Dinant to carry out acts of violence against farmers' movement leaders; and

- Assassins (*sicarios*) hired by Dinant to carry out targeted killings of farmers and their advocates.

385.    Dinant provides its guards and its security personnel with training, supervision, equipment, and other resources and support.

386.    Dinant's Security Manager also directly supervises the actions of Dinant guards and third party contractors and directly oversees and authorizes their use of force.

387.    Dinant's guards carry out joint operations with units of the Honduran military and police acting under MoUs, agreements, and/or other arrangements with Dinant, whether formally written or otherwise. Dinant has publicly admitted to signing an MoU with the Xatruch Task Force in November 2013. The purpose of these operations is to terrorize farmers and their families who

oppose Dinant's claims to land ownership in the Bajo Aguán. These operations are carried out under the direction of, and for the benefit of, Dinant.

388.    On information and belief, even supposedly "unarmed" Dinant guards continue to commit acts of violence and aggression against farmers while improperly adopting military dress and arms in order to conceal their position as Dinant guards.

389.    On information and belief, Dinant also provides financing and logistical support to *sicarios* – or assassins – including paramilitary death squads, and directs them to carry out targeted killings against farmers and their advocates – including some of the targeted killings described in this Complaint.

390.    At all relevant times, Dinant's security personnel were acting as the agents of Dinant. Dinant is vicariously liable for the wrongful actions of its security personnel, including the acts of Honduran military units and police and paid assassins acting on behalf of Dinant.

391.    At all times, Dinant's security personnel were acting in furtherance of Dinant's financial and corporate interests.

392.    In committing the tortious conduct alleged herein, Dinant's security personnel were acting under the supervision of Dinant and/or as Dinant's agents; under Dinant's express instructions, authority, and control; and/or within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence, or subsequent ratification of Dinant.

393.    In committing the tortious acts described herein, Dinant's security personnel caused direct and grave injuries to the Plaintiffs and their decedents.

## D.    The IFC and the IFC-AMC aided and abetted Dinant's tortious conduct alleged herein.

394.    Defendants IFC and IFC-AMC aided and abetted the killings and other tortious conduct alleged herein. The Defendants' relationship with Dinant was not that of a hands-off,

casual, or one-time lender. Here, the Defendants maintained a relationship of support over the course of several years – if not decades in the case of the IFC – in which they repeatedly provided Dinant with critical financial support and moral cover.

395.    They did so even though the Defendants did know, or should have known, the nature and scope of Dinant's tortious conduct alleged herein, including the murder, torture, assault, and detention of the Plaintiffs carried out by Dinant's security personnel. The Defendants also knew, or should have known, that the land that Dinant was using to turn a profit and repay the Defendants' loans was land that Dinant had acquired through unjust, unlawful, and other tortious means.

396.    With this knowledge or probable knowledge, the Defendants provided, and continue to provide, critical funding to Dinant to "develop" young palm plantations in the Aguán even as Dinant used violent means to achieve its business goals. And despite recent public outcry against Dinant's tortious activity and the CAO audit's harsh criticism of the loan to Dinant, the Defendants have continued to channel millions of dollars of support to Dinant indirectly via loans, investments, and loan guarantees to Banco Ficohsa. Moreover, the Defendants went out of their way to maintain their ability to funnel assistance to Dinant by circumventing and waiving their own policies limiting a financial intermediary's exposure to any one client and repeatedly giving both Dinant and Banco Ficohsa extensions on their environmental and social obligations.

397.    The Defendants' support was not only significant in amount, it was also significant in type. A loan or equity investment from the IFC sends a signal of approval to the international project finance community and makes it more likely that the client will obtain additional funding from other sources. The Defendants are aware of the support that a loan from the IFC provides to a client and have – for over seven years now – refused to withdraw that support by terminating or calling in the loan or exercising other remedial options. Dinant would not have been able to acquire

or retain its palm empire without this support. According to the IFC's Articles of Agreement, the IFC "shall not undertake any financing for which in its opinion sufficient private capital could be obtained." Thus, the IFC only invests in projects that would not and could not proceed but for their support.

398.    Over the past two decades, the Defendants' support to Dinant included, at a minimum, the 1997 Cressida Investment, the 2008 Ficohsa Loan, the 2009 Dinant Loan, the 2011 Ficohsa Investments, the GTFP Guarantees, and the 2014 expansion of equity in Ficohsa. By 2009, at the latest, the Defendants knew, or should have known, that this support was enabling Dinant's tortious activities and knew that financing Ficohsa also amounted to financing Dinant.

399.    Between 2011 and 2014, Ficohsa lent around $40 million to Dinant. The Defendants knew that Ficohsa had, and would continue to have, massive exposure to Dinant and enabled that lending. In order to receive IFC money, under IFC policies, Ficohsa should have reduced its Dinant investments. But, instead of requiring that divestment – and even though Dinant was on an IFC Watch List – IFC staff waived their own policies for Ficohsa's loans to Dinant.

400.    The Defendants provided Dinant with capital it could not otherwise obtain but needed to expand and consolidate its oil palm holdings in the Bajo Aguán. They substantially contributed to the injuries alleged herein by providing Dinant with the capital and moral cover to violently suppress farmers' opposition to its contested palm holdings and by directing Dinant to undertake steps that only further imperiled the lives of the Plaintiffs and other farmers in the Aguán – including, but not limited to, by directing Dinant to increase its reliance on the Honduran military.

401.    With the Defendants' critical financing, Dinant expanded its security personnel and armed them with high-powered weapons, which Dinant's security personnel used to attack the Plaintiffs and their families and to intimidate them from pressing their competing claims to land Dinant coveted. In turn, Dinant has used the profit it has gleaned from that land to repay and enrich

the Defendants. With the Defendants' moral support and cover, Dinant was also able to promote

itself as a creditworthy business and solicit additional financing and support even as its security

personnel carried out attacks against the Plaintiffs and others.

**E.     The IFC and the IFC-AMC knowingly participated in Dinant's criminal joint venture that led to the tortious acts alleged herein.**

402.    Defendants knowingly associated themselves with Dinant's venture in the Bajo

Aguán, which employed violence, aggression, and trespass against nearby farmers. This campaign of

violence was intended to dispossess the Plaintiffs and others of their land or intimidate them from

pressing competing land claims in order to pursue a lucrative goal: the expansion of Dinant's palm

oil holdings in the Bajo Aguán.

403.    The Defendants shared Dinant's goal of consolidating and expanding Dinant's palm

oil production and land holdings in the Bajo Aguán to generate a profit, and they agreed to support

and participate in this venture by providing critical financial and moral support and reputational

cover to Dinant. The Defendants either knew about or were recklessly indifferent to the violent and

tortious means by which Dinant expanded its palm oil plantations and business in the Bajo Aguán,

and they, thereby, acquiesced to the tortious conduct alleged herein, including the murder, torture,

assault, and detention of the Plaintiffs carried out by Dinant's security personnel.

404.    Moreover, the Defendants, by their actions, sought to make this venture succeed by

continuously financing and providing moral support and reputational cover for Dinant's production

and expansion of palm oil in the Bajo Aguán, even though Dinant was using violent means to

achieve its ends.

405.    The Defendants were in a position of control with respect to the venture and, in fact,

could exercise significant contractual and financial control over Dinant through the terms of their

Loan and Investment Agreements and the IFC's standards and procedures; yet the Defendants

repeatedly refused to take prompt action to end the tortious conduct alleged herein when they were

in a position to do so. Instead, they ratified Dinant's conduct when they could have exercised

remedies available to them under the Loan and Investment Agreements or under IFC's own

standards and procedures.

406.     With the Defendants' critical financing, Dinant expanded its security personnel and

armed them with high-powered weapons, which Dinant's security personnel used to attack the

Plaintiffs and their families and intimidate them from pressing their competing claims to land Dinant

coveted. In turn, Dinant has used the profit it has gleaned from that land to repay and enrich the

Defendants. With the Defendants' moral support and cover, Dinant was able to promote itself as a

creditworthy business and solicit additional financing and support, even as its security personnel

carried out attacks against the Plaintiffs in broad daylight. As a result, the Plaintiffs have suffered

injuries including loss of life, injury to their persons, psychological trauma, property damage, harm

to their livelihoods, and harm to their health as described herein.

**F.     The IFC and the IFC-AMC acted with reckless disregard of the obvious and highly probable risk that their actions would result in serious harm to the Plaintiffs, and such harm to the Plaintiffs did result.**

407.     At all relevant times, the Defendants have provided financial and other support to

Dinant and failed to exercise remedies that could have stemmed Dinant's violence and aggression

against the Plaintiffs in the face of an unjustifiably high risk of harm to farmers in the Bajo Aguán,

including the Plaintiffs.

408.     At all relevant times, the Defendants were aware of the risk – or the risk was both so

great and so obvious that they should have been aware – that serious harm to farmers, including the

Plaintiffs, would follow from their provision of support to Dinant. This was true before November

2009, when the IFC disbursed $15 million to Dinant; it was also true before the IFC-AMC began

supporting Dinant via Ficohsa in 2011. Yet the Defendants proceeded with their critical support and

backing in conscious and unreasonable disregard of the consequences.

409.    Even when the Defendants undisputedly had actual knowledge that the Plaintiffs and other farmers were, in fact, suffering injuries in the wake of the Defendants' provision of support, the Defendants disregarded those risks and continued to provide financial and moral support to Dinant in reckless disregard of the welfare of the Plaintiffs and other farmers.

410.    The Defendants' decisions to support and continue supporting Dinant in reckless disregard of the probability of serious harm to farmers – including the Plaintiffs – caused the harm alleged herein, because Dinant used the Defendants' funding and moral cover to enlarge and deploy their security personnel to terrorize and commit violence against the Plaintiffs to intimidate them from pressing their competing claims to land Dinant coveted.

411.    As a result, the Plaintiffs have suffered injuries including loss of life, injury to their persons, psychological trauma, property damage, harm to their livelihoods, and harm to their health.

## VI.    THE PLAINTIFFS WERE HARMED BY DINANT'S IFC-BACKED CAMPAIGN OF VIOLENCE AND TERROR

412.    The Plaintiffs have been the victims of violent incidents perpetrated by Dinant's security personnel in the Bajo Aguán from 2010 until the present, including some of the incidents described above.  Other Plaintiffs have been, and continue to be, the victims of the Defendants' unjust enrichment. The specific identities of the Plaintiffs, including details of their injuries by which they could be readily identified, have been omitted for their own safety given the ongoing violence in the Bajo Aguán. They will provide those details upon entry of an appropriate protective order. The following is a general description of the injuries that they have suffered.

413.    Plaintiff Juana Doe I resides in a community in the Bajo Aguán adjacent to a Dinant farm. Her husband, Juan Doe I, was a member of a farmers' group that had contested Dinant's claims to disputed land. He was shot and killed by Dinant security personnel while unarmed. Juana Doe I brings this action on behalf of herself and her deceased husband, Juan Doe I.

414.    Plaintiff Juana Doe II resides in a community in the Bajo Aguán adjacent to a Dinant

farm. Her husband, Juan Doe II, was a member of a farmers' group that had contested Dinant's claims to disputed land. He was shot and killed by Dinant security personnel while unarmed. Juana Doe II brings this action on behalf of herself and her deceased husband, Juan Doe II.

415.    Plaintiff Juana Doe III resides in a community in the Bajo Aguán adjacent to a Dinant farm. Her husband, Juan Doe III, was a member of a farmers' group that had contested Dinant's claims to disputed land. He was shot and killed by Dinant security personnel while unarmed. Juana Doe III brings this action on behalf of herself and her deceased husband, Juan Doe III.

416.    Plaintiff Juana Doe IV resides in a community in the Bajo Aguán adjacent to a Dinant farm. Her husband, Juan Doe IV, was a member of a farmers' group that had contested Dinant's claims to disputed land. He was shot and killed by Dinant security personnel while unarmed. Juana Doe IV brings this action on behalf of herself and her deceased husband, Juan Doe IV.

417.    Plaintiff Juana Doe V resides in a community in the Bajo Aguán adjacent to a Dinant farm. Her husband, Juan Doe V, was a member of a farmers' group that had contested Dinant's claims to disputed land. He was shot and killed by Dinant security personnel while unarmed. Juana Doe V brings this action on behalf of herself and her deceased husband, Juan Doe V.

418.    Plaintiff Juan Doe VI resides in a community in the Bajo Aguán adjacent to a Dinant farm. He is a member of a farmers' group that has contested Dinant's claims to disputed land. He was shot and injured by Dinant security personnel while unarmed. He brings this action on his own behalf.

419.    Plaintiff Juana Doe VI resides in a community in the Bajo Aguán and is a member of a farmers' group that has contested Dinant's claims to disputed land. She was shot and injured by Dinant security personnel while unarmed. She spent a year recovering from this injury and was

unable to return to work. She remains subject to constant threats by Dinant's security personnel, forcing her to flee her home. She brings this action on her own behalf.

420.    Plaintiff Juan Doe VII resides in a community in the Bajo Aguán adjacent to a Dinant farm. His father, Juan Doe XVIII, was tortured and killed by Dinant's security personnel while unarmed. Juan Doe VII brings this action on behalf of himself and his deceased father, Juan Doe XVIII.

421.    Plaintiff Juan Doe VIII resides in a community in the Bajo Aguán adjacent to a Dinant farm and is a member of a farmers' group that has contested Dinant's claims to disputed land. He was shot and injured by Dinant security personnel while unarmed. He spent six months recovering without being able to work and even now cannot work at the same capacity as before. He brings this action on his own behalf.

422.    Plaintiff Juan Doe IX resides in a community in the Bajo Aguán adjacent to a Dinant farm and is a member of a farmers' group that has contested Dinant's claims to disputed land. Dinant security personnel invaded his home, ransacked it, and threatened his family, including aiming a gun at his wife and minor daughter, Juana Doe VII. His daughter was scared because she thought she was going to be killed by the guards and continued to be traumatized for a long time afterwards. He brings this action on his own behalf, on behalf of his minor daughter, Juana Doe VII, and on behalf of all other persons similarly situated.

423.    Plaintiff Juan Doe X resides in a community in the Bajo Aguán adjacent to a Dinant farm. Dinant security personnel invaded his home and beat him, leaving him unconscious. He could not work for twenty-two days and still suffers from pain in his arm. He brings this action on his own behalf.

424.    Plaintiff Juan Doe XI resides in a community in the Bajo Aguán adjacent to a Dinant farm and is a member of a farmers' group that has contested Dinant's claims to disputed land.

93

Dinant security personnel detained him, threatened to kill him, and beat him. He brings this action on his own behalf.

425.    Plaintiff Juan Doe XII resides in a community in the Bajo Aguán adjacent to a Dinant farm and is a member of a farmers' group that has contested Dinant's claims to disputed land. Dinant security personnel invaded his home and beat him, leaving him with serious injuries. He could not work for two months while his wounds healed. He brings this action on his own behalf.

426.    Plaintiff Juan Doe XIII resides in the town of Tocoa in the Bajo Aguán and also in a community in the Bajo Aguán adjacent to a Dinant farm. He is a member of a farmers' group that has contested Dinant's claims to disputed land. He was participating in a peaceful protest outside a Dinant farm in which neither he nor any of the other protestors were armed. Dinant security personnel, including multiple vehicles and tanks, chased the protestors into the community, shot at them, and invaded their homes. Juan Doe XIII, in addition to being placed in danger of imminent harm due to these actions, was arrested, spent a night in prison, and was charged with "encroachment." He brings this action on his own behalf and on behalf of all other persons similarly situated.

427.    Plaintiff Juan Doe XIV resides in a community in the Bajo Aguán adjacent to a Dinant farm and is a member of two farmers' groups that have contested Dinant's claims to disputed land. Dinant security personnel detained him, deprived him of food for three days, and threatened to kill him. He brings this action on his own behalf.

428.    Juan Doe XV was a resident of a community in the Bajo Aguán adjacent to a Dinant farm and a leader of a farmers' group that has contested Dinant's claims to disputed land. He was shot and killed by Dinant security personnel while unarmed. Plaintiff Juan Doe XVI brings this action on his own behalf and on behalf of his deceased father, Juan Doe XV.

94

429.    Juan Doe XVII was a member of a farmers' cooperative in the 1990s in the Bajo

Aguán when he was deprived of his ownership interest in the cooperative by Dinant's late owner,

Miguel Facussé, through fraud and coercion. To this day, Dinant controls and uses the land in which

Juan Doe XVII had an ownership interest, and Dinant uses it for its own gain and profit and to

unjustly enrich the Defendants through repayment of their loans with interest. Plaintiff Juan Doe

XVII brings this action on his own behalf and on behalf of all other persons similarly situated.

## VII.    CLASS ACTION ALLEGATIONS

430.    This action is brought, in part, on behalf of two classes. The first is a class consisting

of the residents of the village of Panamá, who sue the Defendants for negligent infliction of

emotional distress and for aiding and abetting Dinant's intentional infliction of emotional distress.

The second is a class consisting of all residents of the Aguán who were landowners or members

(shareholders) in farmer cooperatives with collective rights to land as of 1992 and whose land has

subsequently been used by Dinant for economic gain after Dinant gained the ability to profit from

that land by fraud, coercion, threat of violence, or actual violence. This second class is suing the IFC

for unjust enrichment.

## A.    The Panamá Class

431.    Juan Does IX and XIII are residents of the community of Panamá and bring this

action on behalf of themselves and all other persons similarly situated, pursuant to F.R.C.P. 23(b)(2)

and/or F.R.C.P. 23(b)(3), in the alternative, for the Defendants' negligent infliction of emotional

distress and for aiding and abetting Dinant's intentional infliction of emotional distress.

432.    The Plaintiffs seek to certify a class for purposes of determining liability and

obtaining appropriate injunctive, declaratory, compensatory, punitive, and other relief.

433.    This class is defined as all residents of the village of Panamá who, since November 5,

2009 have suffered, and/or continue to suffer, emotional distress as a result of Dinant's pattern of

95

aggression against the villagers of Panamá, which is enabled by, and carried out with, the Defendants' substantial support. This pattern of aggression, which Dinant security personnel carry out in order to intimidate and terrorize the villagers of Panamá, includes, but is not limited to, the following acts: deliberately destroying villagers' personal property; trespassing onto villagers' lands and invading their homes; observing the villagers in and around their homes; brandishing weapons to intimidate the villagers; firing off weapons in the direction of villagers or their homes; attacking villagers with rubber bullets, teargas, and/or blunt instruments; detaining, kidnapping, or abducting villagers and violently causing their death; and maintaining a clandestine graveyard on their property abutting the village of Panamá.

434. While the extent and precise manifestations of the class members' injuries may differ, the events giving rise to their injuries are shared throughout the class.

435. The Paso Aguán plantation, which Dinant currently holds and operates for its palm oil business, originally belonged to three different farmer cooperatives (Panamá, Paso Aguán, and Plantel) whose members now largely reside in the adjacent village of Panamá. The African oil palm growing on the plantation was originally planted by those cooperatives during the 1970s and 80s agrarian reform initiatives. However, in or around 1994, Miguel Facussé came to acquire the area of land that now encompasses Dinant's Paso Aguán plantation through fraud, intimidation, and trickery. On information and belief, Facussé deployed agents who approached the leaders of the three cooperatives at the time. The agents posed as government tax officials. They falsely instructed the cooperatives that they owed a significant amount of unpaid taxes and that they had to sell their farms in order to pay off those taxes. Relying on the agents' false representations, the cooperatives sold their land to Facussé against their will. In the wake of the sale of the farmland, the land that the Panamá village sits on was divided into very small, individually titled plots of land over which each family retains title and possession. The plots are not large enough to support any palm production

or even meaningful subsistence farming.

436.    Today, the small community of Panamá is hemmed in on three sides by Dinant's Paso Aguán plantation, which at all relevant time was under the control of Dinant. The residents' ability to supply their own basic needs is highly precarious.

437.    The people of Panamá continue to contest Dinant's claim to the Paso Aguán farm. Since the 1990s, they have tried to initiate lawsuits in Honduras to challenge the land sale to Dinant, but the lawsuits have never reached a determination on the merits. The Panamá villagers continue to vocally challenge Dinant's fraudulent possession of the land that was taken from them through fraud.

438.    As a result of Dinant security personnel's persistent acts of intimidation, the members of the Panamá Class have suffered serious psychological and emotional distress that continues to this day.

439.    Many members of the class now fear guards, soldiers, and police and hide when they see anyone with guns. Some refrain from entering their fields and continuing with their livelihoods for fear of attack. Others have been obliged to find land far away from the village in order to avoid Dinant's intimidation and now are faced with the strain and expense of frequent travel in order to continue with their livelihoods.

440.    *Numerosity – FRCP 23(a)(1).* This class is sufficiently numerous to make joinder impracticable. There are an estimated 200 people in the village of Panamá, and the available evidence suggests that the vast majority of them are suffering severe emotional distress as a result of Dinant's pattern of aggression. The exact number is currently unknown but is ascertainable through contemporaneous records and community meetings.

441.    *Commonality – FRCP 23(a)(2) and 23(b)(3).* The named Plaintiffs' injuries arise from a set of facts and circumstances common to that of the proposed Panamá Class. The questions of law

97

and fact common to the proposed class predominate over questions affecting only individual class members, and include, but are not limited to, the following:

- Whether the Defendants owed a duty to the villagers of Panamá to avoid causing them emotional distress;

- Whether the Defendants breached their duty to the villagers of Panamá to avoid causing them emotional distress by providing repeated and sustained assistance to Dinant in the face of abundant evidence that the funding was being used to kill and intimidate people;

- Whether the Defendants breached their duty of care to the villagers of Panamá by directing Dinant to increase its reliance on the Honduran military although it was widely known that the Honduran military was already involved in a pattern of aggression against the villagers of Panamá at Dinant's behest;

- Whether the Defendants' support and/or directions to Dinant enabled Dinant security personnel's pattern of aggression and caused emotional distress for the villagers of Panamá;

- Whether the Defendants' support and/or directions to Dinant was reckless in disregard of the likelihood that it would result in Dinant's pattern of aggression against the villagers of Panamá;

- Whether Dinant and its security personnel engaged in conduct that was extreme and outrageous beyond the bounds of decency;

- Whether Dinant and its security personnel intended to cause the villagers of Panamá emotional distress; or whether Dinant and its security personnel acted with reckless disregard of whether the conduct would cause the villagers of Panamá to suffer emotional distress;

98

- Whether the Defendants knowingly and substantially supported Dinant's conduct and pattern of aggression against the villagers of Panamá described above;

- Whether the Defendants may be liable for compensatory and/or punitive damages and the measure of such damages; and

- Whether the Plaintiffs are entitled to injunctive relief to prevent further injury, including but not limited to:

  o Requiring Defendant IFC to enforce its contract with Dinant and hold Dinant to IFC Performance Standards and other applicable IFC policies;

  o Requiring the Defendants to direct Dinant to cease any and all coordination with the Honduran military and to withdraw from any MoUs with the Honduran military; and

  o Requiring the Defendants to exercise their control over Dinant to require Dinant to withdraw any armed security personnel from entering within 100 meters of the village of Panamá.

442. *Typicality – FRCP 23(a)(3).* The claims of the named Plaintiffs are typical of the proposed class members in that they all arise out of the same set of circumstances (residing in the village of Panamá and suffering Dinant's pattern of aggression) and the same conduct by the Defendants (the persistent and repeated financial and reputational assistance to Dinant despite ample and growing evidence that Dinant was using the assistance to kill and intimidate people).  The injuries that the named Plaintiffs assert – intentional and negligent infliction of emotional distress – are typical of all members of the proposed class, and the damages and relief sought are similar because the injuries, future anticipated injuries, related costs, and additional consequential losses are similar for all members of the proposed class.

443. *Common Relief – FRCP 23(b)(2).* Defendants have acted and/or failed to act, and

continues to act and/or fail to act, on grounds generally applicable to the Panamá Class, making injunctive and/or declaratory relief as described above appropriate with respect to the class as a whole.

444.     *Adequacy – FRCP 23(a)(4) and 23(g)(1)*. The named Plaintiffs are able to, and will, fairly and adequately protect the interests of the proposed class because they fit within the definition for the proposed class, and their interests do not conflict with the interests of the members of the class they seek to represent. The named Plaintiffs will adequately represent the class in that their personal interest in the outcome of the case ensures that they will maintain an active awareness and involvement in the litigation so as to protect their own interests and those of the class. The named Plaintiffs are represented by counsel with extensive experience in transnational tort litigation and class action litigation. The named Plaintiffs and class counsel intend to prosecute this action vigorously for the benefit of the entire class and can fairly and adequately protect the interests of all of the members of the class.

445.     *Superiority – FRCP 23(b)(3)*. A class action is the best method for the fair, just, and efficient adjudication of this litigation because individual litigation of class members' claims would be impracticable, economically and otherwise, and individual litigation would be unduly burdensome to the courts and parties. Many of the members of the proposed class continue to feel so intimidated by Dinant's security personnel that they would not feel safe bringing this action in their individual capacity. The economic situation of the vast majority of the class members prohibits them from being able to pursue litigation individually. Without the ability to proceed as a class action, the class would have no reasonable remedy and would continue to suffer losses. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**B.      Unjust Enrichment Class**

446.     Plaintiff Juan Doe XVII brings this action on behalf of himself and all other persons similarly situated, pursuant to F.R.C.P. 23 (b)(1)(B) and/or (b)(2) in the alternative.

447.     The Plaintiffs seek to certify a class for purposes of determining liability and obtaining appropriate injunctive, declaratory, compensatory, punitive, and other relief.

448.     This class is defined as all residents of the Bajo Aguán who were members of farmers cooperatives as of 1992 and held land (either individually or collectively) that has subsequently been used by Dinant for economic gain, where Dinant gained the ability to profit from that land by fraud, coercion, threat of violence, actual violence, or other inequitable means. As described above in Section IV, from the 1970s to the early 1990s, thousands of Honduran farmers – including in the Aguán – obtained collective title to farmland by working the land through rural cooperatives. After Honduran law changed starting around 1992, allowing the private transfer of collectively-titled farmland, a large number of the "sales" of cooperative land took place under varying degrees of intimidation and manipulation.

449.      In the ensuing years, Dinant's late owner, Miguel Facussé, and his agents used unjust, illegal, and tortious means to acquire this land. This included, but was not limited to, coercion and intimidation – including threatened and actual violence – to force cooperative leaders to sign land sale deals. Facussé or agents acting on his behalf also deceived cooperatives into selling their land through misrepresentations and false pretenses, and Facussé forced land transfers to go through without complying with laws or procedures for the proper sale of cooperative land. Because Honduran law limited the amount of land any one person could own, Facussé sometimes acted through "prestanombres" or "testaferos" – individuals whose names are used for titling purposes with the understanding that the real owner is a third person.

450.     The profits and the status conferred on Dinant through such purchases enabled

more land purchases in the Aguán, furthering the concentration of land.

451.    Through these questionable transfers, Facussé came to possess and profit from at least eighteen palm plantations in the Bajo Aguán – all of which used to be held and worked by farmer cooperatives. These plantations include the following: 9 de Agosto, Concepción, Isla 1, Isla 2, Marañones, Lempira, Occidental, Paso Aguán, Laureles, San Isidro, Aurora, Confianza, Camarones, Chile, Tranvío, Brisas del Aguán, Panamá, and Plantel.

452.    Dinant continues to profit from the production of palm oil on most of these farms. With respect to seven farms, however, Dinant also profited in a different way. In 2011 and 2012, amidst vocal challenges from MUCA and other farmer federations regarding Facussé's continued unjust control and use of their former lands, Facussé negotiated terms to "re-sell" several of these properties back to the farmer cooperatives. The terms were highly favorable to Facussé, and, on information and belief, Facussé once again deployed security personnel and hitmen to pressure the farmers' federations into accepting these terms. Throughout 2011, several of the farmers' federations had little choice but to capitulate to the pressure and repurchase the lands that they had lost to Facussé at alarmingly high rates. On information and belief, farms that should have been sold at the market rate of 40,000 lempiras per hectare were purchased from Facussé at 135,000 lempiras per hectare. In this way, at least seven farms – Concepción, Isla 1, Isla 2, Marañones, Lempira, Aurora, and Confianza – were "sold" back to farmer cooperatives in 2011 and 2012.

453.    The Plaintiffs in the proposed Unjust Enrichment Class and the families belong to farmer cooperatives that lost their land to Dinant through the tactics described above and from which Dinant profited, either by production of palm oil, forced resale of the land at inflated rates, or both.

454.    Dinant's loan repayment to the IFC, as well as its loan repayment to Banco Ficohsa that in turn accrues to the IFC and the IFC-AMC either through Ficohsa's own loan repayment or

the Defendants' equity investment in Ficohsa, derives, in part, from Dinant's profits from the class members' land. The Defendants, which are profiting off their direct and indirect investments in Dinant, are therefore reaping the benefits of this theft. The Defendants knew from the beginning of these investments that revenue Dinant used to repay the loans would derive in part from land taken through unjust, illegal, and tortious means.

455.    *Numerosity – FRCP 23(a)(1).* This class is sufficiently numerous to make joinder impracticable. The proposed class includes the farmers' cooperatives from whom Facussé or agents acting on his behalf unlawfully, unjustly, and tortiously acquired land, which amounts to at least eighteen of Facussé's palm plantations over the course of two decades. The cooperatives from which these plantations were acquired comprise an estimated membership of approximately 1,000 individuals. The number and identities of all class members is not currently known but are ascertainable through contemporaneous records and community meetings.

456.    *Commonality – FRCP 23(a)(2).* The named Plaintiffs' injuries arise from a set of facts and circumstances common to that of the proposed class. There are questions of law and fact common to the proposed class including, but not limited to, the following:

- Whether members of the proposed class conferred the land on Dinant;

- Whether Dinant's actions in obtaining and retaining the land that was owned, occupied, or used by the members of the proposed class were so unjust and illegal that it would be unjust for the Defendants to receive or retain any benefits from the land;

- Whether the Defendants can be held liable for aiding and abetting or otherwise contributing to, or conspiring, in the unjust enrichment of Dinant;

- Whether Dinant has profited from the land taken from class members;

- Whether the Defendants have received, or will in the future receive, income or other

property derived from Dinant's unjust profits; and

- What remedies, such as a constructive trust over the Defendants' income from its investments in Dinant and Ficohsa, are available to remedy the Defendants' unjust enrichment at the class members' expense.

457.    *Typicality – FRCP 23(a)(3)*. The claims of the named Plaintiffs are typical of the proposed class members in that they all arise out of the same set of circumstances (Dinant's occupation and retention of disputed land in the Aguán through force, fraud, and intimidation) and the same conduct by the Defendants (the persistent and repeated financial and reputational assistance to Dinant despite ample and growing evidence that Dinant was using the assistance to consolidate control over – and retain – disputed land).  The injuries that the named Plaintiffs assert in the name of the class – loss of benefit of land that they owned, used, or occupied – are typical of all members of the proposed class, and the damages and relief sought are similar because the injuries, future anticipated injuries, related costs, and additional consequential losses are similar for all members of the proposed class.

458.    *Common Relief – FRCP 23(b)(2) and FRCP(b)(1)(B)*. Defendants have acted and/or failed to act, and continues to act and/or fail to act, on grounds generally applicable to the Unjust Enrichment Class, making injunctive and/or declaratory relief appropriate with respect to the class as a whole. Such injunctive and/or declaratory relief sought includes, but is not limited to:

- The creation of a constructive trust in favor of the class members on any and all profit that Defendants IFC and IFC-AMC have received, or will receive, from Dinant and Ficohsa as repayment or interest on their loans described herein;

- Restitution to class members of any and all repayment and/or profit that the IFC received from Cressida Corporation subsequent to the 1997 IFC-Cressida Loan;

- An order directing the Defendants to exercise their rights under their current loans

to Dinant and Ficohsa to review whether Dinant or its late owner, Miguel Facussé, used unlawful, unjust, or tortious means to wrongfully deprive class members of their ownership interests in cooperative land taken by Facussé.

459.    *Adequacy – FRCP 23(a)(4) and 23(g)(1)*. Plaintiff Juan Doe XVII is able to, and will, fairly and adequately protect the interests of the proposed class because he fits within the definition for the proposed class, and his interests do not conflict with the interests of the members of class he seeks to represent. Plaintiff Juan Doe XVII will adequately represent the class in that his personal interest in the outcome of the case ensures that he will maintain an active awareness and involvement in the litigation so as to protect his own interests and those of the class. Plaintiff Juan Doe XVII is represented by counsel with extensive experience in transnational environmental tort litigation and class action litigation. Plaintiff Juan Doe XVII and class counsel intend to prosecute this action vigorously for the benefit of the entire class and can fairly and adequately protect the interests of all of the members of the class.

460.    *Limited Fund – FRCP 23(b)(1)(B)*. The value of the class members' unjustly acquired property exceeds the value of the proceeds that the IFC and the IFC-AMC have obtained through repayment of their loans and their equity investments. Thus, adjudication of individual class members' unjust enrichment claims would, as a practical matter, be dispositive of the interests of other members in the absence of a class because insufficient funds are available to satisfy all class members' recovery.

## VIII.    THE DEFENDANTS ARE NOT IMMUNE FROM SUIT.

461.    The IFC generally enjoys the same immunity as foreign governments. However, just like foreign governments, the IFC is not immune from suit for foreseeable injuries to third parties caused by its commercial activity carried out from the United States.

462.    The IFC-AMC does not enjoy any form of official immunity.  It has not been

105

designated by the President of the United States as an international organization that enjoys immunity under the International Organizations Immunity Act and has no other legal source of immunity.

463.     The IFC "is focused exclusively on the private sector[,]" and in loaning money to Dinant, participating in the IFC-AMC's loan and investment in Banco Ficohsa, and providing loan guarantees to Ficohsa in favor of Dinant, the IFC acted as a private actor in the market, not as a regulator.

464.     Through all of its acts described herein, the IFC engaged in substantial commercial activity in the United States (in Washington, D.C.) and engaged in conduct in the United States in connection with commercial activity outside the United States.

465.     The IFC's lending and business operations are controlled by the twenty-five members of the Board of Directors, who work at the IFC's headquarters in Washington, D.C. According to the IFC, the directors "meet regularly at World Bank Group headquarters in Washington, DC, where they review and decide on investment projects and provide overall strategic guidance to IFC management." Each proposed project for financing must be presented for consideration and approval by its Board of Directors, and no loan can go forward to commitment and disbursement of funds without Board approval, which is determined from IFC headquarters in Washington, D.C.

466.     On information and belief, numerous critical decisions relevant to whether to finance Dinant or Banco Ficohsa and under what conditions were made in Washington, D.C., including, but not limited to, the ultimate decisions by the Board to approve the investment, sign the loan agreement, and disburse the funds. IFC-AMC representatives were present at, and participated in, many of the relevant meetings and decisions in Washington, D.C.

467.     On information and belief, the disbursement was made in U.S. dollars and came

from funds held within the United States.

468.     On information and belief, the IFC's responses to allegations of harm caused by its financing of Dinant – including the injuries alleged herein – and to the findings of the CAO, were decided, directed, and/or approved from the headquarters in Washington, D.C.

469.     Liability for the IFC's support to Dinant is consistent with, and supports, the IFC's mission and purpose. The substantial support and moral cover that the IFC provided to Dinant as it carried out a campaign of violence and terror against the Plaintiffs was a crime under the laws of the United States and Honduras. Violating the law and aiding and abetting gross violations of human rights in member countries cannot be consistent with the IFC's mission and purpose.

470.     Given that the IFC's internal ombudsman has concluded that the IFC abjectly failed to meet its own standards, the IFC's goals of reducing poverty while doing no harm to local people are best met by allowing redress for those injured.

471.     On information and belief, the IFC included numerous provisions and requirements intended to protect local people and the environment in its loan agreement with Dinant.

472.     Although the CAO found that the IFC had breached numerous obligations and duties with respect to the Dinant loan and its transactions with Banco Ficohsa, the CAO has no remedial power and no authority to enforce its findings or compel the IFC to act. As the CAO stated in the Audit Report: the "CAO is neither a court of appeal nor a legal enforcement mechanism, nor is CAO a substitute for international court systems or court systems in host countries."

473.     The IFC's "mission is to fight poverty," and the IFC believes that "sound economic growth, grounded in sustainable private investment, is crucial to poverty reduction." "Central to IFC's development mission are its efforts to carry out investment and advisory activities with the intent to 'do no harm' to people and the environment[.]"

474.    As part of its mission, the IFC commits "to ensuring that the costs of economic development do not fall disproportionately on those who are poor or vulnerable, that the environment is not degraded in the process, and that renewable natural resources are managed sustainably."

475.    The IFC's former CEO and Executive Vice President Jin-Yong Cai has explained that "environmental, social, governance, and political risks . . . are equal to financial or credit risks in their potential to impede our development mission."

476.    Cai has also explained that, "[t]o meet the goals of ending poverty and boosting shared prosperity, [the IFC] must safeguard the environmental and social interests of all people who could be affected by our projects."

477.    Under the IFC's own policy and procedures, in order to loan money to companies in pursuit of its development mission, the IFC must ensure that the client can satisfy the Performance Standards. This includes ensuring proper community engagement on matters that impact communities to prevent, mitigate, or compensate for adverse impacts and may also require broad community support for the project. If potentially affected communities object to a project and refuse to consent to it, the IFC cannot go forward with the project. Generally, obtaining community support requires consultations where risks are discussed and promises are made about how the harms will be prevented, mitigated, and compensated.

478.    Community engagement can play a significant role in enabling the client to obtain "a social license to operate." Obtaining community support requires that communities have reason to trust that the IFC will follow through with commitments and that if the promises and representations the communities relied upon are broken, there will be a meaningful avenue for redress. Community support is less likely to be present if the community does not trust the IFC and if community members do not have any recourse if the IFC does not live up to its environmental

and social obligations.

479.    The United States government is the IFC's single largest shareholder. The United States has the largest voting power (22 percent of total voting power) among the IFC's member countries on its Board of Directors. The United States' share of voting power is three times the share of Japan, the member with the second-largest voting power.

480.    Section 7029(d) of the 2016 Consolidated Appropriations Act directed the Secretary of the Treasury to instruct the United States Executive Director of each international financial institution, including the IFC, to seek to require that "such institution conducts rigorous human rights due diligence and risk management, as appropriate, in connection with any loan, grant, policy, or strategy of such institution."

481.    Section 7029(g) of the 2016 Consolidated Appropriations Act directed the Secretary of the Treasury to instruct the United States Executive Director of each international financial institution, including the IFC, "to seek to require that each such institution is effectively implementing and enforcing policies and procedures which reflect best practices for the protection of whistleblowers from retaliation, including best practices for— (1) protection against retaliation for internal and lawful public disclosure; (2) legal burdens of proof; (3) statutes of limitation for reporting retaliation; (4) access to independent adjudicative bodies, including external arbitration; and (5) results that eliminate the effects of proven retaliation."

### IX.    CAUSES OF ACTION

### COUNT I
### WRONGFUL DEATH

(Plaintiffs Juana Does I, II, III, IV, & V, Juan Doe VII, Juan Doe XVI against all Defendants)

482.    Plaintiffs Juana Doe I, Juana Doe II, Juana Doe III, Juana Doe IV, Juana Doe V, and Juan Doe VII and Juan Doe XVI in their individual capacity and as the heirs at law of Decedents Juan Doe I, Juan Doe II, Juan Doe III, Juan Doe IV, Juan Doe V, and Juan Doe XVIII

and Juan Doe XV (collectively, "Decedents"), respectively, reallege and incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

483. Plaintiff Juana Doe I is the heir at law for her deceased husband Juan Doe I.

484. Plaintiff Juana Doe II is the heir at law for her deceased husband Juan Doe II.

485. Plaintiff Juana Doe III is the heir at law for her deceased husband Juan Doe III.

486. Plaintiff Juana Doe IV is the heir at law for her deceased husband Juan Doe IV.

487. Plaintiff Juana Doe V is the heir at law for her deceased husband Juan Doe V.

488. Plaintiff Juan Doe VII is the heir at law for his deceased father Juan Doe XVIII.

489. Plaintiff Juan Doe XVI is the heir at law for his deceased father Juan Doe XV.

490. Each of the deaths of the Decedents was directly and intentionally caused by the wrongful violent acts, including shooting and asphyxiation, by Dinant security personnel. On information and belief, each security personnel who caused death was either a Dinant employee acting in the course of employment and/or was acting at the direction of, or in concert with, Dinant.

491. The Defendants are liable to the Plaintiffs for Dinant's conduct under all the theories detailed above in Section V and for their own negligence and recklessness.

492. As the facts recited herein demonstrate, the Defendants knowingly provided critical financial and moral support to Dinant that enabled its security personnel to carry out a campaign of terror and violence against farmers that caused the violent deaths of the husbands of Plaintiffs Juana Doe I, Juana Doe II, Juana Doe III, Juana Doe IV, and Juana Doe V and the fathers of Plaintiffs Juan Doe VII and Juan Doe XVI.

493. The Defendants had a duty of reasonable care toward the Plaintiffs' decedents to ensure that neither they nor Dinant engaged in conduct leading to, or likely to lead to, foreseeable harm, injury, or death of the Plaintiffs' decedents, as described herein. The Defendants failed to use due care to avoid subjecting the family members of Plaintiffs Juana Doe I, Juana Doe II, Juana Doe

III, Juana Doe IV, Juana Doe V, Juan Doe VII and Juan Doe XVI to foreseeable injury, harm, and

death. Thus, the Defendants proximately caused their wrongful deaths.

494.    As a result of the deaths described above, the Plaintiffs have sustained pecuniary loss

resulting from the loss of society, comfort, attention, services, and support of the Decedents.

495.    The acts described herein constitute wrongful death, actionable under the laws of the

various jurisdictions, including the District of Columbia and the laws of Honduras.

## COUNT II
## BATTERY

(Plaintiffs Juana Does I, II, III, IV, V & VI and Juan Does I, II, III, IV, V, VI, VII, VIII, X, XI, XII,
XIV, XV, XVI & XVIII against all Defendants)

496.    The allegations set forth in the above paragraphs are realleged and incorporated by

reference as if fully set forth herein.

497.    The acts described herein constitute battery, actionable under the laws of District of

Columbia, the United States, and Honduras.

498.    Dinant and/or their agents intentionally, knowingly, and/or recklessly committed

wrongful acts – including beating, abduction, shooting, torture, and murder – that caused offensive

and/or harmful touching of the Plaintiffs and/or their Decedents without their consent.

499.    As a result of these acts, the Plaintiffs and/or their Decedents were placed in great

fear for their lives and suffered severe physical and psychological abuse and agony.

500.    On information and belief, each security personnel who committed these wrongful

acts was either a Dinant employee acting in the course of employment and/or was acting at the

direction of, or in concert with, Dinant at the time.

501.    As the facts recited herein demonstrate, the Defendants are liable to the Plaintiffs for

Dinant's conduct under all the theories detailed above in Section V.

## COUNT III
## ASSAULT
(Plaintiffs Juana Does I, II, III, IV, V & VI and Juan Does I, II, III, IV, V, VI, VII, VIII, X, XI, XII, XIV, XV, XVI & XVIII against all Defendants)

502.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

503.    The acts described herein constitute assault, actionable under the laws of District of Columbia, the United States, and Honduras.

504.    Dinant and/or their agents intentionally, knowingly, and/or recklessly committed or attempted, and/or threatened to commit, wrongful acts – including beating, abduction, shooting, torture, and murder – causing the Plaintiffs and their Decedents to imminently fear and/or apprehend such harmful, offensive, and/or unlawful contact. Dinant acted with the intent to threaten and harm and did actually threaten and harm the Plaintiffs.

505.    As a result of these acts, the Plaintiffs and/or their Decedents were placed in great fear for their lives and suffered severe psychological abuse and agony.

506.    On information and belief, each security personnel who committed these wrongful acts was either a Dinant employee acting in the course of employment and/or was acting at the direction of, or in concert with, Dinant at the time.

507.    As the facts recited herein demonstrate, the Defendants are liable to the Plaintiffs for Dinant's conduct under all the theories detailed above in Section V.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Juana Does I, II, III, IV, V & VI and Juan Does VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XVI, XVIII and Panamá Class members against all Defendants)

508.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

509.    The acts described herein constitute intentional infliction of emotional distress,

actionable under the laws of District of Columbia, the United States, and Honduras.

510.    As the facts recited herein demonstrate, Dinant's security personnel committed outrageous and wrongful acts of aggression against the Plaintiffs and the Panamá Class members, including, but not limited to, deliberately destroying the Plaintiffs' personal property; trespassing onto the Plaintiffs lands and invading their homes; observing the Plaintiffs in and around their homes; brandishing weapons to intimidate the Plaintiffs; firing off rounds of weapons in the direction of the Plaintiffs or their homes; attacking the Plaintiffs with rubber bullets, teargas, and/or blunt instruments; kidnapping or abducting the Plaintiffs; violently causing Plaintiffs' deaths; and maintaining a clandestine graveyard on their property abutting the village of Panamá.

511.    At all relevant times, Dinant security personnel's acts of aggression were committed intentionally and/or recklessly for the purpose of intimidating the Plaintiffs and the Panamá Class members and instilling terror in them and their communities.

512.    On information and belief, each security personnel who committed these wrongful acts was either a Dinant employee acting in the course of employment and/or was acting at the direction of, or in concert with, Dinant at the time.

513.    Dinant's security personnel's torture and execution of the Decedents caused them severe mental and physical trauma prior to their deaths.

514.    Dinant and its security personnel continue to cause the surviving Plaintiffs and Panamá Class members severe mental and physical pain in witnessing, or learning of, the murder of their family members. The Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the death; being forced to flee the area; being kidnapped, beaten, and interrogated about their activities challenging Dinant's land claims; and feeling threatened and frightened that Dinant security personnel would also target them based on their status as farmers or members of farmers' cooperatives. These fears, disturbances, and traumas constitute genuine and

substantial distress of a sort so severe that no person could reasonably be expected to endure it.

515.    Surviving Plaintiffs and Panamá Class members suffer trauma, anguish, distress, and fear on a daily basis in their homes, while in transit, and while carrying out everyday activities in their communities.

516.    The Defendants are liable to the Plaintiffs and the Panamá Class members for Dinant's conduct under all the theories detailed above in Section V.

517.    The Defendants acted intentionally and/or recklessly, with the intent and/or deliberate disregard of the high possibility that their financial and other support, assistance, direction, and collusion with Dinant would cause the outrageous acts of intimidation, torture, abduction, and murder alleged herein and cause the Plaintiffs, Decedents, and proposed class members severe humiliation, mental anguish, and emotional and physical distress.

518.    Due to the Defendants' intentional, reckless, and deliberate outrageous conduct, and due to the intentional, reckless, and deliberate outrageous conduct by Dinant that the Defendants knowingly and intentionally contributed to, the named Plaintiffs, Decedents, and proposed class members have suffered trauma, severe humiliation, mental anguish, emotional and physical distress, and physical and psychological abuse and agony.

519.    At all relevant times, it was in the Defendants' power to cease their assistance, support, facilitation, condonation, and conspiracy with Dinant or to prevent or prohibit Dinant's security personnel from engaging in such conduct, but instead they continued in their course of conduct continuously and gave Dinant critical support and moral backing for its campaign of terror against the Plaintiffs and Panamá Class members.

## COUNT V
## FALSE IMPRISONMENT
(Plaintiffs Juana Doe VII, Juana Doe VIII and Juan Does VII, IX, X, XI, XII, XIII & XIV against all Defendants)

520.    The allegations set forth in the above paragraphs are realleged and incorporated by

reference as if fully set forth herein.

521.    The acts described herein constitute false imprisonment, actionable under the laws of District of Columbia, the United States, and Honduras.

522.    Dinant security personnel and/or Dinant's co-venturers or agents arbitrarily arrested, detained, took into custody, kidnapped, abducted, and/or falsely imprisoned Plaintiffs Juana Doe VIII and Juan Does VII, IX, X, XI, XII, XIII & XIV or their Decedents. Such arrest, detention, kidnapping, abduction, and/or false imprisonment was illegal and unjust, carried on without any other lawful authority or justification.

523.    At all relevant times, Dinant security personnel and/or Dinant's co-venturers or agents acted intentionally, deliberately, and/or recklessly to deprive the Plaintiffs' of their liberty in order to intimidate and terrorize the Plaintiffs; to unlawfully question and interrogate the Plaintiffs about the farmers' federations challenging Dinant; or to abduct and "disappear" the Plaintiffs in order to cause their death.

524.    Plaintiffs Juana Doe VIII and Juan Does VII, IX, X, XI, XII, XIII & XIV or the Decedents were placed in fear for their lives, were deprived of their freedom, reasonably believed they were detained against their will, and were forced to suffer severe physical and mental abuse, as alleged herein. The Plaintiffs did not consent to such conduct, which caused injury, damage, loss, and harm to the Plaintiffs.

525.    On information and belief, each security personnel who committed these wrongful acts was either a Dinant employee acting in the course of employment and/or was acting at the direction of, or in concert with, Dinant at the time.

526.    As the facts recited herein demonstrate, the Defendants are liable to the Plaintiffs for Dinant's conduct under all the theories detailed above in Section V.

<u>COUNT VI</u>
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
(Juana Does I, II, III, IV, V, VI and Juan Does VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XVI and
Panamá Class members against all Defendants)

527.     The Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

528.     The acts described herein constitute negligent infliction of emotional distress, actionable under the laws of District of Columbia, the United States, and Honduras.

529.     At all relevant times, the Defendants and/or their agents owed the Plaintiffs a duty of care, including the duty not to cause fear or fright to the Plaintiffs. Indeed, the Defendants undertook an obligation to do no harm to the Plaintiffs, Decedents, and Panamá Class members when they agreed to provide financial and other support to Dinant to expand and consolidate its palm holdings in the Bajo Aguán in the area where they live and work. That undertaking, by its nature, created not only a foreseeable, but an especially likely, risk that the Defendants' negligent performance of the obligation would cause serious emotional distress.

530.     At all relevant times, the Plaintiffs were within a cognizable and foreseeable zone of danger and fear, and, thus, at all relevant times, harm and/or injury to the Plaintiffs was reasonably foreseeable if such duty of care was breached. All Plaintiffs, Decedents, and Panamá Class members are, or were, members of farmers' cooperatives known to contest Dinant and its owner's claims to land in the Bajo Aguán, and all live, or did live, within the immediate vicinity of Dinant's claimed palm holdings in the Bajo Aguán, where Dinant's acts of aggression against farmers cooperatives and their affiliates were known to take place.

531.     At all relevant times, the Defendants and/or their agents knew, or reasonably should have known, that Dinant and/or its security personnel's conduct described herein – including, but not limited to, Dinant and/or its security personnel destroying the Plaintiffs' personal property; trespassing onto the Plaintiffs lands and invading their homes; observing the Plaintiffs in and around

116

their homes; brandishing weapons to intimidate the Plaintiffs; firing off rounds of weapons in the direction of the Plaintiffs or their homes; attacking the Plaintiffs with rubber bullets, teargas, and/or blunt instruments; kidnapping and/or abducting the Plaintiffs; violently causing Plaintiffs' deaths; and maintaining a clandestine graveyard on their property abutting the village of Panamá – would and did proximately result in the Plaintiffs, Decedents, and Panamá Class members' fear for their safety and in physical and emotional distress to the Plaintiffs, Decedents, and Panamá Class members.

532.     On information and belief, each security personnel who committed these wrongful acts was either a Dinant employee acting in the course of employment and/or was acting at the direction of, or in concert with, Dinant at the time.

533.     At all relevant times, the Defendants and/or agents had the power, ability, authority, and duty to stop Dinant and/or its security personnel from engaging in the conduct described herein and to intervene to prevent or prohibit Dinant and its security personnel from engaging in such conduct by ceasing their relationship of financial and moral support with Dinant and/or exercising remedies against Dinant that were available to the Defendants under the terms of their agreements with Dinant.

534.     Despite said knowledge, power, and duty, the Defendants and/or their agents negligently failed to stop engaging in the conduct described herein, to prevent or prohibit Dinant and its security personnel from engaging in such conduct, or to otherwise protect the Plaintiffs, and instead authorized Dinant's campaign of terror, thereby breaching their duty to the Plaintiffs, Decedents, and proposed class members.

535.     To the extent that said negligent conduct was perpetrated by Dinant and its security personnel, the Defendants aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint venture or enterprise with, confirmed, ratified, were the principals of,

and/or conspired with said conduct with the knowledge that the Plaintiffs, Decedents, and Panamá

Class members' fear and severe emotional and physical distress would, thereby, increase and with a

wanton and reckless disregard for the deleterious consequences to the Plaintiffs, Decedents, and

Panamá Class members.

536.    As a direct and legal result of the Defendants' wrongful acts, the Plaintiffs,

Decedents, and proposed class members were in fear for their own safety and have suffered, and

will continue to suffer, significant physical consequences, pain and suffering, and extreme and severe

mental anguish and emotional distress.

## COUNT VIII
### NEGLIGENCE
(Juana Does I, II, III, IV, V, VI and Juan Does VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XVI and
Panamá Class members against all Defendants)

537.    The Plaintiffs repeat and reallege each and every allegation set forth in the foregoing

paragraphs as if fully set forth herein.

538.    The acts described herein constitute negligence, actionable under the laws of District

of Columbia, the United States, and Honduras.

539.    As the facts recited herein demonstrate, the Defendants enabled Dinant and its

security personnel to commit the acts of violence and intimidation alleged in this complaint by

funding the expansion and/or consolidation of Dinant's oil palm holdings in the Bajo Aguán and

the reinforcement of its security forces, providing financial guarantees for its trade transactions, and

giving money to its main private financial backer, Banco Ficohsa, while expressly waiving limitations

that would have prevented Ficohsa from passing on the money to Dinant.  The Defendants directly

gave Dinant the resources to carry out its campaign of violence, gave private investors the

confidence to follow suit, and gave Banco Ficohsa the resources to act on that increased investor

confidence and expand its exposure to Dinant. Then, Defendant IFC allowed Dinant to rehabilitate

its reputation by offloading its security function to the Honduran state security forces, despite knowing that those forces had been complicit in the violence and would continue to use the same tactics as Dinant's own private forces had used for years.

540.    At all times, the Defendants retained the authority to demand information about Dinant's security practices and land rights conflicts and to condition further funding on an improvement in Dinant's record. Instead, the IFC passed up numerous chances to keep itself informed and, when it did learn of Dinant's pattern of violence, ignored what it had learned and continued to funnel money to Dinant.

541.    The Defendants owed a duty to the Plaintiffs to exercise reasonable care in conducting their due diligence on Dinant and Banco Ficohsa, disbursing financial support on several occasions between 2009 and 2014, and reviewing requests to waive its policy on exposure limits with respect to Banco Ficohsa's investments in Dinant.  The Defendants also owed a duty to the Plaintiffs to exercise reasonable care in considering, proposing, and approving measures to mitigate the violence, including advising Dinant on how to improve its security practices and designing the consensus-building process that is still underway.  In short, by broadcasting to the world that – thanks, in part, to their own environmental and social controls – it was safe to invest in Dinant's oil palm expansion in Honduras, the Defendants assumed a duty to the most likely victims of Dinant's well-known pattern of aggression – the farmers of the Aguán and especially their movement leaders – to take reasonable care to ensure that the very crimes that a reasonably careful due diligence process would have uncovered did not come to pass.

542.    The Defendants knew, or should have known, that Dinant would use IFC financing to expand and deploy its security personnel and violently suppress farmer opposition to its land grabs.

543.    The Defendants also knew, or should have known, that Banco Ficohsa would use a

significant part of the financial support it received from the Defendants to fund Dinant without maintaining adequate social and environmental controls to prevent the money from being misused to harm the Plaintiffs.

544.    Armed with that knowledge, the Defendants had a duty to use their contractual and financial leverage to prevent harm to the Plaintiffs or to withdraw from their investments in Dinant and Banco Ficohsa.  However, the Defendants failed in that duty.

545.    The Defendants were negligent in one, some, and/or all of the following ways, among others:

   a.   Downplaying the risk of violence and land conflict inherent in Dinant's operations in the Aguán during the due diligence process;

   b.   Misclassifying the risk level of the Dinant and Banco Ficohsa transactions;

   c.   Disbursing the first tranche of the Dinant Loan without conducting further due diligence, despite the change in political circumstances, the clearly escalating nature of the land conflicts around Dinant's holdings in the Aguán, and Dinant and Facussé's well-documented and widely-known record of violence and intimidation;

   d.   Introducing Dinant to Don McFetridge, a security consultant with links to mass atrocities in Indonesia;

   e.   Expanding their investments and loans to Banco Ficohsa, even after Dinant's abuses were incontrovertibly known at all levels of IFC management and Ficohsa's exposure to Dinant was known;

   f.   Granting Banco Ficohsa's request to waive the IFC's policy limiting a financial intermediary client's exposure to any one loan recipient in favor of Dinant;

   g.   Expanding their investments and loans to Banco Ficohsa, despite acknowledging that the bank had inadequate social and environmental management systems;

h.  Repeatedly extending deadlines for compliance with their social and environmental requirements based on the mere personal commitment of Dinant's late owner, Miguel Facussé;

i.  Failing to consider exercising their contractual and financial remedies for non-compliance with social and environmental commitments, including refraining from making additional investments in Banco Ficohsa, withdrawing their loans to Dinant or Banco Ficohsa, and demanding specific performance of contractual obligations; and

j.  Advising Dinant to disarm its own security guards and outsource all armed operations to the Honduran state security forces, despite the well-known track record of Honduran military and police for committing human rights abuses across Honduras and, in particular, the Aguán.

546.    As a direct and proximate cause of the Defendants' breaches of their duties, the Plaintiffs and other members of the proposed class have suffered, and will continue to suffer, the injuries described herein. This is because Dinant needed the money and the reputational cover to carry out its campaign of violence, both of which the Defendants provided knowingly and negligently. The Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

## COUNT VI
## TRESPASS
(Plaintiffs Juana Doe VII, Juan Doe VII, Juan Doe IX, Juan Doe X, Juan Doe XII, and Panamá Class members against all Defendants)

547.    The Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

548.    The acts described herein constitute trespass, actionable under the laws of District of Columbia, the United States, and Honduras.

549.    As the facts recited herein demonstrate, Dinant and/or its security personnel have

entered onto and/or invaded the Plaintiffs homes and/or yards without their consent, where Dinant security personnel have proceeded to ransack the Plaintiffs' homes and property and/or cause physical and psychological injuries to said Plaintiffs and their family members.

550.    On information and belief, each security personnel who committed these wrongful acts was either a Dinant employee acting in the course of employment and/or was acting at the direction of, or in concert with, Dinant at the time.

551.    The Defendants are liable to the Plaintiffs for Dinant's conduct under all the theories detailed above in Section V.

552.    As the facts recited herein demonstrate, the Defendants' financial support to Dinant and Banco Ficohsa, along with the reputation cover they provided, contributed substantially to the commission of these acts of trespass, as Dinant would not have been able to expand its holdings or commit acts of intimidation in Panamá without the Defendants' support.  Dinant's acts of trespass were reasonably foreseeable outcomes of the Defendants' assistance because it was well-known that Dinant security personnel commonly carried arms and used them to intimidate the Plaintiffs.

553.    The Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

## COUNT IX
## UNJUST ENRICHMENT
(Juan Doe XVII and all members of the Unjust Enrichment Class against all Defendants)

554.    The Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

555.    As alleged above, Dinant occupied, and/or still occupies to this day, extensive farmland in the Aguán. Facussé's ability to hold and use these properties – including 9 de Agosto, Concepción, Isla 1, Isla 2, Marañones, Lempira, Occidental, Paso Aguán, Laureles, San Isidro, Aurora, Confianza, Camarones, Chile, Tranvio, Brisas del Aguán, Panamá, and Plantel farms – was

achieved through fraud, intimidation, or outright violence committed against the Unjust Enrichment Class members. This benefit, which was conferred unjustly upon Dinant (and, through Dinant's repayment of loans, upon the Defendants) deprived farmer cooperatives (and their shareholders) – who had previously worked and held this land – of their shares and ownership interest. When farmer cooperatives and federations tried various tactics – including lawsuits, land occupations, land cultivation, and negotiation – to win back the land that was unjustly taken from them, Dinant responded with violence. To this day, Dinant unjustly retains this benefit and confers it upon the Defendants, who glean profits from Dinant's repayment on its loans to the Defendants and to Ficohsa.

556.    This land and its profits constitute a benefit that members of the Unjust Enrichment Class conferred (albeit unwillingly) on the Defendants, and the Defendants retain that benefit to this day.

557.    Under the circumstances, it would be unjust for the Defendants to retain the benefits of the land. Dinant deprived the members of the Unjust Enrichment Class of their share and ownership interest in this land through unjust, unlawful, and tortious means – including fraud, violence, and intimidation – and thereafter prevented the members of the Unjust Enrichment Class from challenging Dinant's ownership and occupation of the land by threatening the farmer federations with violence or actually employing violence against the federation leaders and members. The Defendants have benefited from this violence and Dinant's retention of the land; Dinant uses the land and the profits derived therefrom to enrich the Defendants with repayments and interest on loans to Dinant and Ficohsa. Under the circumstances, therefore, it would be unjust for the Defendants to continue to enjoy the benefits of the land.

558.    The Defendants' financial and reputational support to Dinant and Banco Ficohsa contributed substantially to Dinant's ability to unjustly retain the benefits of the land that the

members of the Unjust Enrichment Class conferred unwillingly on Dinant and the Defendants. By providing the money and other assistance for Dinant to expand its security forces, the Defendants enabled Dinant to fend off challenges to its land occupation through violence and illegal acts rather than through official or legal channels.

559.    Because the Defendants knew about Dinant's land conflicts with farmers in the Aguán and knew, or should have known, about Dinant's record of violence in handling those conflicts, it was foreseeable that the Defendants' assistance to Dinant would unjustly enrich Defendants. Defendants have unjustly retained, and continue to unjustly retain, the benefits of the Unjust Enrichment Class members' land.

560.    The members of the Unjust Enrichment Class are entitled to restitution in an amount to be determined at trial and to a constructive trust on all proceeds that Dinant has provided to the Defendants, both directly through repayment of loans to the IFC and indirectly through repayment of loans to Banco Ficohsa, up to the amount necessary for the Plaintiffs to recover the benefits of the land that Dinant continues to unjustly retain. They are also entitled to restitution on the full amount of repayment and interest of Dinant's predecessor, Cressida Corporation, paid to the IFC.

## X.    TIMELINESS AND TOLLING

561.    The Plaintiffs' claims are timely under the applicable statutes of limitations, including those of the District of Columbia and Honduras.

562.    This action was brought as soon as it was safe and practical to do so.

563.    The Plaintiffs have pursued their claims diligently and promptly after they determined that the IFC's "Consensus Building" process had not produced a remedy for the harms they had suffered. Since learning of the prospect for bringing an action in the United States courts, finding lawyers willing to represent them in the United States, and uncovering the Defendants' role

in causing their injuries, the Plaintiffs have moved expeditiously to file their claims against the Defendants.

564.    Because of the precarious security situation in Honduras and in the Bajo Aguán, in particular, none of the Plaintiffs could safely seek out lawyers or file any legal action implicating Dinant or Miguel Facussé until the present date.

565.    From November 2009 through the present, the Plaintiffs and their Decedents have been terrorized and killed by security forces acting on behalf of Dinant. In this environment, it was unsafe for the Plaintiffs to file the present complaint without imminent risk of imminent harm or death.

566.    Indeed, in the wake of the October 18, 2016 killings described above, many farmers affected by Dinant's campaign of terror – including some Plaintiffs – fled their homes for fear of their lives. In those circumstances, they were unable to safely meet with counsel or take the necessary steps to file this action.

567.    By the same token, the Plaintiffs could not have found lawyers to represent them in this action until a lull in assassinations had lasted for long enough to provide some confidence that lawyers could safely travel to visit their clients.  This is especially true because lawyers were among those targeted for murder at the height of the assassinations; the murders of attorney Antonio Trejo and his brother José in late 2012 and 2013 deterred potential counsel from providing legal services to the Plaintiffs. In fact, counsel for the Plaintiffs in this action were only able to consider traveling to the Aguán to meet the Plaintiffs beginning in mid-2015, and, even then, their initial trip to the region was postponed due to security concerns for several months. During one trip, counsel were intimidated with gunfire while meeting with a Plaintiff. Over the past year, several of the individuals with whom counsel met have been the subject of death threats and have had to flee their homes for safety reasons.

568.    This action was also brought as soon as practicable after the Plaintiffs learned, or should have learned, in the exercise of reasonable diligence of the Defendants' role in their injuries and of the Defendants' failure to provide them with an adequate remedy.

569.    Prior to the release of the CAO's audit of the IFC's investment in Dinant in December 2013, none of the Plaintiffs had any means of knowing about the IFC's role in supporting Dinant in the Bajo Aguán.  And prior to the release of the CAO's compliance report on the investments in Banco Ficohsa in August 2014, none of the Plaintiffs had any means to know of the very existence of the IFC-AMC, let alone its role in keeping the money flowing to Dinant.

570.    The Plaintiffs – except for Juan Doe XVI – are poor residents of rural communities in the Bajo Aguán, and they have little or no access to most forms of electronic communication.  In fact, none of the Plaintiffs was aware that either of the Defendants had any connection at all to their injuries until representatives from the IFC and/or the CBI visited their community for the first time in or around June 2014.

571.    Defendant IFC lulled the Plaintiffs into refraining from filing suit through the IFC-sponsored consensus-building process run by CBI. CBI called for community stakeholders and advocates to attempt to resolve these issues through the dialogue process and to refrain from legal actions while dispute resolution efforts were underway.  These efforts were to include the creation of a credible company-level grievance mechanism, strengthening of the investigation and prosecution of past crimes, and an attempt to resolve the deep roots of land conflict in the Aguán. After the CBI process began, the Plaintiffs delayed filing suit in hopes that the dispute resolution process would succeed in addressing these core issues. To date, however, Dinant lacks a credible grievance mechanism that could provide redress for the Plaintiffs' injuries; investigation and prosecution of past crimes has stalled, and there has been no visible progress on land conflict.  The IFC itself admits that Dinant's own commitment to hire a credible third party consultant to

investigate "past security incidents" is nothing more than a "work in progress." The Plaintiffs would have filed suit long ago if they had not been urged to restrain themselves during a dispute resolution process that has, in the end, born little fruit.

572.    Juana Doe VIII is eight years old and is still a minor.

## XI.    DEMAND FOR JURY TRIAL

573.    The Plaintiffs demand a trial by jury on all issues so triable.

## XII.    PRAYER FOR RELIEF

574.    WHEREFORE, the Plaintiffs respectfully request the Court to:

(a) Enter judgment in favor of each of the Plaintiffs and the members of the proposed classes on all counts of the Complaint;

(b) Declare that the Defendants have violated the laws of the various states, including the District of Columbia, the federal common law, and/or the law of Honduras;

(c) Award the Plaintiffs and the members of the proposed classes damages, including compensatory and punitive damages in an amount greater than $75,000;

(d) Grant each of the Plaintiffs and the members of the proposed classes appropriate injunctive, equitable, and/or declaratory relief, including the injunctive relief described above to prevent further injury to the Panamá Class and a constructive trust for the benefit of the Unjust Enrichment Class;

(e) Award each of the Plaintiffs and the members of the proposed classes the costs of suit, including reasonable attorneys' fees; and

(f)  Award each of the Plaintiffs and the members of the proposed classes such

other and further relief as the Court deems just under the circumstances.

Dated: March 7, 2017

Respectfully submitted,

Marco Simons, D.D.C. and DC Bar #492713
marco@earthrights.org
Marissa Vahlsing, D.D.C. and DC Bar #1025043
marissa@earthrights.org
Richard Herz
rick@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street, NW, Suite 401
Washington, D.C. 20006
Tel: (202) 466-5188
Fax: (202) 466-5189

Jonathan Kaufman, D.D.C. and DC Bar #996080
LAW OFFICE OF JONATHAN KAUFMAN
341 W. 24th St., Apt. 21C
New York, NY 10011
T: (212) 620-4171

Judith Brown Chomsky
LAW OFFICES OF JUDITH BROWN CHOMSKY
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367

Lauren Carasik
lcarasik@gmail.com
WESTERN NEW ENGLAND UNIVERSITY
SCHOOL OF LAW
International Human Rights Clinic
1215 Wilbraham Road
Springfield, MA 01119
Tel: (413) 782-1504

*Counsel for Plaintiffs*